## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ALLEY'S OF KINGSPORT, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION FILE NO. |
| | ) | No. 11-100C |
| v. | ) | (Judge Firestone) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| COLONIAL CHEVROLET CO., INC., | ) | |
| *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION FILE NO. |
| v. | ) | 10-647-C |
| | ) | (Judge Firestone) |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| SPITZER MOTOR CITY, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION FILE NO. |
| | ) | No. 12-900C |
| THE UNITED STATES, | ) | (Judge Firestone) |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF COLONIAL'S SUR-REPLY TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS ALLEGING TAKINGS OF GENERAL MOTORS DEALERSHIP AGREEMENTS

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**……………………………………………………………………..2

**I. INTRODUCTION AND SUMMARY**…………………………………………………………5

**II. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE WIND DOWN AGREEMENTS WERE SIGNED AS A RESULT OF A UNILATERAL MISTAKE UNDER UNUSUAL CIRCUMSTANCES OR A RESULT OF COERCION….10**

*A. Under Federal and Michigan Law, summary judgment cannot be granted if there is a genuine issue of material fact concerning whether there were unusual circumstances present that may have contributed to the making of either a mutual or unilateral mistake, and this is especially true if the Government Knew, Should Have Known, or created the risk that the dealers were acting in ignorance of the scope of the release*………..........................9

*a. Congress Confirmed the fact that Unusual Circumstances Surrounded The Execution of the WDAs, and Confirmed Factors Did Exist That Create A Genuine Issue of Material Fact On The Issues of Unilateral Mistake, Coercion, And Whether or Not old GM and the Government Knew of Should Have Known the GM Plaintiffs may Not Understand the Scope of the Release*………………………..12

*b. The SIGTARP Report Confirms Unusual Circumstances Surrounded The Execution of the Wind-Down Agreements, and Confirms There is A Genuine Issue of Material Fact On Whether or Not there was Coercion In the Form of "Irresistible Pressure" From the Government toward Old GM and the GM Plaintiffs To Terminate The GM Plaintiffs Dealerships*...………………………...14

*c. The GM Plaintiffs Affidavits Are Valid Summary Judgment Evidence, And They Create A Genuine Issue of Material Fact As to Whether Or Not the Government and Old GM Knew Or Should Have Known the GM Plaintiffs Did Not Understand the Scope of the Wind-Down Agreements, And Were Signing Them In Response to the "Irresistible Pressure" From the Government Resulting In Coercion*...………………………………………………………………………...19

**III. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE COLONIAL DEALERS VOLUTARILY SIGNED THE WIND-DOWN AGREEMENTS, AND THEREFORE, WHETHER IT WAS THE WIND-DOWN AGREEMENTS VS GOVERNMENT ACTION THAT TERMINATED THE GM PLAINTIFFS' DEALERSHIPS…**……………………………………………………………………….22

**IV. PRAYER**………………………………………………………………………………….26

PLAINTIFF COLONIAL'S SUR-REPLY TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS ALLEGING TAKINGS OF GENERAL MOTORS DEALERSHIP AGREEMENTS

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1154-55 (Fed. Cir. 2014)..9,10,11, 14, 24

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)…………………………………...20

*Alves v. United States*, 133 F.3d 1454, 1458 (Fed. Cir. 1998)…………………………………23

*Argenyi v. Creighton Univ.,* 703 F.3d 441, 446 (8th Cir. 2013)………………..……………21

*Axion Corp. v. United States*, 68 Fed. Cl. 468, 478 (2005)…………………………… 5, 10,11, 20

*Barryton State Savings Bank v Durkee*, 37 N.W.2d 892 (1949)……………...……………......10

*BMR Gold Corp. v. United States*, 41 Fed. Cl. 277, 282 (1998)…………………………………22

*Brace v. United States*, 72 Fed. Cl. 337, 359 (2006), *aff'd,* 250 F. App'x 359 (Fed. Cir. 2007)….22

*Brookhart v. Janis*, 384 U.S. 1 (1966)……………………………………………………………10

*Burnett Elecs. Lab., Inc. v. United States,* 479 F.2d 1329, 1333 (Ct. Cl. 1973)……….................10

*Consol. Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 810 (Fed. Cir. 1990)……………...24

*Cooper v. Harris*, 137 S. Ct. 1455 (2017 )……………………………………………..…………..7

*Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998)………………………………………..19

*District* of Columbia v. Wesby, 138 S. Ct. 577, fn 1 (2018). …………………..……………………6

*Dupage Forklift Serv., Inc. v. Mach. Distrib., Inc., N*o. 94 C 7357, 1995 WL 623093 (N.D. Ill.
Oct. 20, 1995) …………………………………………………………………………………….24

*F.C.C. v. Florida Power Corp.,* 480 U.S. 245, 253 (1987)…...............................................22

*Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013)……………………….19

*Eulrich v. Snap-On Tools Corp.*, 121 Or. App. 25, 853 P.2d 1350 (1993), *cert. granted, judgment
vacated,* 512 U.S. 1231,  (1994)……………………………………………………………………..24

*Harris v. J.B. Robinson Jeweler,* 627 F.3d 235, 239 (6th Cir. 2010)……………………………21

*Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013)………………………………………...21

*Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2430-31 (2015)………………………………………11

*Kirleis v. Dickie, McCamey & Chilcot*e, PC, 560 F.3d 156, 161–162 (3d Cir. 2009)…..….…..20

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)………………………………………....19

*MZ Ventures, LLC v. Mitsubishi Motors Sales of America, Inc.*, Bus. Franchise Guide (CCH), P11,692 (C.D. Cal. Sept. 1, 1999)…………………………………………………………..24

*Norman v. United States*, 429 F.3d 1081, 1089 (Fed. Cir. 2005))……………………………22, 23

*Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003)…………………………………………....19

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945)…..….…..24

*Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir.)…………………………………………….19

*Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001)……………………………...21

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1007-08 (1984)……………………… ……………..22

*Siegel Oil Co. v. Richardson*, 208 F.3d 1366, 1374(Fed. Cir. 2000)……………………… ……20

*Spring Street Partners-IV, L.P. v. Lam,* 730 F.3d 427, 441 n.7 (5th Cir. 2013)………………20,21

