# In the United States Court of Federal Claims

Nos. 10-647C, 11-100C, and 12-900C
(Filed: September 17, 2018)
**CONSOLIDATED**

| | |
|---|---|
| COLONIAL CHEVROLET CO., INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. <br><br> * * * * * * * * * * * * * * * * * * * * <br> ALLEY'S OF KINGSPORT, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. <br><br> * * * * * * * * * * * * * * * * * * <br> UNION DODGE, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. | Denial of Summary Judgment; Fifth Amendment Taking; Disputed Issues of Fact; Government's Role in Terminating General Motors Dealership Agreements; Voluntary Release of Dealership Agreements to General Motors; Ambiguous Release Language; Burden Shifting as to Whether Dealerships Had Greater Value in the "But For" World Without Government Bailout of General Motors Than They Received or Were Offered in Wind-Down Agreements; Motion to Supplement Evidentiary Record. |

*Marquette William Wolfe*, Mesquite, TX, for plaintiffs Colonial Chevrolet Co., Inc., et al., Mesquite, TX. *Ted B. Lyon*, *Richard Mann*, and *Charles Benne*, Mesquite TX, and *Harry Zaville*, La Mesa, CA, of counsel.

*Kenneth M. Dintzer*, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Joseph H. Hunt*, Attorney General, *Robert E. Kirschman,* Jr., Director, and *Elizabeth M. Hosford*, Assistant Director, for defendant. *James P. Connor*, *Agatha M. Koprowski*, *Amelia R. Lister-Sobotkin*, *Alison S. Vicks*, and *Zachary J. Sullivan*, Washington, DC, of counsel.

## OPINION DENYING SUMMARY JUDGMENT

**FIRESTONE**, *Senior Judge*.

Pending before the court is the motion for summary judgment filed by the defendant, the United States ("government"), pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). The government seeks summary judgment against all of the General Motors plaintiffs (here after "plaintiffs") from this consolidated case brought by former General Motors and Chrysler dealers whose dealerships were terminated as part of the United States government's bailout of the auto industry in 2009.[1] Additionally, pending before this court is the plaintiffs' "Motion for Leave to Supplement the Summary Judgment Evidence While Defendant's Motion for Summary Judgment is Under Consideration." The named plaintiffs owned franchise dealerships to sell various General Motors ("Old GM") vehicles before Old GM went into bankruptcy during the 2008-09 financial crisis. The plaintiffs claim that the government is responsible for a taking of their franchise agreements without paying just

---

[1] The government has not sought summary judgment with regard to the Chrysler plaintiffs that also had dealerships that were terminated in connection with the auto industry bailout.

compensation in contravention of the Fifth Amendment of the U.S. Constitution.  U.S. Const. amend V.  Specifically, the plaintiffs claim that before the government would agree to give more financial resources to Old GM as part of the government's Troubled Asset Relief Program ("TARP") during the 2008-09 financial crisis, the government forced Old GM to terminate their franchise dealerships through Wind-Down Agreements. This case has 59 plaintiffs who contend that they were coerced into signing Wind-Down Agreements and six plaintiffs who refused to sign the Wind-Down Agreements and had their dealerships rejected in Old GM's bankruptcy.[2]

The government makes four arguments as to why the court should enter summary judgment in its favor.  First, the government argues that it cannot be held liable for a

---

[2] There are 59 plaintiffs who signed Wind-Down Agreements and the six plaintiffs who did not sign Wind-Down Agreement. Those plaintiffs that did sign the Wind-Down Agreements are A.J. Chevrolet, Inc.; Al Hanken Motors, Inc.; Alexander Ford-Mercury, Inc.; Andrews Chevrolet Sales and Service, Inc.; Andy Chevrolet Company; Atchison Automotive Group, Inc., Axelrod Pontiac, Inc.; B. Bogdewic Chevrolet, Inc.; Barber Brothers Motor Company, Inc.; Bilton-Behr Chevrolet, Inc.; Cascade Chevrolet Company; Cliff Jones, Inc.; Colonial Cadillac Hyundai, Inc.; Colonial Motors; Crown Chevrolet, Inc.; Dalgleish Cadillac-Oldsmobile, Inc.; Deery Brother, Inc.; Don Steves Chevrolet, Inc., Duplessis Cadillac Volvo, Inc.; Dwight Shank Chevrolet, Inc.; Fisher Motors, Inc.; Fortuna Mortors, Inc.; Gibson Chevrolet, Inc.; Gober & Merrell Chevrolet, Inc.; Grand Auto, Inc.; Grossman Chevrolet Company, Inc.; Hagemann Enterprises; Hansen Motor Co., Inc.; Herb Adcox Chevrolet Company; Huntington Chevrolet, Inc.; Joe Panian Chevrolet, Inc.; Keeton Motor Co., Inc.; Kneip Implement Co., Inc.; Merollis Chevrolet, Inc.; Merollis Oldsmobile-Cadillac-GMC Truck Inc.; Mullahey Chevrolet, Inc.; Olesen Chevrolet-Oldsmobile, Inc.; Palace Motors, Inc.; Parkway Chevrolet, Inc.; Paul Benton Chevrolet; Pavlik Motor Cars, Inc.; P.H.D. Motors, Inc.; Phillip Motor, Inc.; Preakness Chevrolet, Inc.; Ray Chevrolet, Inc.; Ray Huston, Inc.; Rick Justice Pontiac-Buick-GMC, Inc.; Ricky Smith Pontiac, Inc.; Ronnie Smith, Inc.; Rust Auto Center, Inc.; Schulz Automotive, Inc.; Serra Chevrolet, Inc.; Simms Chevrolet Motors, Inc.; Stagg Chevrolet, Inc.; Sunnyside Automotive III, LLC; Vander Meer Chevrolet-Buick-Oldsmobile, Inc.; Williams Motor Company, Inc.; Woody Chevrolet Sales, Inc.; and Young Motor Co., Inc.

The plaintiffs who were offered but did not sign the Wind-Down Agreements are Colonial Chevrolet Co., Inc.; Keystone Automotive, Inc.; Mullins Motors, Inc.; Rapp Chevrolet, Inc.; Terry Gage Chevrolet-Oldsmobile, Inc.; and Graves Pontiac-Chevrolet-Buick, Inc.

taking stemming from the execution of any Wind-Down Agreement because the government was not a party to any Wind-Down Agreement and thus the termination of the franchise agreements through the Wind-Down Agreements did not involve any government action.  Second, the government argues that even if there was government action in connection with the termination of the plaintiffs' franchise agreements through the execution of the Wind-Down Agreements, the government cannot be liable for a taking because the plaintiffs who signed the Wind-Down Agreements voluntarily relinquished their franchise dealership agreements to Old GM in exchange for various concessions and a onetime monetary payment.  Third, the government argues with regard to the plaintiffs who signed the Wind-Down Agreements that the government cannot be liable for a taking under the Fifth Amendment because those plaintiffs released the government from all liability by agreeing, in their Wind-Down Agreements, to release the shareholders of the 363 Acquirer of GM ("363 Acquirer" or "New GM") from all liability following the Old GM bankruptcy.  The United States was a shareholder of the 363 Acquirer.  Finally, the government argues with regard to both the plaintiffs that signed Wind-Down Agreements and the plaintiffs that were offered Wind-Down Agreements but did not sign the Agreements that all of the plaintiffs received or were offered economic benefits in those Agreements that equal or exceed what they are seeking in this case, i.e. the value of their dealership had Old GM not received a government bailout.  As such, the government argues none of the plaintiffs can prove a takings claim.