*Velazquez-Garcia v. Horizon Lines of P.R., Inc.,* 473 F.3d 11, 18 (1st Cir. 2007)………………20

*Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 459–460 (7th Cir. 2014)…………………………...20

*Woolner v Layne*, 181 N.W.2d 907 (1970)…………………………………………………......5, 10

## STATUTES

*Automobile Dealers' Day in Court Act,* 15 U.S.C. § 1221, *et. seq.* (1976)………………………..7

## OTHER AUTHORITIES

Instruction 1.5, *Model Jury Instructions of the Ninth Circuit.* ………………………………… 7

Steven Eagle, *Property Rights After Horne*, 10 N.Y.U. J.L. & Liberty 669 (2016)……………...11

PLAINTIFF COLONIAL'S SUR-REPLY TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS ALLEGING TAKINGS OF GENERAL MOTORS DEALERSHIP AGREEMENTS

## I. INTRODUCTION AND SUMMARY

The Government's Motion for Summary Judgment (ECF 136) and Reply Brief to Plaintiff's Response to the Government's Motion for Summary Judgment (ECF 315) are wrong on both the relevant law and the facts,[1] and ignore the standard of review as it is required to be applied.

First, the Government is wrong as a matter of fact and law when it claims that the unambiguous nature of the Wind-down Agreements ("WDA") bars the ability of Colonial to raise a question of material fact necessary to establish mistake or coercion as a ground to challenge the validity of the WDA releases. The Government's articulation of general legal principles regarding mistake completely misses the issues raised in this unique factual situation. For example, its reliance solely on general principles ignores the controlling exception in black letter law that "courts may use the equitable remedy of reformation to correct a unilateral mistake if the Government knew or should have known of a mistake." *Axion Corp. v. United States*, 68 Fed. Cl. 468, 478 (2005)(opinion by Judge Firestone). Michigan's jurisprudence agrees. *See Woolner v Layne*, 181 N.W.2d 907 (Mich. 1970). In such cases, even when the mistake is the legal meaning of a release, "reformation is not barred if the party seeking reformation can establish that such unusual circumstances are present." *See Axion Corp.* 68 Fed. Cl. at 478. Specifically, when companies made release agreements under unusual circumstances "based on its mistaken belief as

---

[1] In reply to any Government claim that Colonial failed to plead facts or conclusions supporting arguments of the invalidity or unenforceability of the releases of the WDAs, Plaintiffs had no duty to plead a reply to the affirmative defenses. Pleadings for answers to affirmative defenses are not listed in FRCP Rule 8(c), Plaintiffs are not required to reply to affirmative defenses unless a court orders it. FRCP Rule 7(a)(7). *See: Gulf Refining Co. v. Fetschan*, 130 F.2d 129 (6th Cir. 1942)("plaintiff not required to plead or reply to defendant's answer, unless it contains a counterclaim, Rule 7 of the Federal Rules of Civil Procedure. See Moore's Federal Practice, Vol. 1, p. 421 *et seq".*) *Garner v. Morales*, 237 F.R.D. 399 (S.D. TX. 2006); *FDIC v. First Nat'l Fin. Co.*, 587 F.2d 1009, 1012 (9th Cir. 1978) ("No reply to the answer is allowed, unless ordered by the court."); *Traylor v. Black. Sivalls & Bryson, Inc.*, 189 F.2d 213, 216 (8th Cir. 1951) *Kansas-Nebraska Natural Gas Co. v. Village of Deshler, Neb.*, 192 F. Supp. 303, 311 (D. Neb. 1960) (pursuant to Rule 7, filing of a reply was not appropriate), *aff'd* 288 F.2d 717 (8th Cir. 1961); *Strubel v. Hartford Ins. Co. of the Midwest*, 2010 U.S. Dist. LEXIS 150388 (M.D. FL. 2010).

PLAINTIFF COLONIAL'S SUR-REPLY TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' CLAIMS ALLEGING TAKINGS OF GENERAL MOTORS DEALERSHIP
AGREEMENTS

to the scope of the release," as alleged by the GM Plaintiffs and supported by affidavits and other evidence, Judge Firestone previously held that the issue is not amenable to resolution on summary judgment. *See id.* Whether viewed under Federal law or Michigan law, the outcome is the same.

Here, when the facts are viewed in the light most favorable to the GM Plaintiffs with all doubts resolved in their favor, there is a genuine issue of material fact as to whether coercion existed by the Government toward both old GM and the GM Plaintiffs in the context of these agreements, and whether or not the Government and old GM knew or should have known the GM Plaintiffs would not understand the meaning of the agreements by the threat and fact of the deadline they were given to choose to sign it or be terminated through bankruptcy.

Prior to the signing of the wind-down agreements, on June 3, 2009, members of Congress specifically told the Government and others that the WDAs were written in a manner that could not be understood within the twelve-day [2] deadline where the GM Plaintiffs were confronted with the imperative demand to sign or be terminated. Requests for more time were rejected. The Government and old GM cannot deny that this Congressional transcript is <u>objective</u> evidence that they were made actually aware of the high risk of misunderstanding the content of the WDAs. Furthermore, all the GM Plaintiffs affidavits confirm the dealers did not understand the scope of

---

[2] The Government wrongly claims that the law of releases holds the dealers accountable for absolutely knowing the full legal effect of the releases they were compelled to sign under the circumstances at issue. The Government is the movant in this summary judgment proceeding: it has the duty to present evidence in the record to support its claim that there are no genuine issues of material fact. In this regard, there is a genuine issue of material fact as to what both objectively and subjectively is required of the dealers at the time they were forced to decide in twelve days what to do. The Government produced zero evidence in this record to show what due diligence the dealers should have done to understand that they were abandoning their constitutional rights to redress for a Takings under the Fifth Amendment.  How ironic would it be for the Government to succeed with an argument in this Court that it did not know such claims could be brought but that the dealers should have known?  Unlike the Government, the dealers did not have the legal duty under Executive Order 12630 of the president to inquire into the Takings consequences of the proposed governmental action, and they did not have full time lawyers assigned to do that precise task.  There is no support in the law based on these facts and the record in this case to hold the dealers accountable for knowing the scope of the release under the circumstances..