Plaintiffs argue, in response, that there are disputed issues of material fact that preclude the entry of summary judgment in favor of the government.  First, the plaintiffs

argue that they have presented evidence to show that the government forced Old GM to terminate the plaintiffs' franchise dealership agreements and thus, contrary to the government's contentions, the government and not Old GM was responsible for the terminations of their dealerships.  Second, plaintiffs argue that they have presented evidence to show that there are disputed issues of material fact which establish that the plaintiffs did not voluntarily relinquish their franchise agreements but were given no choice.  Third, the plaintiffs argue that the government is not entitled to summary judgment regarding the 59 plaintiffs that signed the release in the Wind-Down Agreements on the grounds that the release is ambiguous under Michigan state law and that parole evidence is needed to discern the parties' intentions.  Specifically, the plaintiffs argue that it is not clear from the language of the release whether the parties intended to include the release of the United States government from takings liability when the plaintiffs agreed to relinquish all claims against the 363 Acquirer.  Finally, plaintiffs argue that there are genuine issues of material fact which preclude summary judgment as to the value of plaintiffs' franchise dealership agreements if Old GM had been forced to liquidate in bankruptcy.  Plaintiffs argue that they have presented sufficient evidence to show that if Old GM had liquidated they would have received more than they received or were offered in the Wind-Down Agreements.

For the reasons set forth below, the court finds that genuine issues of material fact preclude the court from granting summary judgment in favor of the government.  It is for this reason, as discussed in greater detail below, that the government's motion for

summary judgment is **DENIED**.  Additionally, as discussed below, the plaintiffs' motion

to supplement the evidentiary record is **GRANTED**.

## I.      Procedural History

Before turning to the undisputed and disputed facts the court will briefly review

the extensive procedural history that makes up the backdrop to the pending motion.

### A.      Initial Complaint and Federal Circuit Appeal

The present case was filed on September 27, 2010, by 65 plaintiffs on behalf of

themselves and a putative class of Old GM dealerships who either signed a Wind-Down

Agreement or who were offered but did not sign agreements and had their claims rejected

in Old GM's bankruptcy proceeding.[3] Compl. (ECF No. 1).  On January 21, 2011, the

government moved to dismiss the case.  (ECF No. 11).  On February 27, 2012 the

government's motion to dismiss was denied and the case was certified for interlocutory

appeal.  *Colonial Chevrolet Co., Inc v. United* States, 103 Fed. Cl. 570 (2012); *Colonial*

*Chevrolet Co., Inc. v. United States*, 106 Fed. Cl. 619, 622 (2012).

On April 7, 2014, the Federal Circuit issued its decision affirming the denial of the

government's motion to dismiss, but holding that the plaintiffs' complaint was deficient

because the plaintiffs had failed to include allegations "regarding the but-for economic

loss of value the plaintiffs' franchises."  *A&D Auto Sales*, 748 F.3d 1142, 1158 (Fed. Cir.

2014).  The Federal Circuit explained that in order to establish a taking under the Fifth

---

[3] The plaintiffs' motion for class certification has been stayed pending the outcome of this
motion.  ECF No. 165.

Amendment the plaintiffs would need to allege and eventually prove that their franchises would have had value in a "but for" world. *Id.* at 1158-59. The Federal Circuit remanded the case to allow plaintiffs the opportunity to amend their complaint. *Id.* at 1159.

### B.    Amended Complaint and Renewed Motion to Dismiss

On September 15, 2014, the plaintiffs filed their amended complaint in which they posited three "but for" scenarios in response to the Federal Circuit's decision. Am. Compl., (ECF No. 101); *Colonial Chevrolet Co., Inc. v. United States,* 123 Fed. Cl. 134, 140-46 (2015). The government moved to dismiss the amended complaint claiming that all three of the scenarios alleged by the plaintiffs were either implausible or barred by the Federal Circuit's *A&D Auto Sales* decision. (ECF No. 104).

On September 9, 2015, this court granted the government's motion to dismiss in part and denied it in part holding that one of the three scenarios posited by the GM plaintiffs was plausible and consistent with the Federal Circuit's decision in *A&D Auto Sales*.[4] *Colonial Chevrolet Co., Inc.,* 123 Fed. Cl. at 140-46. The court held that plaintiffs could proceed under a "but for" scenario, wherein the dealerships would have remained open "during [an] orderly wind-down" of Old GM while it was liquidated in bankruptcy under the United States Bankruptcy Code. *Id.* at 146.

---

[4] The court found that the plaintiffs could not support two "but for" world scenarios: (1) that the government would have provided loans to GM without requiring termination of the dealerships on the grounds that the scenario was precluded by Federal Circuit's *A&D Auto Sales* decision and (2) that another entity would have purchased GM's assets without financial assistance from the government on the grounds that the GM plaintiffs failed to allege sufficent facts to establish this "but for" world. *Chevrolet Co., Inc.,* 123 Fed. Cl. at 144-45.

**C.** **Pending Motion for Summary Judgment, Motion for Discovery Pursuant to Rule 56(d), and Motion to Supplement the Evidentiary Record.**

Following the denial of the government's motion to dismiss on December 7, 2015, the government filed the pending motion for summary judgment. Def.'s Mot. for Summ. J. (Mot. for Summ. J.) (ECF No. 136). In response to the government's motion for summary judgment, the plaintiffs sought numerous extensions of time and eventually a stay to allow for discovery pursuant to Rule 56(d). (ECF No. 155). On June 14, 2017 the court granted the plaintiffs' motion on Rule 56(d) in part. (ECF No. 263).

Discovery was completed on September 12, 2017. (ECF No. 280). Thereafter, the parties resumed briefing on the government's motion for summary judgment which was completed with plaintiff's sur-reply on March 26, 2018. Pls.' Sur-Reply (ECF No. 334). Oral Argument was held on May 22, 2018.

Three days after oral argument, on May 25, 2018, plaintiffs filed a motion for leave to supplement their opposition to the government's summary judgment motion with additional evidence not available at the time of the initial briefing on the motion. (ECF No. 344)

Briefing on the plaintiffs' motion to supplement was completed on June 14, 2018 (ECF No. 353) and for the following reasons set fort immediately below, the court is granting plaintiffs' motion to supplement their opposition to summary judgment with new evidence.

## II.      Motion to Supplement Is Granted

The GM plaintiffs have moved to supplement their opposition to the government's motion for summary judgment with the following evidence: (1) an expert report from Ted Stockton, an expert hired by the plaintiffs and the Vice President and Director of Economics Services of the Fontana Group, Inc, regarding the value of the GM plaintiffs' dealerships in the "but for" world, (2) excerpts from the deposition of Steve Rattner taken on April 26, 2018, excerpts from the deposition of Harry Wilson taken on May 16, 2018, and excerpts from the deposition of the Rule 30(b)(6) corporate representative from Boston Consulting Group ("BGC") taken on April 24, 2018,[5] and (3) additional documents: (i) "GM and Task Force Contingency Planning Meeting: New York City- May 1, 2009; May 15 2009: Key Issues and Deliverables,"[6] (ii) "1GM and Task Force Contingency Planning Meeting: New York City- May 1, 2009: Key Issues and Deliverables,"[7] and (iii) excerpts of an interview transcript conducted on May 26, 2010, prepared by Steve Rattner for his book "Overhaul: An Insider's Account of the Obama Administration's Emergency Auto Rescue."  (ECF No. 346).