PLAINTIFF COLONIAL'S SUR-REPLY TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' CLAIMS ALLEGING TAKINGS OF GENERAL MOTORS DEALERSHIP
AGREEMENTS

the release extended to an abandonment of their constitutional rights. Under the standard of review, there is a genuine issue of material fact as to whether the Government and old GM knew or should have known that the GM Plaintiffs did not and would not understand the scope of the wind-down agreements, particularly as to the waiving of constitutional rights regarding an involuntary taking by the Government.

Second, on the issue of coercion, the SIGTARP Report[3], constitutes both direct and circumstantial evidence[4] that it was the Government, not old GM, that required the termination of the GM Plaintiffs dealership or else the billions of federal funding would be withheld. Moreover, the Report is also clear that it was not old GM's plan to terminate the dealerships at the accelerated pace or without full compensation as the Government required. In fact, the Report shows GM officers saw no financial benefit to GM to the Government's demand that the dealerships be terminated *en mass* and at an accelerated pace; however, in order to receive the Government funds, it was a requirement. Additionally, U.S. Treasury officials' admissions in the Report, objectively establish it was the Government's plan and intent to target and terminate the dealerships as a requirement of funding in order to implement their vision for GM going forward. By the time the WDAs were presented to the GM Plaintiffs, circumstantial evidence confirms old GM was simply a puppet of the Government. The Government, only weeks before, fired GM's CEO (Rick Wagner), and the Government controlled all of the decisions including using bankruptcy and the wind-down agreements to aggressively target and terminate the GM Plaintiffs

---

[3] The SIGTARP Report, explicitly authorized by the United States Congress, is an official report and is a binding admission upon it.

[4] All federal circuits require informing jurors that "You are to consider both direct and circumstantial evidence. Either can be used to prove any fact. The law makes no distinction between the weight to be given to either direct or circumstantial evidence." Instruction 1.5, *Model Jury Instructions of the Ninth Circuit.* Regardless of the case before a court, this statement of law is modern and accurate. *See, Cooper v. Harris*, 137 S. Ct. 1455 (2017); *District of Columbia v. Wesby*, 138 S. Ct. 577, fn 1 (2018).

PLAINTIFF COLONIAL'S SUR-REPLY TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' CLAIMS ALLEGING TAKINGS OF GENERAL MOTORS DEALERSHIP
AGREEMENTS

dealerships. The circumstantial evidence in the SIGTARP Report for coercion constitutes binding admissions and is strong: far more than merely sufficient to show the existence of a genuine issue of material fact as to whether or not coercion existed by the Government toward both old GM and the GM Plaintiffs in the context of signing the wind-down agreements. This coercion[5] not only supports a finding of the requisite unusual circumstances necessary for reformation, but it also confirms there is a genuine issue of material fact as to whether or not the release in the wind down agreements is unenforceable as to the Government.

Third, the genuine issue of material fact as to whether the agreements were signed voluntarily vitiates the Government's argument that the WDA, not it's actions, terminated the GM Plaintiff's dealership agreements. In every case cited by the Government to support its argument, it was either undisputed that the agreements were signed voluntarily or it was determined by the trier of fact that the agreement was signed voluntarily at trial, not at summary judgment. Because that there is, *at a minimum,* a factual dispute between the Government and the Colonial plaintiffs whether the WDAs were signed voluntarily, there is a genuine issue of material fact as to whether or not it was the Government's action that caused the terminations, not the agreements themselves.

Here, when the standard of review of viewing the evidence in the light most favorable to the GM Plaintiffs is followed, it is clear that the WDA's were not signed voluntarily. The evidence overwhelmingly shows the GM Plaintiffs fought not to sign the wind-agreements. Congressional transcripts confirm widespread complaints to Congress by the GM Dealers, and

---

[5] Congress has long been concerned about the fragility of auto dealers to withstand the power of auto manufacturers and those acting in concert with them when the dealer's property rights are targeted to force them to abandon their franchises. Congress carefully protected auto dealers from all forms of coercion including actual or threatened intimidation. Furthermore, it stressed in its standards that equitable principles such as 'fair and equitable' and 'good faith' were required elements before dealers could be forced to give up their dealerships. See, *Automobile Dealers' Day in Court Act,* 15 U.S.C. § 1221, et. seq. (1976).

8

PLAINTIFF COLONIAL'S SUR-REPLY TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' CLAIMS ALLEGING TAKINGS OF GENERAL MOTORS DEALERSHIP
AGREEMENTS

the statements from the senators confirm signing WDAs were not voluntary acts, but the only alternative given over immediate termination in the bankruptcy. Additionally, the facts stated found by SIGTRAP and documented in its Report, further supports the conclusion that there was nothing voluntary about the signing of the WDAs nor the termination of the GM Plaintiffs dealership. The agreements were only signed following the threat of immediate termination, and nearly all of the terminated dealers (including all GM Plaintiffs) applied in the appeals process to unwind the wind-down agreements and the termination of their dealerships agreements.

It should be noted that the Government's argument that the WDA, not Government action, terminated plaintiff's dealership agreements has a faulty necessary premise. It fails to recognize the Government's action that caused a taking involved coercing old GM to terminate the dealerships by giving the GM Plaintiffs a choice between termination through the vehicle of bankruptcy or termination through the vehicle of the WDA, which themselves were still apart of the bankruptcy. In other words, whether the GM dealers went through door 1 (the wind-down agreement) or door 2 (the bankruptcy court order), both paths directly led to the termination of their dealerships by a Government action that was specifically designed to target and terminate their dealerships without just compensation. Either path created the "irresistible pressure" the Circuit Court in *A & D Auto Sales* recognized could cause a taking. *See A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1154-55 (Fed. Cir. 2014)("Our predecessor court found coercion…when the embargo placed 'irresistible pressure' on the plaintiffs to turn the property over to the United States, it created a taking.")

If the facts are viewed in the light most favorable to the Plaintiffs with all doubts resolved in their favor, the WDAs must be seen as nothing more than a thin veil that does little more than attempt to conceal the Government's irresistible pressure that was directed and intended to

terminate the GM Plaintiff's dealerships without just compensation. Whether through bankruptcy or through the wind-down agreement did not matter--an involuntary taking without just compensation was the result. Moreover, there is a genuine issue of material fact as to whether or not the Government has clean hands in the context of the signing of the agreement they are seeking to enforce. If not, the agreements are unenforceable as to the Government in equity.