The plaintiffs argue that these documents refute the government's contention that the plaintiffs have received or were offered more by Old GM in the Wind-Down Agreements

---

[5] As discussed in depth below, the Task Force was created to respond the 2008-09 financial crises' impact on the American automotive industry.  Steve Rattner was the lead advisor on the auto industry crisis and Harry Wilson was a leading member of the Task Force. BGC was a consulting group used by the Task Force to evaluate the viability of GM and Chrysler.

[6] Included as part of Mr. Wilson's May 16, 2018 deposition and labeled as deposition exhibit 3.1.

[7] Included as part of Mr. Wilson's May 16, 2018 deposition and labeled as deposition exhibit 3.2.

than they would have received in an Old GM liquidation without any government assistance. The plaintiffs assert that under Rule 56(e), the court has discretion to allow them to supplement the evidentiary record before it rules on the government's summary judgment motion.  Specifically, Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by RCFC 56(c), the court may: (1) give an opportunity to properly support or address the fact; [or] . . . (4) issue any other appropriate order." RCFC 56(e).  The GM plaintiffs argue that precedents from several circuits support the appropriateness of supplementation in this case.  *See In re Louisiana Crawfish Producers,* 852 F.3d 456, 459-60 (5th Cir. 2017); *Steven N.S. Cheung, Inc. v. United States,* 2006 WL 2136738, at *1–2 (W.D. Wash. July 28, 2006).

The government opposes plaintiffs' motion to supplement the evidentiary record on the grounds that all of the evidence the plaintiffs contend is new was available to the plaintiffs during summary judgment briefing and before oral argument and thus the plaintiffs' motion is untimely.  In the alternative, the government argues none of the evidence presented by the plaintiffs in its motion created a material issue of fact and did not seek to provide any additional evidence of its own.

Plaintiffs argue, in response, that under the plain language of Rule 56(e) the court has the discretion to allow a party to supplement the summary judgment record prior to the court issuing a decision.  *See Steven N.S.*, 2006 WL 2136738 (July 28, 2006).  As such, the plaintiffs argue that the court should allow for the supplementation of the summary

judgment record pursuant to Rule 56(e) to ensure that the court has all the facts before it rules on the government's motion for summary judgment.

After considering the parties' arguments, the court finds that it is in the interest of justice to consider the new evidence submitted by plaintiffs before ruling on summary judgment. The focus of the government's summary judgment motion has evolved through briefing and at the oral argument to be more clearly focused on the plaintiffs' failure to address whether in a "but for" world without any government assistance the plaintiffs' dealerships would have more value than the dollar amounts and other benefits the plaintiffs were offered or accepted from Old GM in the Wind-Down Agreements.  With the above-described evidence and expert report, the court finds in accordance with Rule 56(e) that it now has plaintiffs' response and an evidentiary record to rule on the government's summary judgment motion.  Accordingly the court will consider the (1) expert report from Ted Stockton, (2) excerpts from the deposition of Steve Rattner taken on April 26, 2018, (3) excerpts from the deposition of Harry Wilson taken on May 16, 2018, including deposition exhibit 3.1 "GM and Task Force Contingency Planning Meeting: New York City- May 1, 2009; May 15 2009: Key Issues and Deliverables" and exhibit 3.2 "1GM and Task Force Contingency Planning Meeting: New York City- May 1, 2009: Key Issues and Deliverables," (4) interview transcripts created by Steve Rattner while writing his book, and (5) excerpts from the deposition of the 30(b)(6) corporate representative from BGC,  when considering the government's motion for summary judgment.

## III.   Statement of Undisputed Facts

### A.   Government's Financial Assistance to GM during the 2008-2009 Financial Crisis.

In the fall of 2008, a historic recession and credit crisis crippled the financial liquidity markets which severely impacted automobile sales. *A&D Auto Sales*, 748 F.3d at 1147.  As a result, GM "suffered deep erosion in revenues, significant operating losses, and a dramatic loss of liquidity, putting its future in grave jeopardy." *In re. Gen. Motors Corp,* 407 B.R. 463, 476 (Bankr. S.D.N.Y. 2009), *aff'd, In re Motors Liquidation Co.,* 430 B.R. 65 (S.D.N.Y. 2010) (*GM Sale Op'n).*  The crisis led Old GM to seek financial assistance from the United States Government. *Id*. at 476-77.

Using its authority under the Emergency Economic Stabilization Act of 2008, the government, in December 2008, provided Old GM with bridge loans totaling $13.4 billion. *In re. Gen. Motors Corp,* 407 B.R. at 477.  In exchange for these loans, Old GM agreed to submit a viability plan to the government in order to demonstrate that the company could achieve financial stability with an infusion of additional government funds. Thereafter, on February 15, 2009, President Obama announced the creation of the Presidential Task Force on the Auto Industry ("Task Force"), which he made responsible for reviewing the viability plan submitted by Old GM. Pls.' Resp., App. at 7 (ECF No. 295-1).[8]

---

[8] The Office of the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") was charged with "conduct[ing], supervis[ing], and cordinat[ing] audits and investigations on the purchase, management, and sale of assets by the Secretary of the Treasury under any program established by the Secretary under section 5211 of this title [purchases of troubled assets], and the management by the Secretary of any program established under section

Old GM submitted its first plan to the Task Force on February 17, 2009. Old

GM's first plan, among other things, called for the incremental reduction in the number

of GM dealerships over a five year period. *Id.* at 9. Under the initial plan, Old GM

proposed the elimination of 1650 dealerships which would take the total number from

5,750 to 4,100. *Id.*

On March 31, 2009, Old GM reported liabilities of $172 billion and assets of only

$82 billion. *GM Sale Op'n,* 407 B.R. at 475. After reviewing Old GM's initial viability

plan, the Task Force, on March 30, 2009, rejected Old GM's proposal, in part, because

"GM's proposed 'pace' of closing dealerships was too slow and was an obstacle to its

viability." Pls. Resp., App. at 15-17.

In its Viability Determination dated March 30, 2009,[9] the Task Force gave GM 60

days to revise its plan to include a more aggressive approach for "dealership

---

5212 of this title [insurance of troubled assets][.]" 12 U.S.C. §5231(c)(1). On July 19, 2010, SIGTARP produced a report entitled "Factors Affecting the Decisions of General Motors and Chrysler to reduce their Dealership Networks." In a section entitled "Why SIGTARP Did This Study", explained that as part of bankruptcy proceedings "Chrysler terminated 789 dealerships on June 10, 2009, and GM planned to wind down 1454 dealerships by October 2010." Pls.' Resp., App. at 3. The study explained that "[q]uestions arose as to how GM and Chrysler selected dealerships for termination and what benefit, if any, the companies gained from terminating the dealerships." *Id.* "The report adresse[d] (1) the role of Treasury's Auto Team in the decision to reduce dealership networks, (2) the extent to which GM and Chrysler developed and documented processes for deciding which dealerships to terminate and which to retain, and (3) to what extent the dealership reductions are expected to lead to cost savings for GM and Chrysler." *Id.*

[9] The Task Force found that Old GM's overall plan was not viable, "in part because GM relied on overly optimistic assumptions about the recovery of the company and the economy." Pls.' Resp., App. at 17. The Auto Team determined that Old GM needed to improve its restructuring plan in five areas: "more realistic assumption of its cash needs associated with legacy liabilities, reassessment of its market share assumption, improvement in prices, improved mix of products to steer the company away from high-margin trucks and SUVs, and an excess of brands and dealers." *Id.* With regards to the excess dealerships the Task Force explained "GM has been

13

terminations." Pl.s' Resp., App. at 18. At the same time Old GM was provided with $6 billion more funds from the government to use for working capital. *Id.* Old GM submitted a revised plan to the Task Force in May 2009 in which it agreed to reduce the number of dealerships by 1,454 by October 2010, "rather than its originally planned closure of approximately 450 in the same time period." *Id.* at 19.