Under the facts of this case, the issues before the Court cannot be properly resolved by summary judgment.

## II. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE WIND DOWN AGREEMENTS WERE SIGNED AS A RESULT OF A UNILATERAL MISTAKE UNDER UNUSUAL CIRCUMSTANCES OR A RESULT OF COERCION

*A. Under Federal and Michigan Law, summary judgment cannot be granted if there is a genuine issue of material fact concerning whether there were unusual circumstances present that may have contributed to the making of either a mutual or unilateral mistake, and this is especially true if the Government knew, should have known, or created the risk that the dealers were acting without an accurate understanding of the scope of the release.*

Repeatedly, the Government asks the Court to limit its review to the contract "as written." See e.g. Def. Reply (ECF 315) at 10.  The Government is attempting to remove this court's ability to inquire about such factual matters such as whether there were highly unusual circumstances, whether the government was involved in any way in creation of a plan to coerce or intimidate or pressure surrounding the creation of the WDAs that included the possibility that the dealers would not understand they were being forced to abandon their constitutional right against the government itself.

Under both Federal and Michigan law, however, the Court must look beyond contract to underlying circumstances to determine whether or not the Government or defendant should have known of a unilateral mistake by the GM Plaintiffs regarding their understanding of the scope of the wind-down agreements in order to make an equitable determination.

Under federal law[6], courts may use the equitable remedy of reformation to correct a unilateral mistake if the Government knew or should have known of a mistake. *See id; see also Burnett Elecs. Lab., Inc. v. United States,* 202 Ct.Cl. 463, 479 (1973) ("The remedy [of reformation] has been extended from its traditional area of application—mutual mistake by the parties—to include cases where the Government knew or should have known of a mistake."). In such cases, "reformation is not barred if the party seeking reformation can establish that such unusual circumstances are present." *Axion Corp. v. United States*, 68 Fed. Cl. 468, 478 (2005). In such cases, the Court may void or reform the contract. *Id. at* 475..

Michigan law recognizes this principle. The Michigan Supreme Court stated:

> "if one party at the time of the execution of a written instrument knows not only that the writing does not accurately express the intention of the other party as to the terms to be embodied therein, but knows what that intention is, the latter can have the writing reformed so that it will express that intention."

*Woolner v Layne*, 181 N.W.2d 907 (Michigan 1970). *See also, Barryton State Savings Bank v Durkee*, 37 N.W.2d 892 (Michigan 1949)(a contract may be reformed based on a unilateral mistake where the other party had knowledge of the mistake and concealed that knowledge).

It is critically important to focus on the fact that the Supreme Court made it clear that in a Takings case that Government claims of waiver of Constitutional Takings protection must be rejected if the waiver was obtained coercively. *See Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2430-31 (2015); *see also* Steven Eagle, Property Rights After Horne, 10 N.Y.U. J.L. & Liberty 669 (2016). [7]

---

[6] As previously explained, according the United States Supreme Court, the waiver of a takings claim is a federal question controlled by federal law. *See Brookhart v. Janis*, 384 U.S. 1 (1966)("The question of a waiver of a federally guaranteed constitutional right is, of course, a federal question controlled by federal law.").

[7] It is patently obvious that the Government is trapped on the horns of a dilemma. If it admits that it knew of the potential for Takings claims and induced old GM to pressure the dealers to knowingly abandon their constitutional rights, it runs squarely afoul of the prohibition against forcing unconstitutional conditions through a third party.  But

PLAINTIFF COLONIAL'S SUR-REPLY TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS ALLEGING TAKINGS OF GENERAL MOTORS DEALERSHIP AGREEMENTS

Importantly, when determining whether or not the circumstances warranted reformation, this Court has relied on declarations of the party seeking the release as well as evidence of the surrounding circumstances in making a determination of intent. *See Axion, supra at* 477–79. . Moreover, in this case, the Federal Circuit provided its guidance stating,

> "[t]he circumstances relevant to the issue of coercion include but are not limited to whether the Government insisted on the terminations, whether the terminations would have occurred in any event absent Government action, whether the Government financing was essential to the companies, whether the Government had any role in creating the economic circumstances alleged to give rise to coercion, and whether the Government targeted the dealers for termination."

*A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1155–56 (Fed. Cir. 2014).

In application to this case, if the facts are viewed in the light most favorable to the Plaintiffs and all doubts are resolved in Plaintiffs favor, the circumstances are highly unusual and there is a question of material fact on whether or not the Government was coercive through the use of "irresistible pressure" on both old GM and the GM Plaintiff dealers at the time the wind-down agreements were signed.

> **a. *Congress Confirmed the fact that Unusual Circumstances Surrounded The Execution of the WDAs, and Confirmed Factors Did Exist That Create A Genuine Issue of Material Fact On The Issues of Unilateral Mistake, Coercion, And Whether or Not old GM and the Government Knew of Should Have Known the GM Plaintiffs may Not Understand the Scope of the Release.***

Prior to the signing of the WDAs, The June 3, 2009, the hearing transcript of the Senate Committee On Commerce, Science, And Transportation, 111th Congress (PL MSJ Appendix (ECF 295-1) Exhibit 3), objectively proves that the Government and old GM were made aware by

---

if it claims, as it does, that it had no idea that such claims might be possible and it was all old GM's idea, then it has to produce evidence that old GM intended to terminate the constitutional claims of the dealers. The Government cannot procure that evidence because it is obvious it does not exist. So, at the end of the day, the Government is left pretending it is a third party beneficiary rather than, at best, an incidental beneficiary; and at worst, refusing to concede that it was using an artifice to deprive the dealers of their property and constitutional rights.  This is precisely what Rattner admitted in his book

PLAINTIFF COLONIAL'S SUR-REPLY TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' CLAIMS ALLEGING TAKINGS OF GENERAL MOTORS DEALERSHIP
AGREEMENTS

direct questions from senators that the WDAs were written in a manner that could not be understood in the time frame the GM Plaintiffs were given as a deadline to sign it. One of the Senators directly states to the CEO of GM, Frederick A. Henderson,

> "I got a copy of the wind-down agreements last night. It's 12 pages, single-spaced. It would take a team of lawyers that **obviously devised it, to make it as difficult as and as dense as possible, so no one could possibly make a decision within the 10 days they were required to make a decision.** They have to **sign it within the 10 days or they close down with no assistance whatsoever."**
> PL MSJ Appendix (ECF 295-1) p.60.(emphasis added).