### B.    Old GM Bankruptcy and Wind-Down Agreements

On June 1, 2009, the same day that Old GM filed for bankruptcy, Old GM filed a motion in bankruptcy court requesting approval to sell substantially all of its assets under a Master Sale and Purchase Agreement ("Sale Agreement") to a new entity, Vehicle Acquisition Holding, LLC, or "New GM/363 Acquirer." *GM Sale Op'n*, 407 B.R. at 473-474. In order to help facilitate the sale, the United States and Canada agreed to provide the debtor-in-possession financing, with the U.S. Treasury providing $30.1 billion in financing to support Old GM throughout its bankruptcy and restructuring. *Id.* at 479-80. As part of the Sale Agreement to New GM, Old GM on June 1, 2009, offered Participation Agreements to approximately 4,100 of the 6,000 Old GM dealerships. *Id.* at 476. These agreements allowed signatories to continue to function as dealerships for the New GM, with certain modifications to the existing dealership agreements designed to make New GM more competitive.

---

successfully pruning unprofitable or underperforming dealers for several years. However, its current pace will leave it with too many such dealers for a long period of time while requiring significant closure costs that its competitors will not incur. These underperforming dealers create a drag on the overall brand equity of GM and hurt the prospects of the many stronger dealers who could help GM drive incremental sales." *Id.* at 18.

On the same day that Old GM offered Participation Agreements to the 4,100 dealerships, Old GM offered the remaining dealerships Wind-Down Agreements or Deferred Termination Agreements (collectively "Wind-Down Agreements"). *Id.; A&D Auto Sales,* 748 F.3d at 1149. In the cover letter accompanying the Wind-Down Agreements, Old GM stated that "due to the extremely short court deadlines in the bankruptcy process, [GM] must receive the enclosed agreement on or before **June 12, 2009**." Def.'s Motion for Summ. J., App. at 13 (ECF No. 136-1). This gave the dealers only 11 days after they had received the Wind-Down Agreement to either accept or reject. The cover letter further explained that if a dealership did not return the Wind-Down Agreement, Old GM would proceed with rejecting the dealership agreement under Section 365 of the Bankruptcy Code. *Id.*

Although the Wind-Down Agreements contained somewhat different terms to address brand and regional differences, the typical Wind-Down Agreement allowed dealers to: (1) remain in business for 17 months (from June 2009 through October 2010), (2) sell their remaining inventory of new cars, (3) purchase GM parts, and (4) service GM cars. Def.'s Mot., App. at 8 (Sample Wind-Down Agreement); Def.'s Mot., App. at 36 (Declaration of GM Chief Executive Officer Frederick A. Henderson) ("GM has offered the Wind-Down Dealers the opportunity to accept 'wind-down' agreements that will allow them to stay in business until October 2010 so that they can – in an orderly fashion – sell down their inventory and provide warranty service to customers with the continued support of GM."); Def.'s Mot., App. at 43 (Mr. Henderson's June 12, 2009 Congressional Testimony).

The Wind-Down Agreements also provided for cash payments. Most dealers were offered $1,000 for each car in their inventory and reimbursement for eight months of remaining rent. Def.'s Mot., App. at 4-5, 153. The Wind-Down Agreements further allowed the dealers to continue to participate in GM's marketing programs and acquire used vehicles at the company's auctions. *Id.* at 120.  The Wind-Down Agreements all stated that the "Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of its rights and alternatives.  In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress." *Id.* at 10.

In addition, all of the Wind-Down Agreements contained the following release language:

> Dealer, for itself, its Affiliates and any of their respective members, partners, ventures, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealership Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, ventures, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to the (i) the Dealer Agreement or this Agreement, (ii) any predecessor

16

> agreement(s), (iii) the operation of the dealership for the
> Existing Model Line …

*Id.* at 6.

The dealers were not given the opportunity to negotiate any of the Wind-Down Agreement terms.

The bankruptcy court determined that the agreements were "valid and binding contracts" and provided "good and sufficient consideration" to the GM dealers. Def.'s Mot, App. at 71, 86 (Sale Order).  Over 98 percent of the dealers that were offered the Wind-Down Agreement signed the Agreement they were offered. GM Sale Op'n, 407 B.R. at 476, Def.'s Mot., App at 36, 71, 114, 121.  The bankruptcy court approved the Sale Agreement between Old GM and New GM in July 2009. GM Sale Op'n, 407 B.R. at 473-475.

On July 6, 2009, the day after the bankruptcy court approved the Sale Agreement, Old GM filed a motion to reject the dealership agreements of the small number of dealers that did not sign a Wind-Down Agreement.  Def.'s Mot, App. at 103-137.  In total, out of the over 6,000 dealers, Old GM sought to reject 38 dealerships in bankruptcy. Def.'s Mot, App. at 114, 134-137.  The bankruptcy court granted Old GM's motion to reject the dealership agreements in August 2009. These dealers were left with unsecured breach-of-contract claims against Old GM.  Def.'s Mot, App. at 45-52; *A&D Auto Sales*, 748 F.3d at 1149.

### C.    Arbitration Legislation

In December 2009, Congress enacted legislation to allow dealerships to file for arbitration regarding the terms of their Wind-Down Agreements. *Consolidated Appropriations Act of 2010*, Pub. L. No. 111-117, § 747, 123 Stat. 3034 (2009).  Pursuant to that legislation, 1,169 GM dealers sought arbitration. Pls. Resp., App. at 28.  On March 5, 2010, at the conclusion of the arbitration process, GM announced that it would be sending letters of intent offering reinstatement to 666 dealers. The court has not been presented with any facts regarding which, if any, of the 65 plaintiffs in this action participated in the arbitration process.

### IV.    Disputed Facts Regarding The Government's Role in the Wind-Down Agreement Process, the Voluntary Relinquishment of Property, and the Wind-Down Agreement Release

The government does not dispute that the Task Force had a role in drafting the Wind-Down Agreements but contends that the evidence produced by the plaintiffs is not sufficient to establish that the government either coerced Old GM to terminate dealership franchise agreements or otherwise controlled the termination decision-making process. The government contends that there is no evidence to show that the Task Force identified dealerships for termination or directed GM to retain specific dealerships.

Plaintiffs contend that in addition to the above-described role of the government set forth in the SIGTARP report, the deposition of Harry Wilson, a member of the Task Force, and exhibits accompanying his deposition- specifically, exhibits 3.1. and 3.2 entitled "GM and Task Force Contingency Planning Meeting: New York City- May 1, 2009; May 15 2009: Key Issues and Deliverables" and "1GM and Task Force

Contingency Planning Meeting: New York City- May 1, 2009: Key Issues and Deliverables." (ECF No. 346-3, p. 3; ECF No. 346-4, p. 2; ECF No 347-2, p. 6-7), indicate that the Task Force controlled the termination process and was responsible for "[f]inali[izing] dealer agreements and process for rejection." ECF No. 346-3, p.3.