Furthermore, on the issue of the hyper-short time frame to review the release, the transcript confirms there would be no extension. The transcript states:

> [Senator Begich asks] "…in the time lines that have been granted, **the June 12th time line, if I got that right, is there any opportunity to expand that; yes or no**? [Mr. Henderson CEO of GM responds] "In our case, Senator, **no."** [Senator Begich asks] Ok. In the parts of the appeal process that they have before June 9 or 12, whatever the date is again, on the appeal process, **is there any opportunity to extend that beyond the target date of when they have to sign**? [Mr. Henderson responds.] **"No."**
> PL MSJ Appendix (ECF 295-1) p.61.(emphasis added).

On the issues of coercion, whether the GM Plaintiffs had a voluntary choice, and what would happen if a dealership chose not to sign the wind-down agreements, the transcript shows:

> [Senator Begich interrupts],  "If I could interrupt, **it's kind of a no choice deal?"** [To which, Mr. Henderson, GM CEO, responds] **"It is.** …" PL MSJ Appendix (ECF 295-1) p.61. (emphasis added).

> [Mr. Henderson, GM CEO, further stated] "In the case of **a dealer that chooses not to sign the wind-down agreement,** they won't have a contractual relationship with the new General Motors. And in that case---[Senator interjects,] **"So out then"**---so the old **General Motors would reject their contract."** PL MSJ Appendix (ECF 295-1) p.61(emphasis added).

Under the standard of review of viewing the evidence in the light most favorable to the GM Plaintiffs, old GM and the Government cannot deny they were given objective, actual awareness that under the time frame given, a mere 12 days, that the WDA as written would not be

13

understandable by the GM Plaintiffs, especially considering the senators addressed the issue directly with Frederick Henderson (who was GM's new CEO, chosen by the Government's Auto Task force a few weeks earlier). On this evidence alone there is a genuine issue of material fact as to whether or not the Government and old GM knew or should have known the GM Plaintiffs (or anyone in their positions) could understand that the scope of the release including a claimed waiver of constitutional rights regarding an involuntary taking by the Government. Under the circumstances, it is not surprising that all of the GM Plaintiffs affidavits confirm they did not understand the scope of the release. PL MSJ Appendix (ECF 295-1) p.415-498.

Further, the Congressional transcript also confirms there is a genuine issue of material fact regarding whether or not the GM Plaintiffs were subjected to coercion by old GM and the Government to sign the wind-down agreements involuntarily before they had a meaningful opportunity to understand them. As the transcript confirms, they were faced with a "no choice deal" and that they could either sign the wind-down agreement that they did not have the time to understand or have their dealership agreements terminated involuntarily through the 363 bankruptcy that the Task Force required GM to file in order to receive Government assistance. Under these facts, there is a genuine issue of material fact as to whether or not the agreements were signed voluntarily, and whether or not Government coercion existed in the unusual circumstances surrounding their signing.

   ***b. The SIGTARP Report Confirms Unusual Circumstances Surrounded The Execution of the Wind-Down Agreements, and Confirms There is A Genuine Issue of Material Fact On Whether Or Not there was Coercion In the Form of "Irresistible Pressure" From the Government toward Old GM and the GM Plaintiffs To Terminate The GM Plaintiffs Dealerships.***

The circumstances relevant to the issue of coercion in the form of "irresistible pressure", according to the *A & D Auto Sales* are present in this case directed from the Government toward

14

old GM and the GM Plaintiffs based on the SIGTARP report, when viewed in the light most favorable to the GM Plaintiffs.

First, the Report confirms that the Government, specifically the Auto Task Force, insisted on the GM Plaintiff terminations as a condition of continuing to receive Government funding during the liquidity crisis, and GM sent the WDA's in response to the Task Force's insistence that GM accelerate its dealership terminations. The report makes clear the following:

- "the Task Force and had the responsibility of evaluating the companies' restructuring plans and negotiating the terms of any further assistance." PL MSJ Appendix (ECF 295-1) p.7

- "On February 17,2009, both companies submitted their restructuring plans." PL MSJ Appendix (ECF 295-1) p.8

- "**the Auto Team reviewed the companies' proposals and rejected them**, noting, among other things, that **GM's proposed "pace" of closing dealerships was too slow** and was an obstacle to its viability." PL MSJ Appendix (ECF 295-1) p.10.

- "**GM was given 60 days to submit a "more aggressive plan"** overall, including planning for their **dealership terminations, and was provided an additional $6 billion of TARP funds as working capital.**" PL MSJ Appendix (ECF 295-1) p.18. [It should also be noted that during this 60 day period the Auto Team fired GM's CEO, Rick Wagner, and replaced him with Frederick Henderson, who was essentially under the Auto Team's complete control.]

- "**In response to the Treasury Auto Team's rejection of GM's [] restructuring plan**[] and its explicit comment that GM's "pace" of dealership closings was too slow and an obstacle to its viability, **GM** and Chrysler **substantially accelerated their**

15

**dealership termination timetables**. In GM's case, instead of gradually reducing its network by approximately 300 dealerships per year through 2014, as GM had proposed in the plan initially  submitted to Treasury, **GM  responded to <u>the Auto Team's  decision by terminating 1,454  dealerships'</u>** ability to acquire new GM vehicles and giving  them until  October 2010 to wind down  operations completely." PL MSJ Appendix (ECF 295-1) p.33;

- During  the first  week  of June  2009, **GM  sent <u>wind-down  agreements  to 1454 dealerships</u>** to  end  their  franchise  agreements  in  October  2010.   **<u>To receive compensation as part of bankruptcy,</u> dealerships were <u>required to sign the wind-down agreements </u> and submit them to GM by June 12, 2009.**  PL MSJ Appendix (ECF 295-1) p.24;

Further, the Report makes it clear that it was the Government's Auto Task Force, not GM officials, that were targeting the dealers for termination based on the Government's unproven theory about how GM should be run. The report also creates a genuine issue of material fact in the context of coercion as to whether it was the Government or GM that was actually making the decision to terminate the GM Plaintiff Dealerships. When viewing the facts in the light most favorable to the GM Plaintiffs, the Report shows that at the time the wind-down agreements were sent, GM was under the Auto Task Force's complete control, and it was really the Task Force that was dictating the wind-down agreements be sent as a part of an overall strategy to terminate the dealerships as quickly as possible.