Regarding the issue of whether the plaintiffs who signed Wind-Down Agreements did so voluntarily, the plaintiffs have introduced affidavits from Colonial Cheverolet Buick, Inc., Cascade Autocenter, Dalgleish Cadillac, Inc., Gibson Chevrolet, Merollis Chevrolet, Inc., Dwight Shank Auto Inc., Andy Chevrolet, Fisher Motors, Inc., VanderMeer Chevrolet-Buick, Inc., Young Motor Co., Inc. as well as the testimony from Old GM's CEO during a congressional hearing to the effect that the plaintiffs did not have a choice but to relinquish their franchise agreements. The plaintiff affidavits state that "[t]he short time frame that was imposed upon me for making the decision to sign the wind down agreement and liability release agreement was coercive, abusive, and prevented me from careful analysis of the true effects of signing the wind down agreement[.]" *See* Pls.' Resp., App. at 416-498.

The plaintiffs have also submitted the testimony of the CEO of Old GM before the Senate's Committee on Commerce, Science, and Transportation in which he stated that GM dealers who were presented with Wind-Down Agreements faced a "no choice deal." Pl. App. at 61.

Regarding the release, the plaintiffs state in the same affidavits discussed above, that they did not understand that the release of the 363 Acquirer included the United States government for takings claims. Specifically, the affidavits state that they "did not

know or believe that the wind down agreement and liability release applied to any part of the Federal government."  The plaintiffs further state that they were "never asked to and did not agree to release and/or give up [their] right to assert a constitutional takins claim against the Federal government in relation to the bankruptcy filing of GM.  I believe that the only claims I released were claims I had against GM in bankruptcy." *See* Pls.' Resp., App. at 416-498.

## V.  Disputed Facts Concerning the Value of Plaintiffs' Dealerships in the "but for" World

The government has not proffered any evidence to support its summary judgment motion regarding the value of plaintiffs' franchise agreements in a "but for" world without any government bailout, despite having the opportunity to do so both in it is initial briefing on the motion for summary judgment and in its response to the plaintiffs' motion to supplement the evidentiary record.  Rather, the government has provided evidence as to what each named plaintiff was offered or received in their Wind-Down Agreement and claims that those amounts equal or exceed what they would have received in a "but for" world and thus plaintiffs have not suffered any economic loss.

The plaintiffs have submitted the following evidence regarding the value of their dealerships in the "but for" world where the government provided no financial assistance to Old GM and Old GM would be liquidated in bankruptcy. They have offered an affidavit from Ted Stockton the current Vice President and director of Economics Services of the Fontana Group, Inc. who has 30,000 hours within the retail automotive industry with experiences which includes studies of hundreds of franchised operations

that sell, or have sold, vehicles of several makes and models. Stockton Dec. at ¶5. In his report, he states that "[w]hile the question of whether any given GM Plaintiff's value in a liquidation scenario would have been greater than the Wind-down payment amount is a factual one, the retained value of GM Plaintiffs in a liquidation scenario makes it likely that many or most GM plaintiffs would have had value in excess of their respective Wind-down payment amounts." *Id.* at ¶ 16. Mr. Stockton's conclusions were drawn from several sources concerning the state of the auto market in the United States. *See* Stockton Dec. As part of his analysis Mr. Stockton considered the plaintiff's "direct value" through the ability to sell used cars as well the ability to provide secondary services such as providing maintenance. In order to show this continued value, Mr. Stockton notes that "[o]f GM sales in 2017, 84.6% were of models that had common names or platforms with vehicles in 2009. Of GM sales in 2009, 85.2% were vehicle platforms that continued until at least 2017." *Id.* at ¶ 25. Furthermore, Mr. Stockton notes that "domestic manufacturers had a much more active presence in rural areas than did import brands" and as a result foreign manufacturers would have sought out franchises who were successful in these areas and as such would have had more value. *Id.* at ¶¶ 27 and 28. Ultimately, Mr. Stockton notes that in such circumstances GM dealers would have had more value in a "but for" world than they received or were offered as part of the Wind-Down Agreements. *Id.* at ¶ 16. Mr. Stockton did not tie his opinions to any of the individual plaintiffs.

## VI.   Legal Standards

Summary judgment must be granted where "there is no genuine issue as to any material fact and . . . . the moving party is entitled to judgment as a matter of law." RCFC 56 (c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Mann v. United States*, 334 F.3d 1048, 1050 (Fed. Cir. 2003). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. The burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Coletex, Corp.v. Catrett*, 477 U.S. 317, 323 (1986).

On a motion for summary judgment, the court views the evidence "in the light most favorable to the party opposing the motion," and resolves all doubts in favor of the nonmovant.  *Crown Operations Int'l v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002); *see also Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984, 991 (Fed. Cir. 2009).  In its analysis the court may neither make credibility determinations nor weigh evidence and seek to determine the truth of the matter.  *See Anderson*, 477 U.S. at 255.  With regard to takings cases, "due to the fact-intensive nature ... summary judgment should not be granted precipitously."  *Moden v. United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005).  As the moving party, the government "has the burden to show 'that there is an absence of evidence to support the non-moving party's case.'" *Crown Operations*, 289 F.3d at 1377 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).  The moving party may submit sworn affidavits in support of its motion.  *See* RCFC 56(c)(1), (e). Once the moving party has met its burden, the party opposing summary judgment must respond and "set out specific

facts showing a genuine issue for trial." *Crown Operations*, 289 F.3d at 1377.  The

nonmoving party's burden requires more than "mere assertions" or "conclusory

pleadings."  *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626–27 (Fed. Cir.

1984); *see also Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731

F.2d 831, 836 (Fed . Cir. 1984) ("The party opposing the motion must point to an

evidentiary conflict created on the record at least by a counter statement of a fact or facts

set forth in detail in an affidavit by a knowledgeable affiant. Mere denials or conclusory

statements are insufficient.").

It is well-recognized, however, that the "non-movant need not always provide . . .

evidence to defeat a summary judgment motion. If, for example, the movant bears the

burden [of proof] and its motion fails to satisfy that burden, the non-movant is 'not

required to come forward' with opposing evidence." *Saab Cars USA, Inc. v. United

States*, 434 F.3d 1359, 1368 (Fed. Cir. 2006) (quoting *Adickes v. S.H. Kress & Co.*, 398

U.S. 144, 160 (1970)).  Thus, under Rule 56(e), a non-movant must provide "opposing

evidence ... only if the moving party has provided evidence sufficient, if unopposed, to

prevail as a matter of law." *Id*. at 1369; *see also Zenith Elecs. Corp. v. PDI Commc'n Sys.

Inc*., 522 F.3d 1348, 1363 (Fed. Cir. 2008).

## VII.   Discussion

> ### A.    Disputed Issues of Material Facts Preclude Summary Judgment for the Government on the Issue of Whether the Plaintiffs' Franchise Dealership Agreements Were Terminated Because of Government Action.

In order to succeed on a Fifth Amendment takings claim against the United States, the plaintiffs must demonstrate that the action which resulted in the deprivation of their property was the result of government action and not an act of a private party. *Alves v. United States*, 133 F.3d 1454, 1458 (Fed. Cir. 1998); *Colvin Cattle Co. v. United States*, 468 F.3d 803, 809 (Fed. Cir. 2006). Specifically, "[t]here clearly can be no taking when whatever acts complained of are those of private parties." *Alves*, 133 F.3d at 1458 (citation omitted).