- "An **Auto Team memo** dated  May  11,2009,  five  weeks  after  it  wrote  its  Viability Determination, dealership reductions generally involve  near-term sacrifice and  long-term gain." PL MSJ Appendix (ECF 295-1) p.33

- A **Treasury document** summarizing the efforts of the AIFP noted that, although Chrysler and GM were on two different paths, "their best chance of success  may well  require utilizing the bankruptcy code in a quick and  surgical way." **According to Treasury,** this would  not  entail  liquidation  or  a  conventional  bankruptcy.  Instead  a  "structured" bankruptcy would function as a tool to "make it easier for Chrysler and  General Motors to  clear away old liabilities."  **One effect of this strategy is that dealerships could be closed more quickly. In an internal memo, Auto Team officials reiterated that <u>their goal was </u> to  take  advantage  of  the  bankruptcy  code  <u>to reject dealership franchise agreements without significant up-front costs.</u>"** PL MSJ Appendix (ECF 295-1) p.18

- **Mr. Bloom [the head of the Government's Auto Team] stated** that GM and Chrysler could use  the terms of bankruptcy to  **eliminate dealerships quickly**, and  that it would have  been  a  **<u>"waste of  taxpayer resources"</u>** for  the  auto  manufacturers  to  exit bankruptcy when they knew  the networks would still have  to be rationalized. **Mr. Bloom referred to this as "<u>taking the pain and getting past it."</u>** PL MSJ Appendix (ECF 295-1) p.18

- "**the Auto Team rejected GM's original  plan** (which  included gradual dealership terminations), **expressly indicated that GM's pace of terminations was too slow, and then encouraged  the companies' use of  bankruptcy to accelerate  dealership terminations. <u>These decisions - all based on the Auto Team's theory that GM and Chrysler would be better off by  accelerating dealer  terminations.</u>"** PL MSJ Appendix (ECF 295-1) p.34

- "to the companies of **accelerated terminations were based  almost entirely  on the not-universally-accepted theory** that an immediate decrease in  dealerships would  make

them similar to their foreign competitors and therefore improve the companies' profitability, and the theory arguably did not take into account some of the unique circumstances of the domestic companies' dealership networks." PL MSJ Appendix (ECF 295-1) p.36.

- The Report acknowledges that it was the Auto Team's decision to terminate the dealerships, stating, "More importantly, there was no effort even to quantify the number of job losses that the **Auto Team's decision** would contribute to until after the decision was made, and the effect on the broader economy caused by accelerated dealership terminations similarly was not sufficiently considered. PL MSJ Appendix (ECF 295-1) p.36.

- **Treasury made a series of decisions** that may have substantially contributed to the accelerated shuttering of thousands of small businesses and thereby potentially adding tens of thousands of workers to the already lengthy unemployment rolls - all based on a theory and without sufficient consideration of the decisions' broader economic impact. PL MSJ Appendix (ECF 295-1) p.36.

- Furthermore, a GM official stated that removing a dealership from the network does not save money for GM-it might even cost GM money. PL MSJ Appendix (ECF 295-1) p.30

- Indeed, one **GM official emphasized this point by telling SIGTARP that GM would usually save "not one damn cent" by closing any particular dealership**. PL MSJ Appendix (ECF 295-1) p.35

- Indeed, **key members of the Auto Team - including Messrs. Rattner and Bloom -** stated that **they** did not consider [GM's] cost savings to be a factor in determining the need for dealership closures. PL MSJ Appendix (ECF 295-1) p.0

18

- "when asked explicitly whether **the Auto Team could have left the dealerships** out of the restructurings, **Mr. Bloom, the current head of the Auto Team, confirmed that the Auto Team "could have left any one component [of the restructuring plan] alone," but that doing so would have been inconsistent with the President's mandate for "shared sacrifice."** PL MSJ Appendix (ECF 295-1) p.36.

When viewed in the light most favorable to the GM Plaintiffs case, the SIGTARP Report confirms highly unusual circumstances surrounded the execution of the wind-down agreements. Further, the Report also confirms there is a genuine issue of material fact on whether or not there was coercion in the form of "irresistible pressure" form the Government towards old GM and the GM Plaintiffs, specifically targeting the GM Plaintiffs' dealerships for termination. GM's initial intent in its proposed viability plan was to close the dealerships at a much slower rate and compensate them at a much higher rate, and it was only after their proposals were rejected by the Auto Task Forces were the wind-down agreement sent. Under these unusual circumstances, there is a question of material fact as to whether or not the accelerated terminations through the vehicle of the wind-down agreements were really a part of the Government's strategy to terminate the dealerships for the benefit of the taxpayers, and that GM was really being coerced in order to receive billions in Government funds.

When the SIGTRAP Report is viewed through the lens of the standard of review required at this juncture, summary judgment is not warranted. There are simply too many genuine issues of material fact surrounding whether or not coercion from the Government existed.

     c.  *The GM Plaintiffs Affidavits Are Valid Summary Judgment Evidence, And They Create A Genuine Issue of Material Fact As to Whether Or Not the Government and Old GM Knew Or Should Have Known the GM Plaintiffs Did Not Understand the Scope of the Wind-Down Agreements, And Were Signing Them In Response to the "Irresistible Pressure" From the Government Resulting In Coercion.*

PLAINTIFF COLONIAL'S SUR-REPLY TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' CLAIMS ALLEGING TAKINGS OF GENERAL MOTORS DEALERSHIP
AGREEMENTS

Contrary to the Government's Reply, courts rely on declarations of the party seeking the release as well as evidence of the surrounding circumstances in making a determination of intent. *See Axion, supra at* 477–79. Simply because the GM Plaintiffs affidavits are self serving does not mean they should be ignored by the Court for the purposes of summary judgment. To the contrary, across the circuits, courts support their use.