The government argues that the undisputed facts demonstrate that plaintiffs' franchise dealership agreements were terminated by Old GM and that because the government was not a signatory to those agreements the government cannot be held responsible for a taking of plaintiffs' dealerships. The plaintiffs do not dispute the government was not a signatory to the Wind-Down Agreement but argue that the facts presented in the SIGTARP report, and confirmed by the Wilson deposition, establish that the government's Task Force was controlling the Wind-Down Agreement process and that the government was responsible for ordering a larger number of dealership terminations and a faster termination schedule than proposed by GM. Specifically, the plaintiffs cite the portion of the SIGTARP report that explains that the Task Force rejected GM's initial restructuring plan and ordered GM to produce a new plan with more dealership terminations. In March 2009, "GM was given 60 days to submit a more aggressive plan overall, including planning for their dealership terminations . . ." Pl.'s App. at 18. Specifically, the plaintiffs argue that the government rejected Old GM's initial restructuring proposal and in its rejection stated that "GM has been successfully

24

pruning unprofitable or underperforming dealers for several years.  However, its current

pace will leave it with too many such dealers for a long period of time while requiring

significant closure costs that its competitions will not incur.  These underperforming

dealers create a drag on the overall brand equity of GM and hurt the prospects of the

many stronger dealers who could help GM drive incremental sales." *Id.*  Based on this

evidence, plaintiffs maintain that it is clear that the government forced GM to increase

the number and pace of dealership closures and was thus responsible for the plaintiffs

losing their property interests.

The plaintiffs also rely on the deposition of Harry Wilson, who as discussed above

was the member of the Task Force charged with reviewing the Wind-Down Agreement

and the accompanying deposition exhibits 3.1 and 3.2 entitled "GM and Task Force

Contingency Planning Meeting: New York City- May 1, 2009; May 15 2009: Key Issues

and Deliverables" and "1GM and Task Force Contingency Planning Meeting: New York

City- May 1, 2009: Key Issues and Deliverables."  Plaintiffs argue that the deposition of

Mr. Wilson and the agendas referenced by Mr. Wilson show that Mr. Wilson was

responsible for reviewing and signing off on the Wind-Down Agreements initially

drafted by Old GM as a deliverable to the Task Force on May 1, 2009.  ECF No. 346-4 at

p. 2. Plaintiffs argue that this is confirmed by documents that show that on May 16, 2009

David Markowitz, a member of the Task Force who reported to Mr. Wilson, had a

deliverable which included "[f]inalize dealer agreements and process for rejection." ECF

No 346-3 at p. 3.  Furthermore, the plaintiffs note that the status column stated "letters

being revised on 5/26 based on Treasury input." *Id.*  The plaintiffs argue that these

deliverables were to be completed shortly before the Wind-Down Agreements were sent to the plaintiffs and as such create an issue of material fact as to the government's control over the Wind-Down Agreements and process.

The court agrees with the plaintiffs that there are genuine issues of material fact that preclude the court from entering summary judgment in the government's favor on whether there was sufficient government action to support plaintiffs' takings claims. The facts presented by plaintiffs from the SIGTARP report as well as the deposition of Mr. Wilson and the accompanying exhibits demonstrate that the government, through the Task Force, forced Old GM to terminate more dealerships on a more expedited basis and thereby forced the closure of at least some of the plaintiffs' dealerships. In such circumstance, the court cannot agree with the government that the Wind-Down Agreements and the termination of plaintiffs' dealerships was not the result of government action but only the product of a private transaction between the plaintiffs and Old GM.

**B.     Plaintiffs Did Not Voluntarily Relinquish Their Franchise Dealerships to the United States.**

It is not disputed that when an owner of property voluntarily conveys property to the government or a third party by agreement, the property owner cannot subsequently maintain a takings claim regarding that property against the United States. *See, Norman v. United States*, 429 F.3d 1081(Fed. Cir. 2005); *Wyatt v. United States,* 271 F.3d 1090 (Fed. Cir. 2001). Thus, the government argues that even assuming the government was involved in plaintiffs' relinquishment of their franchise agreements through the Wind-

26

Down Agreement process, based on these precedents plaintiffs cannot claim a taking because they relinquished their dealerships voluntarily in exchange for cash and other valuable consideration.

The government relies on the on the express language of the Wind-Down Agreements, which states the "Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives.  In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress."  Def.'s Mot., App. at 10.  Thus, the government argues the terms of the Wind-Down Agreements make clear that the plaintiffs who signed the Agreements voluntarily relinquished their dealership agreements and therefore cannot maintain a Fifth Amendment takings claim against the government.

In response, the plaintiffs argue that they did not voluntarily relinquish their dealership agreements when they signed the Wind-Down Agreements. First, the plaintiffs rely on the SIGTARP report as evidence that the plaintiffs did not sign the Wind-Down Agreements voluntarily.  Specifically, they note that the SIGTARP report states that "GM received a total of 1,316 appeals related to both complete and partial wind-downs."  Pl.'s Resp., App. at 25.  The plaintiffs argue that the number of GM dealers that took advantage of the arbitration legislation indicates that Old GM dealers did not wish to voluntarily terminate their dealership agreements and tried to reinstate their dealership agreements at the first opportunity.  Second, the plaintiffs point to the several affidavits they submitted from different GM plaintiffs where they state that they did not want to terminate their dealerships and did not do so voluntarily.  *Id.* at 415-498.  In their

27

affidavits, the plaintiffs state that "[t]he short time frame that was imposed upon me for making the decision to sign the wind down agreement and liability release agreement was coercive, abusive, and prevented me from careful analysis of the true effects of signing the wind down agreement[.]" *See* Pls.' Resp., App. at 416-498.  Third, the plaintiffs rely on the testimony of the CEO of Old GM before the Senate Committee on Commerce, Science, and Transportation.  Specifically, the plaintiffs rely on an exchange between the CEO of Old GM and Senator Begich where the CEO of Old GM implied that the GM dealers who were presented with a Wind-Down agreement were faced with a "no choice deal." Pls.'s Resp., App. at 61.  For these reasons, the plaintiffs argue that there are disputed issues of material fact concerning whether the plaintiffs who signed the Wind-Down Agreements did so voluntarily and as such this court is precluded from entering summary judgment in favor of the government on this alternative basis.

Although the parties have focused their arguments on whether the plaintiffs voluntarily relinquished their franchise agreements, the court finds for the below stated reasons that the government's reliance on the plaintiffs alleged voluntary action in signing the Wind Down Agreements is misplaced.  Contrary to the government's contentions, the present case is plainly different from *Norman v. United States*, 429 F.3d 1081 (Fed. Cir. 2005) and *Wyatt v. United States,* 271 F.3d 1090 (Fed. Cir. 2001), the precedents relied on by the government.

In *Norman*, the plaintiffs alleged that the government required them to transfer 220.85 acres of wetland to a third party in order to receive the appropriate permit from the Army Corps of Engineers.  *Norman,* 329 F.3d at 1088-89. Specifically, the plaintiffs

alleged that the government deprived them of these acres and as a result the government effectuated a taking of the plaintiff's property. *Id.*  The Federal Circuit held that because the plaintiffs' transfer of title of the aces was voluntary and was not an exclusive condition that needed to be met in order to receive the permit no taking occurred because the transfer of the acres was voluntary. *Id.* at 1089. In this connection the Federal Circuit determined that there were other means by which the plaintiffs could have satisfied the conditions necessary in order to receive the relevant permit from the Army Corps of Engineers. *Id.*

Next, in *Wyatt*, plaintiff alleged a regulatory taking by the government when the government denied issuing a new permit to allow the plaintiff to continue to operate a mine. *Wyatt*, 271 F.3d  at 1096.  The Federal Circuit determined that no taking occurred because the plaintiff voluntarily relinquished its leasehold over the relevant property that it wished to mine by not renewing the lease and thus there was no valid property interest under which the plaintiff could assert a takings claim. *Id.*

In this case in contrast to *Norman*, the plaintiffs could not have avoided the loss of their franchise agreements by not signing the Wind-Down Agreements. The plaintiffs who did not sign the Wind-Down Agreements would have lost their franchise agreements in bankruptcy court.  Thus unlike *Norman*, the plaintiffs did not have the option of retaining their franchises.  Additionally, *Wyatt* is not similar to the case at hand either because the plaintiffs here claim that they had a property interest remaining following the execution of the Wind-Down Agreements and seek in this action the additional value of their franchises above the amount they receive in the Wind-Down Agreements.