As a matter of law, merely conclusory affidavit are insuffcient, *see, e.g., Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990), but nothing in Rule 56 (or, for that matter, in the Federal Rules of Civil Procedure) prohibits an affidavit from being self-serving. Indeed, as the Seventh Circuit observed, "most affidavits submitted [in response to a summary judgment motion] are self-serving." *See Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003). Not surprisingly, a litigant's self-serving statements based on personal knowledge or observation do defeat summary judgment. *See, e.g., Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are selfserving, but that alone does not permit us to disregard them at the summary judgment stage."); *see also Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir.) ("Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving."), *modified on other grounds on denial of reh'g*, 425 F.3d 1292 (11th Cir. 2005); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("Properly understood, *Gibson* stands only for the unremarkable proposition that a fact-finder can choose to disregard a litigant's self-serving (and unsupported) trial testimony, and that its decision to do so generally will not constitute clear error. That proposition has no place at summary judgment, where 'the [court's] function is not . . . to weigh the evidence.'"); *see Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998) (rejecting the argument that a self-serving affidavit is insufficient to defeat summary judgment because it would 'thrust the courts—

at an inappropriate stage—into an adjudication of the merits.'"); *see Siegel Oil Co. v. Richardson*, 208 F.3d 1366, 1374 (Fed. Cir. 2000)("We do not accept, however, OHA's ground of decision that the affidavit was 'self-serving.' Of course, a company official's affidavit is self-serving in that it alleges injury in a manner that purports to be sufficient. But OHA had no basis to disbelieve the affiant, i.e., no ground to think he was fabricating his assertions. Rather, his affidavit lacked factual and quantitative support and was devoid of references to supporting documentation. Thus, we do not accept the premise that any 'self-serving' evidence must be rejected. Rather, we hold that a purchaser seeking a refund must submit more than merely conclusory statements of injury without any support or information about how the injury was calculated."); *see Velazquez-Garcia v. Horizon Lines of P.R., Inc.,* 473 F.3d 11, 18 (1st Cir. 2007) ("a party's own affidavit, containing relevant information of which he has first-hand knowledge may be self-serving, but it is nonetheless competent to support or defeat summary judgment"); *see Kirleis v. Dickie, McCamey & Chilcot*e, PC, 560 F.3d 156, 161–162 (3d Cir. 2009) ("'conclusory, self-serving affidavits are       insufficient      to      withstand      a      motion for summary judgment,' but plaintiff's affidavit set forth specific facts that revealed genuine issue of material fact as to existence of agreement to arbitrate); *see Spring Street Partners-IV, L.P. v. Lam,* 730 F.3d 427, 441 n.7 (5th Cir. 2013) (although affidavit may have been "self-serving" it was acceptable because it was based on affiant's personal knowledge); *see Harris v. J.B. Robinson Jeweler,* 627 F.3d 235, 239 (6th Cir. 2010) ("A court may not disregard evidence merely because it serves the interests of the party introducing it"); *see Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 459–460 (7th Cir. 2014) ("Self-serving affidavits can indeed be a legitimate method of introducing facts on summary judgment."); *see Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("As we have repeatedly emphasized over the past decade, the term 'self-serving'

must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment"; court also overruled several cases to the extent they suggest plaintiff may not rely on "self-serving" evidence to create a material factual dispute); *see Argenyi v. Creighton Univ.,* 703 F.3d 441, 446 (8th Cir. 2013) (district court erred in disregarding plaintiff's affidavit as "self-serving" because there was "a variety of supporting evidence in the record"); *see Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001) ("self-serving affidavits are cognizable to establish a genuine issue of material fact so long as they state facts based on personal knowledge and are not too conclusory").

In application here, while the GM Plaintiffs affidavits are self-serving, they clearly show that none of the GM Plaintiffs wanted their dealerships terminated, and none of the GM Plaintiffs understood the scope of the release agreement. PL MSJ Appendix (ECF 295-1) p.415-498. The GM Plaintiffs affidavits, however, are not merely conclusory as to what these franchise owners understood when wind-down agreements were signed: rather, they are present recollections of what they knew and what they intended. The GM Plaintiffs' Affidavits support the additional evidence that there is a genuine issue of material fact as to whether or not the Government and old GM knew or should have known the GM Plaintiffs did not understand the scope of the wind-down agreements, as well as whether they were signed voluntarily and free from coercion.

### III. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE COLONIAL DEALERS VOLUTARILY SIGNED THE WIND-DOWN AGREEMENTS, AND THEREFORE, WHETHER IT WAS THE WIND-DOWN AGREEMENTS VS GOVERNMENT ACTION THAT TERMINATED THE GM PLAINTIFFS' DEALERSHIPS.

Regarding the Government's argument that the WDAs, not Government action, terminated plaintiff's dealership agreements, there is a genuine issue of material fact as to whether the agreements were signed voluntarily. If the agreements were not signed voluntarily

due to Government coercion through "irresistible pressure", it is the Government's action, not the wind-down agreements that terminated the GM Plaintiffs' dealerships.

The cases cited by the Government in support of its argument that the WDAs terminated the dealerships, merely confirm only that agreements that are signed voluntarily are binding. *See Norman v. United States*, 429 F.3d 1081, 1089 (Fed. Cir. 2005)(the record is clear that the title transfer was voluntary, and not a condition required under the 1999 Permit."); *see BMR Gold Corp. v. United States*, 41 Fed. Cl. 277, 282 (1998)("The undisputed facts demonstrate that plaintiff granted its consent to plaintiff to cross its land to reach the helicopter. Consequently, plaintiff's takings claim, if any, based upon the helicopter incident lacks the necessary element of coerciveness …"); *see Brace v. United States*, 72 Fed. Cl. 337, 359 (2006), *aff'd,* 250 F. App'x 359 (Fed. Cir. 2007)("Absent some evidence of compulsion, the court, therefore, must find that, like any other consent decree, the decree at issue led to a voluntary acquiescence and thus did not give rise to a physical taking."); *See F.C.C. v. Florida Power Corp.,* 480 U.S. 245, 253, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987) ("the element of required acquiescence is at the heart of the concept of occupation"); *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1007-08 (1984) ("a voluntary submission of data by an applicant in exchange for the economic advantages of a registration can hardly be called a taking"); *see Norman,* 429 F.3d at 1089 ("voluntary transfer" not "a proper basis on which to premise a takings claim"); *see Alves v. United States*, 133 F.3d 1454, 1458 (Fed. Cir. 1998)("the trespass complained of is by livestock owned and rightfully controlled by private third parties, the Danns. There clearly can be no taking when whatever acts complained of are those of private parties, not the Government.")