Notwithstanding the foregoing, the court agrees with the government that if the value provided for in Wind-Down Agreements equals or exceeds the value of the plaintiffs franchise agreements in the "but for" world there can be no taking. Without evidence regarding the value of the franchises in the "but for" world, the fact that the plaintiffs entered into Wind-Down Agreements with Old GM does not end plaintiffs' takings claims against the United States.[10]

### C.    The Wind-Down Agreement's Release Provision is Ambiguous.

Next, the government argues that the broad release language in each Wind-Down Agreement defeats the takings claims of the GM plaintiffs who signed the Agreement. Specifically, the government argues that even if plaintiffs have a takings claim, the Wind-Down Agreement contained language which "release[d], settle[d], cancel[ed], discharge[d], and acknowledge[d] to be fully satisfied any and all claims . . . against GM, the 363 Acquirer, their Affiliates … arising out of or relating to the (i) Dealer Agreement or this Agreement . . ." Def.'s Mot., App. at 6. The government argues that the "363 Acquirer" referred to New GM, the acquirer of Old GM's assets under the Sale Agreement, of which the United States was a stockholder. Therefore, the government maintains that under Michigan law, which both parties agree governs the interpretation of the Wind-Down Agreement, the release is unambiguous and the plaintiffs who signed the Wind-Down Agreements cannot sustain a takings claim against the government because

---

[10] Plaintiffs will also have to prove that their dealerships had any economic value above the amounts they received or were offered in order to meet the criteria for a regulatory takings.

they released the government of any liability, including liability for Fifth Amendment takings claims.

In support of its assertion that takings claims can be released the government relies on this court's decisions in *Henderson County Drainage Dis. No. 3 v. United States,* 53 Fed. Cl. 48 (2002) and *W. Chelsea Bldgs. LLC v. United States*, 109 Fed. Cl. 5 (2014), *aff'd* Fed. Cir. 13-5066 (Feb. 12, 2014).   In *Henderson County Drainage Dis. No. 3*, the court was presented with a release which stated that the drainage districts "release and forever discharge the United States . . . from any and all damages and claims for damages, past, present, and future[.]" 53 Fed. Cl. at 55.  The *Henderson County* court explained that the plain language of the release showed that "the parties' mutual intent to contract was limited to the payment of a specific amount for damages, in exchange for a full release." *Id.*

In *W. Chelsea Bldgs.*, this court was presented with a release which stated that the plaintiff "agrees not to sue or join any action seeking compensation from, and will not participate with and will withdraw from any class action seeking compensation from the City or the United States or any of its departments or agencies with respect to the Highline CITU . . ." 109 Fed. Cl. at 12.  The court held the intent of the parties is clear from the terms of the release and the plaintiffs cannot maintain a lawsuit for a taking against the United States government.  *Id.* at 23.  The government argues that the release provisions in *Henderson County* and *W. Chelsea Bldgs.* are similar to the one present in the Wind-Down Agreements signed by the plaintiffs.

The government also relies on the decision by the Court of Appeals of Michigan, in *Gortney v. Norfolk & Wester Ry., Co.* where the court reasoned that "[i]f the text in the release is unambiguous," the court "must ascertain the parties' intentions from the plain, ordinary meaning of the language of the release" and upheld a release where the "language of the release evidences as a clear intent to settle and to release defendant from liability[.]" 216 Mich. App. 535, 540-41, n.9 (1996).  A release is ambiguous "if its language is reasonably susceptible to more than one interpretation." *Id*. at 540 (citations omitted).

The government argues that by signing the Wind-Down Agreements the plaintiffs agreed to a one-time cash payment as well as a period of time to wind-down their operations and in exchange they also agreed that they would release Old GM and the new 363 Acquirer from all liability.  The government argues that since the government was the majority shareholder of the 363 Acquirer and the release extended to shareholders, the plaintiffs who signed the Wind-Down Agreements necessarily released the government from all liability in connection with the Wind-Down Agreements, including constitutional claims.

In response, the plaintiffs make two arguments. First, the plaintiffs argue under Michigan law it is not certain that the United States government is covered by the release in the Agreements. Plaintiffs argue that M.C.L.A. § 600.1405 "defines third-party beneficiaries and the rights they possess," *Kammer Asphalt Paving Co., Inc. v E. China Tp. Sch.,* 443 Mich. 176, 189 (Mich. S.Ct. 1993), and that under that statute a person is a third party beneficiary only when the promisor undertakes an obligation 'directly' to or

for the person.  The plaintiffs maintain that the Michigan Supreme Court requires courts to take a "guarded" and "cautious" approach to ensure that M.C.L.A. § 600.1405 is "narrowly construed." *Shay v. Aldrich*, 487 Mich. 648, 675 (Mich. S.Ct. 2010).  Plaintiffs argue that under the Michigan Supreme Court's decision in *Koenig v. City of S. Haven*, if the parties had intended for the United States government to be released in the Wind-Down Agreements the parties needed to have specifically named the United States as a released party.  *Koenig v. City of S. Haven*, 460 Mich. 667, 676-77 (Mich. S.Ct. 1999).

Second, the plaintiffs argue that the scope and extent of the release is ambiguous and that evidence is needed to establish its meaning.  Plaintiffs assert that under Michigan law, "[i]t is well settled that the meaning of an ambiguous contract is a question of fact that must be decided by the fact finder." *Marrocco v. Oakland Macomb Interceptor Drain Drainage Dist.,* Nos. 326575, 327614, 2016 WL 3355218, at *3 (Mich. Ct. App. June 16, 2016); *See also Klapp v. United Ins. Group Agency, Inc.* 664 N.W.2d 447, 454 (Mich. 2003).  The plaintiffs maintain that the scope of the release is ambiguous because at the time that the Agreements were signed, there is no evidence as to the identity of the 363 Acquirer.  Plaintiffs argue that they were required to sign and return the Wind-Down Agreements within 10 days of their receipt on June 1, 2009 and the bankruptcy court did not approve the 363 sale until July 5, 2009.  Therefore, plaintiffs argue that there was no way prior to July 5, 2009 that they could have known with certainty who would be the 363 Acquirer and thus who the release would apply to. The plaintiffs further argue that it is unclear that the scope of the release included Fifth Amendment takings claims because the release is designed to ensure that the new acquirer will not inherit the liabilities of Old

GM and not to release the new acquirer from any liabilities plaintiffs have separate from actions by Old GM.  Finally plaintiffs argue that when a release intends to release the United States of all liability the release specifically does so.  Specifically, the plaintiffs rely on the senior executive officer agreements signed by GM executives which state that "[t]his waiver includes all claims I may have under the laws of the United States or any state related to the requirements imposed by the aforementioned regulations and Limitations including without limitation a claim for any compensation or other payments or benefits I would otherwise receive[.]"  Pls.' App. at 413.