The Government's citations simply do not help its position that the WDAs, not Government action, terminated the dealerships, considering the evidence in this case supporting

23

the conclusion that there is a genuine issue of material fact on whether the WDAs were signed voluntarily or as a result of coercion.

In addition to the evidence previously cited, the SIGTARP Report provides additional circumstantial evidence that the dealers did not sign the WDAs voluntarily. The large volume of dealerships that sought reinstatement supports the conclusion the terminated GM dealers did not want to have their dealerships terminated, but rather the WDAs were signed  involuntarily.

- "GM received a total of 1,316 appeals related to both complete and partial wind-downs."

  PL MSJ Appendix (ECF 295-1) p.25

Moreover, the GM Plaintiffs affidavits contradict the Government's assertion that the GM Plaintiffs wanted to terminate their dealerships, and that they did so voluntarily. PL MSJ Appendix (ECF 295-1) p.415-498.

On the issues of coercion, whether the GM Plaintiffs had a voluntary choice, the June 3,2009, Congress transcript suggests they did not, and were faced with a "no choice" deal.

> [Senator Begich interrupts],  "If I could interrupt, **it's kind of a no choice deal?"** [To which, Mr. Henderson, GM CEO, responds] **"It is.** …" PL MSJ Appendix (ECF 295-1) p.61.

Legally sufficient evidence shows the GM Plaintiffs faced "irresistible pressure" specifically designed by the Government's Auto Team to have them terminated. *See A & D , supra at* 1154-55 (Fed. Cir. 2014). Moreover, in the event of coercion by the Government towards the GM Plaintiffs, the releases in the WDAs are voidable[8] and not enforceable for the purposes of the Government seeking a release from constitutionally protected takings claims,

---

[8] *See, Eulrich v. Snap-On Tools Corp.,* 853 P.2d 1350 (Or. Ct. App. 1993)*, cert. granted, judgment vacated on other grounds*, 512 U.S. 1231 (1994) (holding that where a franchisor insisted on a release in connection with the repurchase of franchisee's inventory when franchisee was in financial distress, it was not error for a jury to find **economic duress** that voided release); *see Dupage Forklift Serv., Inc. v. Mach. Distrib., Inc., N*o. 94 C 7357, 1995 WL 623093 (N.D. Ill. Oct. 20, 1995); *see MZ Ventures, LLC v. Mitsubishi Motors Sales of America, Inc.*, Bus. Franchise Guide (CCH), P11,692 (C.D. Cal. Sept. 1, 1999).

PLAINTIFF COLONIAL'S SUR-REPLY TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS ALLEGING TAKINGS OF GENERAL MOTORS DEALERSHIP AGREEMENTS

because the Government lacks clean hands in the context of the signing of these agreement.[9]

At a minimum, there is a genuine issue of material fact as to whether or not the agreements were signed voluntarily, and whether or not the Government has clean hands in the context of the signing of the agreement they are seeking to enforce.

Finally, the Government claims that the dealers are barred from the remedy of reformation because they have not repaid old GM the wind-down money. This argument is utterly without merit. The Government lacks standing to make this argument. There is no evidence in the record before the Court that the wind-down money was Government money. There is no evidence that the Government changed position in reliance having old GM obtain the releases, a fact of which it still claims it did not know or anticipate. Furthermore, there was a mixture of promises in the WDA. There is no evidence showing what value, if any, the releases constitute by dollar amount of percentage of the money paid by old GM. Importantly, there is no objective manner of which a dealer could know or even guess would be the correct amount to pay for the obviation of the release, especially with twelve days to evaluate and decide. Finally, there is no evidence in the record as to who and when it should have paid this unknown amount to. Surely summary judgment cannot be granted ion such a specious argument and with no evidence in the record to support it.

---

[9] *See Consol. Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 810 (Fed. Cir. 1990)("Settlement contracts were unenforceable when "inequitable conduct was present in the patents that were the subjects of the settlement contracts, and that conduct related to the entire cause of action to enforce those contracts."); *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945)("The guiding doctrine in this case is the equitable maxim that 'he who comes into equity must come with clean hands.' … That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith….This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is 'not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.' *Keystone Driller Co. v. General Excavator Co.*, *supra*, 290 U.S. 245, 246. Accordingly one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of **998 conduct is sufficient cause for the invocation of the maxim by the chancellor.")

For these reasons and the additional arguments to be made at the anticipated oral hearing, summary judgment should not be granted.


## IV. PRAYER

WHEREFORE, for the foregoing reasons, the GM Plaintiffs request that the Court DENY the Government's Motion for Summary Judgment

March 26,2018,

Respectfully submitted,

**Ted B. Lyon & Associates, PC**

*/s/ Marquette Wolf*
**Marquette Wolf**
Texas Bar No. 00797685
mwolf@tedlyon.com
**Ted B. Lyon**
Texas State Bar No. 12741500
tlyon@tedlyon.com
**Richard Mann**
Texas Bar No. 24079640
rmann@tedlyon.com
18601 LBJ Freeway, Suite 525
Mesquite, Texas 75150
Telephone: 927-279-6571
Facsimile: 972-279-3021


I hereby certify that on DATE, a copy of "PLAINTIFF COLONIAL'S SUR-REPLY TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS ALLEGING TAKINGS OF GENERAL MOTORS DEALERSHIP AGREEMENTS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Marquette Wolf*
Marquette Wolf

PLAINTIFF COLONIAL'S SUR-REPLY TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS ALLEGING TAKINGS OF GENERAL MOTORS DEALERSHIP AGREEMENTS