In response, the government argues that the United States government was included in the release because the release applied to all stockholders of the 363 Acquirer and that it was understood that the United States government was becoming the majority shareholder in New GM. Next, the government argues that the release provision is unambiguous under Michigan law. Relying on *Quality Prod. & Concepts Co. v. Nagel Precision, Inc.,* 469 Mich. 362, 375 (2003) and other cases, the government argues that the scope of the release is not ambiguous but extends to all claims and that plaintiffs cannot create an ambiguity with self-serving affidavits. *See Hunt v. Lower Harbor Properties, L.L.C.*, No. 303960, 2012 WL 5233633 at *5 (Mich. Ct. App. Oct. 23, 2012) ("self-serving affidavit essentially mirror[ing] plaintiffs' legal arguments regarding the proper construction of the release" was insufficient to create an ambiguity). The government argues that the court should reject the plaintiffs attempt to create ambiguity of the release provision after the fact.

The court agrees with the government that the government as a shareholder in the 363 Acquirer is without question included as an intended beneficiary of the release. However the court agrees with the plaintiffs that the scope and extent of the release contained in the Wind-Down Agreements is ambiguous.  A release is ambiguous "if its language is reasonably susceptible to more than one interpretation." *Rinke v. Automotive Moulding Co.*, 226 Mich.App. 432, 435 (1997) (citations omitted).  "It is well settled that the meaning of an ambiguous contract is a question of fact that must be decided by the fact finder." *Marrocco v. Oakland Macomb Interceptor Drain Drainage Dist.,* Nos. 326575, 327614, 2016 WL 3355218, at *3 (Mich. Ct. App. June 16, 2016).

The court finds that the scope of the release is ambiguous and thus it is necessary for the court to hold a trial to determine the scope of the Wind-Down Agreement's release.  The release is ambiguous because the government was not specifically named as a third-party beneficiary, but became a third-party beneficiary through its status as a shareholder of the 363 Acquirer. Whether the parties thus intended to release the United States government for Fifth Amendment takings claims is unclear. Indeed, the evidence presented by plaintiffs shows that in other agreements entered into with GM executives following the GM bailout, the release language included all potential claims for payment under the laws of the United States, including presumably the Fifth Amendment.  The absence of such express language in the Wind-Down Agreements supports plaintiffs' contention that the subject releases are ambiguous on this question.  It is for all these reasons that a trial to discern the parties' intentions is needed in accordance with Michigan law.

### D. Government's Burden Regarding the Value of the Plaintiff's Property in the "But For" World.

Finally, the government argues that it is entitled to summary judgment on the takings claims of all of the named plaintiffs, because they already have received or were offered the amounts they are seeking in this litigation.  The government maintains that the Wind-Down Agreements, which provided the plaintiffs with a cash payment, the ability to sell remaining inventory, purchase service parts, and perform warranty services and other normal service operations for 17 months, are the same benefits that the plaintiffs claim that they were deprived of by the government.  The government argues that under the Federal Circuit's decision in *Cienega Gardens v. United* States, 503 F.3d 1266 (Fed. Cir. 2007), this court must take into consideration the benefits that were offered or received by the plaintiffs when considering if there was any economic loss as a result of the alleged taking. The government maintains that because the plaintiffs were offered or received everything they are now saying that the government deprived them of, the plaintiffs cannot establish a taking as a matter of law and the court should enter summary judgment in favor of the United States.

In response, the plaintiffs argue that there are disputed issues of material fact that prevent this court from ruling in favor of the government's motion for summary judgment.  The plaintiffs maintain that the value of their dealerships would have been greater than the amount they received or were offered as part of the Wind-Down Agreements.  In support of this assertion the plaintiffs have submitted an affidavit from their expert Ted Stockton.  In his affidavit, Mr. Stockton states that "[w]hile the question

of whether any given GM Plaintiff's value in a liquidation scenario would have been greater than the Wind-down payment amount is a factual one, the retained value of GM Plaintiffs in a liquidation scenario makes it likely that many or most GM plaintiffs would have had value in excess of their respective Wind-down payment amounts." Stockton Dec. at ¶ 16.  Mr. Stockton's conclusions were drawn from several sources concerning the state of the auto market in the United States.  Plaintiffs argue that Mr. Stockton's affidavit creates a genuine issue of material fact regarding the value of the plaintiffs' dealerships in the "but for" world of liquidation and as such the court should not grant the government's motion for summary judgment.

The government argues that Mr. Stockton's affidavit does not preclude summary judgment because Mr. Stockton's opinion only addresses one of the benefits of the Wind-Down Agreements, the cash payment, and ignores the other benefits included in the Wind-Down Agreements.  The government argues, that by only offering an opinion on if the plaintiffs' dealerships were worth more than the cash payments received or offered with the Wind-Down Agreement Mr. Stockton has not offered an opinion on the relevant issue on summary judgment, i.e. whether the plaintiffs would have received more benefits than offered in the Wind-Down Agreements had Old GM been liquidated in an orderly bankruptcy proceeding.  The government argues that because Mr. Stockton's affidavit does not address that issue, his report is irrelevant and does not raise a genuine issue of material fact.

In addition, the government argues that Mr. Stockton's opinions are the sort of "conclusory statements [that are] insufficient" to create a genuine issue of material fact in

any case.  *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831,

836 (Fed. Cir. 1984).  Specifically, the government argues that the only evidence that Mr.

Stockton offers to support his conclusion that most of the plaintiff's dealerships would

have had value in excess of the Wind-Down Agreements is that the Wind-Down

Payments received by the 59 plaintiffs who signed the agreements averaged $251,000

which was "less than half of the net profit achieved by U.S. franchised dealerships" in

2008.  Stockton Dec. at ¶ 16.  The government argues that Mr. Stockton neither explains

why averaging the Wind-Down Payments is a reliable measure of the plaintiffs'

dealership agreements in Old GM bankruptcy or why the average profit of dealerships in

2008 is relevant to the value of the plaintiffs' dealership agreements in a GM bankruptcy.

Thus, the government maintains that these conclusory statements made by Mr. Stockton

about the value of the plaintiffs' dealerships in the "but for" world are insufficient to

create a genuine issue of material fact that would preclude the court from granting the

government's motion for summary judgment.

The court finds summary judgment is not appropriate in this case because to

prevail on summary judgment the government needed to show "that there is an absence

of evidence to support the nonmoving party's case." *Celotex Corp.* 477 U.S. at 325.

Specifically, the government has only provided this court with the actual amounts that the

plaintiffs received and were offered and has provided nothing to show that plaintiffs

cannot demonstrate that their dealerships would have been worth more in the "but for"

world where Old GM liquidated in bankruptcy.  The court finds that despite the

deficiencies in Mr. Stockton's Declaration, which are numerous, it is sufficient to

preclude summary judgment. The mere assertion that what the plaintiffs have received or were offered is all that they would have gotten in a "but for" world is not enough to establish a right to judgment where plaintiffs have submitted contrary evidence. *See Id.* at 328 (White, J. concurring) ("[i]t is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case. . . . It is the [movant's] task to negate, if he can, the claimed basis for the suit."). For these reasons, the government is not entitled to summary judgment on this ground.

## CONCLUSION

For the reasons stated above, the plaintiffs' motion to supplement the evidentiary record is **GRANTED**. Additionally, for the reasons stated above, the government's motion for summary judgment is **DENIED**. The court will turn next to the plaintiffs' motion for class certification which had been stayed pending the outcome of this motion. The parties shall have until **October 1, 2018** to file any additional authorities they wish the court to consider regarding the plaintiffs' motion for class certification.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge