# In the United States Court of Federal Claims

Nos. 10-647C, 11-100C, and 12-900C
(Filed: October 2, 2019)
**CONSOLIDATED**

<table>
<tr><td>

COLONIAL CHEVROLET CO.,
INC., et al.,

               Plaintiffs,

v.

THE UNITED STATES,

               Defendant.

* * * * * * * * * * * * * * * * * * * *

ALLEY'S OF KINGSPORT, INC., et
al.,

               Plaintiffs,

v.

THE UNITED STATES,

               Defendant.

* * * * * * * * * * * * * * * * * * * *

UNION DODGE, INC., et al.,

               Plaintiffs,

v.

THE UNITED STATES,

               Defendant.

</td><td>

Fifth Amendment Taking; Government
Action Through Coercion; Economic
Value in a "But For World"

</td></tr>
</table>

**TRIAL OPINION**

*Roger J. Marzulla*, Washington, DC, counsel for Alley's of Kingsport, Inc., et al.,
plaintiffs, and *Marquette W. Wolf*, Mesquite, TX, counsel for Colonial Chevrolet Co.,
Inc., et al., plaintiffs. *Nancie G. Marzulla*, Washington, DC, *Richard Mann*, Mesquite,

TX, *Leonard A. Bellavia*, Mineola, NY, *Thomas A. Homan*, New York, NY, *Stephen G. Larson*, *Steven E. Bledsoe*, and *Lauren Wulfe*, Los Angeles, CA, and *Harry W. Zanville*, La Mesa, CA, of counsel.

*Kenneth M. Dintzer*, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *James P. Connor* and *Elizabeth M. Hosford*, Assistant Directors, *Christopher J. Carney*, Senior Litigation Counsel, for defendant. *Jonathan E. Jacobson*, *Joshua A. Mandlebaum*, *Antonia R. Soares*, *Zachary J. Sullivan*, and *Alison S. Vicks*, Washington, DC, of counsel.

**FIRESTONE,** *Senior Judge.*

This action was brought by car dealers that had their franchise agreements with Chrysler LLC ("Old Chrysler" or "Chrysler") rejected when Old Chrysler went into bankruptcy during the Great Recession in April 2009.[1] These car dealer plaintiffs claim that the United States Government ("government") is liable for taking their franchise agreements without just compensation in contravention of the Fifth Amendment. They claim the government is liable because the government through its actions coerced Chrysler into filing for bankruptcy under a government negotiated prepackaged bankruptcy plan, which called for a reduction in Chrysler's franchise network. The reduction was accomplished through the rejection in the bankruptcy of 789 franchise agreements, including plaintiffs' agreements.[2] Plaintiffs claim that had the government not gotten involved in the Chrysler bankruptcy their franchise agreements would not have

---

[1] The court's use of the terms "Old Chrysler" or "Chrysler" in this opinion refer to Chrysler before it filed for bankruptcy in 2009. The term "New Chrysler" will be used to refer to the Chrysler that emerged after the 2009 bankruptcy. The court follows the same approach for Old General Motors, "Old GM" or "GM," to refer to the company before it filed for bankruptcy in 2009.

[2] Under the Bankruptcy Code, 11 U.S.C. § 365, a debtor or bankruptcy trustee "may assume or reject any executory contract . . . of the debtor." The franchise agreements at issue in this case are executory contracts that were rejected in bankruptcy by the debtor, Chrysler.

been rejected by Chrysler in bankruptcy but would have been assumed by the owner of New Chrysler.

The taking claims addressed in this decision trace back to three separate lawsuits, Case Nos. 10-647, 11-100 and 12-900, filed by three groups of plaintiffs that owned franchise agreements with either Old Chrysler or Old General Motors and that had their franchise agreements rejected in the Chrysler and GM bankruptcies. The first of these three lawsuits, *Colonial Chevrolet Co.*, was filed on September 27, 2010 and the government moved to dismiss the lawsuit on January 21, 2011. On February 27, 2012 the government's motion to dismiss was denied and the case was certified for interlocutory appeal. *Colonial Chevrolet Co., Inc. v. United* States, 103 Fed. Cl. 570 (2012); *Colonial Chevrolet Co., Inc. v. United States*, 106 Fed. Cl. 619, 622 (2012). During the Federal Circuit's interlocutory review, two later filed cases, *Alley's of Kingsport, Inc.* and *Union Dodge, Inc.* (Case Nos. 11-100 and 12-900) were stayed pending the Federal Circuit's decision in *Colonial Chevrolet Co.*

On April 7, 2014, the Federal Circuit issued its decision affirming the denial of the government's motion to dismiss. *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142 (Fed. Cir. 2014). The Circuit held that the plaintiffs had alleged sufficient facts to support potential Fifth Amendment taking claims based on a theory of coercion. The Circuit also held, however, that the plaintiffs had failed to allege sufficient facts to show that their franchise agreements would have had economic value in a "but for world" where the government had not provided financial assistance to Chrysler or GM.[3]

---

[3] The concept of the "but for world" is derived from the Federal Circuit's discussion of economic value in *A&D Auto Sales*. 748 F.3d at 1158-59. As the Circuit explained, in a regulatory taking

Regarding a taking by coercion, the Federal Circuit indicated that if the plaintiffs could establish that Chrysler's decision to enter bankruptcy under terms negotiated by the government was not voluntary, a potential taking may be found. *Id.* at 1154. The Circuit identified several cases where a party's actions affecting the property of third parties was found to be attributable to government pressure and thus a possible taking under a theory of government coercion. *Id.* at 1154-55. Based on the plaintiffs' allegations of Chrysler and GM seeking government assistance during the Great Recession in late 2008 and early 2009, the Circuit listed several "circumstances" it deemed potentially relevant to the issue of coercion including but not limited to (1) whether the government insisted on the franchise terminations or targeted franchisees for termination, (2) whether the franchise terminations would have occurred in any event, (3) whether government financing was essential to Chrysler, and (4) whether the government had a role in creating the economic circumstances alleged to have given rise to coercion. *Id.* at 1155. But the Circuit also noted that if the government was acting only as a lender to Chrysler and GM and negotiated bankruptcy terms necessary to protect the government's financial interests, the government might not be liable for a taking. *Id*. at 1156-57.

Regarding plaintiffs' failure to allege that their franchise agreements had economic value, the Circuit explained that to prove a taking the plaintiffs would need to establish that their franchise agreements would have had value in a hypothetical "but for world" where the government had not provided financial assistance to Chrysler or GM.

---

case, plaintiffs have the burden of showing what value their property would have had in the absence of government action. *Id*.

*Id.* at 1157-59. If plaintiffs' franchise agreements would not have had value in a "but for world" without government assistance, the Circuit explained, the government did not "take" anything of value and cannot be liable for a "taking." *Id.* The Circuit remanded the case to this court to allow plaintiffs the opportunity to amend their complaints to include allegations of value in a "but for world" without government assistance. *Id.* at 1158-59.

On September 15, 2014, the plaintiffs in all three above-captioned cases filed amended complaints in which they posited that their franchise agreements would have had value under several "but for world" scenarios in which the government did not provide financial assistance to Chrysler or GM. *Colonial Chevrolet Co., Inc. v. United States,* 123 Fed. Cl. 134, 140-46 (2015). The government moved to dismiss the amended complaints claiming that plaintiffs' "but for" assumptions were either implausible or barred by *A&D Auto Sales*. *Id.* On September 9, 2015, this court granted in part and denied in part the government's motion, holding that certain of plaintiffs' "but for world" scenarios were consistent with the Federal Circuit's decision in *A&D Auto Sales*. *Id.* The court also severed the GM plaintiffs from the Chrysler plaintiffs and put the GM plaintiffs' claims on a separate discovery time table.

Following this court's decision granting in part and denying in part the government's motion to dismiss, the court, on December 4, 2015, consolidated the three above-captioned lawsuits for the purposes of case management, discovery, and for trial on the merits of the Chrysler plaintiffs' taking claims. On April 6, 2016, this court denied the Chrysler plaintiffs' motion for class certification. Thereafter, the parties chose 10 representative Chrysler plaintiffs for purposes of discovery and trial. One of the Chrysler

representative plaintiffs withdrew from the litigation prior to the commencement of trial leaving nine representative plaintiffs.

The nine representative plaintiffs were divided into two groups: the *Alley's* group with seven plaintiffs including Taylor & Sons, Inc., Cedric Theel, Inc., Whitey's Inc., RFJS Company, Jim Marsh American Corp., Livonia Chrysler Jeep, Inc., Barry Dodge, Inc., and the *Colonial* group with two plaintiffs including Guetterman Motors, Inc. and Mike Finnin Motors, Inc. The two groups of plaintiffs are represented by different attorneys and sometimes relied on different evidence to prove their taking claims.

Trial to determine principally whether there was government action through coercion and whether plaintiffs' franchise agreements would have had economic value in a "but for world" without government assistance was held in Washington, D.C. between April 8, 2019 and May 8, 2019. Post-trial arguments were held on June 19, 2019 and June 20, 2019. During trial the court heard testimony from 36 witnesses and received 542 exhibits into evidence.

Importantly, at trial the representative plaintiffs did not focus their coercion evidence on Chrysler being forced to accept the government's negotiated bankruptcy terms (including a reduction in Chrysler franchises) because Chrysler needed the government's financial assistance, as the Federal Circuit had assumed in *A&D Auto Sales.* 748 F.3d at 1155. Instead, plaintiffs presented opinion testimony to the effect that Chrysler did not need the government's financial assistance. Plaintiffs' experts conceded that Chrysler would have had to file for bankruptcy in 2009. However, they opined that Chrysler would have had more options in bankruptcy than the one option negotiated by the government. According to plaintiffs' experts, Chrysler was coerced because Chrysler

6

was left with no alternative but to accept the government's assistance after the government took over negotiations with Chrysler's creditors and others in early 2009.

Plaintiffs' evidence to prove coercion by government action was somewhat conflicting at trial. On the one hand, the plaintiffs introduced evidence to show that Chrysler did not wish to enter bankruptcy but instead wanted the government to loan Chrysler billions of dollars outside of bankruptcy. The plaintiffs relied on this evidence to show (among other things) that the government, not Chrysler, wanted to use bankruptcy to reduce Chrysler's franchise network by rejecting plaintiffs' franchise agreements, rather than pursuing voluntary franchise terminations consistent with state law.

On the other hand, the plaintiffs conceded that Chrysler could not have avoided bankruptcy in 2009 and built both their coercion and economic value theories around this concession. The plaintiffs offered expert opinions to support a coercion theory based on the assumption that there were many companies interested in purchasing Chrysler in late 2008 and early 2009, during the Great Recession. According to plaintiffs' experts, these potential purchasers would have kept Chrysler open during a Chrysler bankruptcy and would not have had any reason to reject any franchise agreements. Plaintiffs introduced evidence to show that the government took over negotiations with Chrysler's creditors, worker unions, and suppliers to accomplish the government's public policy goals of saving jobs and pensions. The plaintiffs asserted that their evidence demonstrated that the decision to reduce the Chrysler franchise network involuntarily in bankruptcy was in furtherance of these policy goals and was never part of Chrysler's own franchise reduction plans.

Plaintiffs also claimed that their franchise agreements would have had economic value in a "but for world" where Chrysler did not accept government assistance but was able to enter bankruptcy outside the terms negotiated by the government. Specifically, plaintiffs presented expert valuation testimony to show that their franchise agreements would have had value in a "but for world" without government assistance because their franchise agreements would never have been rejected in a bankruptcy.

The *Alley's* plaintiffs presented expert opinion testimony to show that if Chrysler had entered bankruptcy without government assistance the outcome for Chrysler would have been very similar to the bankruptcy with government assistance, but with all franchisees remaining Chrysler franchisees. According to the evidence presented by the *Alley's* plaintiffs, franchises had value in a "but for world" because franchisees would have had retained all their income streams, including new car sales, used car sales, warranty and other services. They also presented expert valuation testimony to the effect that their income from these sources would have continued for years because any new Chrysler owner would have assumed their franchise agreements in bankruptcy.

The *Colonial* plaintiffs also presented expert opinion evidence to show that their franchise agreements would have had value in a "but for world." The *Colonial* expert also opined that franchisees would have been able to generate profits from various income streams during a Chrysler bankruptcy without government assistance. The *Colonial* plaintiffs, however, did not claim that their franchise agreements had a "fair market value," as the *Alley's* plaintiffs' claimed. Rather, the *Colonial* plaintiffs' expert set forth various "but for world" values based on the anticipated profits those plaintiffs

would have received from being able to sell their remaining Chrysler inventory and used cars, and from performing warranty and other service work.

The government presented fact and expert evidence to refute the *Alley's* and *Colonial* plaintiffs' claims of government liability based on coercion and on economic value. The government presented evidence to show that the government did not force Chrysler into bankruptcy or into rejecting any of the plaintiffs' franchise agreements. The government presented undisputed evidence to show that Chrysler had been working to reduce its franchise network for years and that Chrysler, not the government, identified the number and names of the franchise agreements to be rejected in bankruptcy.

The government also presented evidence from government and Chrysler witnesses to show that Chrysler's decision to enter bankruptcy under government negotiated bankruptcy terms was based on Chrysler's best business judgment after consideration of its options. The government presented undisputed testimony from Chrysler and government witnesses to confirm that the government did not directly threaten or force Chrysler to accept the government's bankruptcy plan. The undisputed evidence established that the government was willing to allow Chrysler to pursue bankruptcy with limited government assistance if it wished to proceed in bankruptcy on its own. In fact, the government offered Chrysler $750 million to help finance a wind-down if Chrysler wished to pursue other bankruptcy options. The undisputed evidence also made clear that if all of Chrysler's creditors had agreed to the government's terms, the government would have given Chrysler financial assistance outside of bankruptcy.

The government also presented undisputed testimony from Chrysler witnesses to show that Chrysler's financial problems pre-dated the Great Recession. The undisputed

evidence established that Chrysler had started to look for a partner or alliance in 2007 because Chrysler knew it was not viable without an alliance with a company having a small car fleet. The testimony established that no car manufacturer was interested in joining forces with Chrysler in 2007 other than Fiat, and that Fiat made clear that it was not willing to offer Chrysler the financial assistance Chrysler needed.

The government further presented expert opinion evidence to show that the assumptions the *Alley's* and *Colonial* plaintiffs' experts relied on to establish that Chrysler could have remained open during a bankruptcy without government assistance and would not have rejected any franchise agreements were not supported by facts. The government presented expert evidence to establish that there were no potential purchasers of Chrysler in 2009. The government also presented expert evidence to confirm that, without government funding, Chrysler would not have been able to remain operational during a bankruptcy. According to the government's expert witnesses, Chrysler would have faced immediate liquidation under Chapter 7 of the Bankruptcy Code if it had not received government assistance and would have had to immediately close its factories and reject all of its franchise agreements. Based on this evidence the government asserted that Chrysler's decision to accept the government's bankruptcy plan was made voluntarily and was not coerced.

Regarding economic value, the government's experts opined that, in the "but for world" without government assistance, all of Chrysler's factories and parts depots would have closed. The experts opined that in the "but for world" there would have been no new cars to sell, paid warranty work or Chrysler parts. According to the government's experts, in the "but for world" without government assistance, Chrysler would have been forced

into liquidation and the bankruptcy trustee would have rejected all Chrysler franchise agreements. As such, the government's experts concluded, none of Chrysler's franchise agreements would have had economic value.

As discussed in the opinion that follows, the court finds, after considering all of the fact and expert evidence, that the plaintiffs failed to establish by a preponderance of the evidence that the United States by its actions coerced Chrysler into filing for bankruptcy under the government's negotiated bankruptcy terms or into rejecting any of the plaintiffs' Chrysler franchise agreements in the Chrysler bankruptcy.[4] The evidence established that the government did not force Chrysler to accept its bankruptcy terms. The evidence established that the government was willing to give $750 million to Chrysler if Chrysler wished to proceed to bankruptcy alone.

The government's evidence also established that the government through its actions did not interfere with potential acquirers from coming forward to purchase Chrysler in bankruptcy. The evidence established that none of the potential acquirers the plaintiffs' identified were interested or capable of purchasing Chrysler in April 2009. The evidence established that Chrysler accepted the government's prepackaged bankruptcy plan based on Chrysler's best business judgment after consideration of its options. The evidence further established that had the government not provided financial assistance to Chrysler, Chrysler would have been forced into liquidation under Chapter 7 of the Bankruptcy Code and that, in that circumstance, all of plaintiffs' franchise agreements

---

[4] The plaintiffs conceded that Chrysler was not acting as the government's agent in this case. Tr.4821:25-4822:5. Thus their entire case hinged on their proving the government by its actions coerced Chrysler into entering bankruptcy under prepackaged terms negotiated by the government.

11

would have been rejected by the bankruptcy trustee. The evidence thus established that Chrysler's decision to accept the government's prepackaged bankruptcy terms was a voluntary decision and not coerced.

Because the evidence established that Chrysler would have faced immediate liquidation in a Chapter 7 bankruptcy without government assistance, the court also finds that plaintiffs failed to prove their franchise agreements would have had value in a "but for world" without government assistance. The evidence established that in a Chapter 7 bankruptcy all of Chrysler's franchise agreements would have been rejected by the bankruptcy trustee to preserve the assets of the bankruptcy estate and that plaintiffs' franchise agreements would have had no economic value in that circumstance. Thus, plaintiffs failed to prove that any property of value was "taken" from them.[5]

In reaching these conclusions, as discussed in the opinion, the court is mindful of the testimony it heard from the owners of each representative franchise and appreciates the sense of betrayal they felt when they learned that Chrysler had decided to reject their franchise agreements in the April 2009 Chrysler bankruptcy. The court sympathizes with many of these owners who testified as to how the loss of their franchise agreements devastated not only their businesses but their lives. Nonetheless, the court was tasked with deciding whether the plaintiffs proved that the United States coerced Chrysler into rejecting their franchise agreements and whether their franchise agreements would have

---

[5] Because the court reaches these conclusions, the court does not discuss in this opinion other issues presented at trial as to whether the taking alleged by the plaintiffs was a *per se* taking or should be evaluated under the *Penn Central* factors. *See A&D Auto Sales*, 748 F.3d at 1151, 1159.

had any value during the Great Recession in a "but for world" without the government's financial assistance. For the reasons discussed below, the court was compelled to find that the plaintiffs did not meet their burden and it is for those reasons that plaintiffs' taking claims have been rejected.

The court's opinion begins with a lengthy summary of the evidence presented followed by detailed findings of fact and conclusions of law as follows: (I) Summary of the Individual Plaintiffs' Testimony and Claims, (II) Summary of the Plaintiffs' Evidence, (III) Summary of the Government's Evidence, and, finally, (IV) Findings of Fact and Conclusions of Law.

## I.      SUMMARY OF INDIVIDUAL PLAINTIFFS' TESTIMONY AND CLAIMS

Based on the evidence summarized below, the court has made the following findings regarding the terms of the plaintiffs' franchise agreements, the profitability of their franchises before their Chrysler franchise agreements were rejected in the Chrysler bankruptcy, Chrysler's justification for rejecting their franchise agreements in bankruptcy, and their participation or decision not to participate in an arbitration program established by Congress after the Chrysler bankruptcy to allow Chrysler franchisees to seek reinstatement as New Chrysler franchisees. The court also summarizes the amount each plaintiff claims as just compensation based on their experts' valuations.

### A.      Taylor & Sons Inc.

Gregory Taylor testified on behalf of the Taylor & Sons, Inc. ("Taylor") dealership, which for the years at issue was located at 300 Cedar Street in Sandpoint, Idaho. Taylor was incorporated under Idaho state law. The dealership included Chrysler, Dodge, and Jeep franchises at the time of the alleged taking. Taylor also had a GM

franchise allowing it to sell Chevrolet vehicles at the time of the alleged taking of its

Chrysler franchises. Taylor operated its Chrysler/Dodge/Jeep and Chevrolet dealership

under the same roof from 1988 until 2009. Taylor continues to sell Chevrolet vehicles

under its franchise agreement with New GM.

Taylor was formed in August 1988 and when it purchased a majority interest in an

existing Chevrolet, Oldsmobile, Chrysler, Dodge, and Plymouth dealership. In September

1988, Taylor was awarded a new Chrysler franchise agreement, a new Plymouth

franchise agreement,[6] and a new Dodge franchise agreement. PX162 (Chrysler,

Plymouth, and Dodge Agreements). In June 1998, Taylor was awarded a Jeep franchise

which was subject to the same terms as the Chrysler, Plymouth, and Dodge franchise

agreements. DX39 (Jeep Agreement).

The Chrysler, Dodge, and Jeep franchise agreements Taylor entered into with

Chrysler were virtually identical. Entitled "Sales and Service Agreements," the franchise

agreements provided Taylor with the "right to order and purchase from [Chrysler] and to

sell at retail . . . those specific models of [Chrysler] vehicles . . . listed on the Motor

Vehicle Addendum[.]" PX162 (Chrysler and Dodge Agreements), DX39 (Jeep

Agreement). The Motor Vehicle Addendum ("MVA") to Taylor's Chrysler franchise

agreement allowed it to sell "[a]ll passenger cars of the Chrysler line-make." PX162. The

---

[6] Chrysler stopped producing Plymouth cars in 2001 and terminated all Plymouth franchises,
including the Taylor franchise, on September 30, 2001. Taylor, along with all other Plymouth
franchise holders, received a letter from Chrysler on September 19, 2000, a year before the
termination, informing them that the Plymouth line would end with the 2001 model year. In
these letters, Chrysler agreed, consistent with the terms of the Plymouth franchise agreements, to
buy back all new vehicles, parts, accessories, and signs from terminated Plymouth franchise
holders.

MVA to the Dodge franchise agreement allowed it to sell "[a]ll passenger cars of the

Dodge line-make" and "[a]ll trucks of the Dodge line-make." PX162. The MVA for the

Jeep dealership allowed Taylor to sell "all trucks in the Jeep Line-make." DX39.

      In addition to allowing Taylor to sell the above-mentioned Chrysler vehicles, the

agreement also contained a "Sales Locality" provision which identified the "territory of

DEALER's responsibility for the sale of [Chrysler, Dodge or Jeep] vehicles, vehicle parts

and accessories." PX162; DX39. Taylor's sales locality ranged from twenty-five to

seventy-five miles from its dealership depending on the direction and county boundaries.

In the same Sales and Service Agreement, Taylor agreed to build a facility in a specific

area meeting the requirements set forth by Chrysler for "new and used vehicle display

areas, salesrooms, service areas, parts and accessories areas, building exterior and

grounds [that would be] satisfactory to [Chrysler] as to appearance and layout, and [that

would] be maintained and used as set forth in the Dealership Facilities and Location

Addendum." DX1424.

      Taylor's franchise agreements with Chrysler also required that it agree to "service

[Chrysler] vehicles actively and effectively and provide and maintain, for servicing

[Chrysler] vehicles, adequate facilities equipped with the basic tools common to the trade

and with special tools and equipment peculiar to [Chrysler] products and necessary for

servicing and repairing specified [Chrysler] vehicles proper, efficiently, and

competitively." *Id.* As part of its service obligation to Chrysler, Taylor was further

required to "cause its service personnel to receive such training from time to time

required by [Chrysler] to maintain their technical expertise to render competent customer

service, including the use of improved methods of repair, or the repair of new parts or

systems, developed by [Chrysler]." *Id.* Furthermore, the franchise agreements required

Taylor to "at all times keep on hand . . . the number and assortment of [] parts that in

[Chrysler's] judgment is necessary to meet the service requirements and to meet all of

[the] obligations" under the franchise agreement. Taylor's franchise agreements also

required franchisees to "submit to [Chrysler], in such manner, in such form, and at such

times as [Chrysler] may reasonably request, complete and accurate reports of sales and

stocks of new and used vehicles on hand and other reports, including monthly financial

statements and operating reports." *Id.* These reports were admitted into evidence as

exhibits PX181, PX187, PX188, PX189, PX182, PX184 for the years between 2004 and

2009 and included information on each of the following income streams: (1) new car

sales, (2) used car sales, (3) warranty service work, (4) customer pay service work, (5)

miscellaneous (body shop, finance and insurance, etc.).

   Finally, each of Taylor's franchise agreements identified standardized additional

terms regarding Chrysler and Taylor's rights in the event of termination. Paragraph 28

describes the various ways in which Chrysler and a dealer can terminate the franchise:

> (a) DEALER may terminate this Agreement on not less
> than thirty (30) days written notice. (b) [Chrysler] may
> terminate this Agreement on not less than (60) days
> written notice for the following reasons: . . . failure of
> DEALER to meet its minimum service satisfaction
> requirements . . . failure of DEALER to perform fully any
> of DEALER's undertakings or obligations as set forth in
> this Agreement . . . the conviction of DEALER . . . of any
> crime . . . impairment of the reputation or financial
> standing of DEALER . . . (c) Notwithstanding the
> provision above this Agreement will terminate
> automatically without notice from either party on: . . . (v)
> the discontinuance by [Chrysler] of the production or

distribution of all [Chrysler] vehicles listed on the Motor
Vehicle Addendum[.]

DX1424.

Under the agreements, if Chrysler terminates a franchise pursuant to Paragraph 28,

Chrysler agreed

> to buy and DEALER agrees to sell, free and clear of any liens
> and encumbrances, within ninety (90) days after the effective
> date of any termination under  Paragraph 28: (a) All new,
> unused and unsold specified [Chrysler] vehicles . . . (b) All
> new, unused and undamaged [Chrysler] parts that are priced
> and identified as eligible for return . . .(c) All new, unused
> and undamaged [Chrysler] accessories or accessories
> packages for the yearly model current at the effective date of
> termination . . . (d) All signs of a type required by [Chrysler]
> belonging to DEALER, showing the name 'Chrysler
> Corporation' or one of the designated trade names applicable
> only to [Chrysler] products or [Chrysler's] affiliated
> companies. . . (e) Special tools (in complete sets), of a type
> recommended by [Chrysler], adapted only to the servicing of
> [CHRYSLER] vehicles and purchased by DEALER during
> the thirty-six (36) months immediately preceding the effective
> date of termination at a price and under terms and conditions
> to be agreed upon by [Chrysler] and DEALER.

*Id.*

Mr. Taylor and each of the other plaintiffs who testified explained that they

understood that, regardless of the above-cited termination provisions in the franchise

agreements, each of their franchise agreements were also subject to state laws precluding

the termination of dealerships under state law unless certain criteria were met.[7]

---

[7] Idaho state law provides that "a manufacturer shall not cancel, terminate or fail to renew any
franchise agreement with a dealer unless the manufacturer has satisfied the notice requirement of
subsection (2) of this section and has good cause for cancellation, termination or nonrenewal."
Idaho Code Ann. § 49-1614(1) (West 2009). Specifically, Idaho law provides that
"[n]otwithstanding the terms, provisions or conditions of any franchise agreement or of any
waiver, good cause shall exist for the purposes of termination, cancellation or nonrenewal when
there is a failure by the dealer to comply with a provision of the franchise agreement, where the

On May 13, 2009, after Chrysler had filed for bankruptcy on April 30, 2009,

Taylor received a letter from Chrysler stating that all three of its Chrysler franchise

agreements would be rejected in bankruptcy. The letter stated in full:

> As you know, we are in the process of seeking approval of the sale of our primary operating assets to a new company. The unprecedented decline in the industry has had a significant impact upon sales and requires the new company to reduce production levels to better match ongoing demand. With the downsizing of operations following the sale and reduction of plants and production, similar reductions must be made in the size of the dealer body.
>
> With regret, this letter is to inform you that on May 14th, 2009, we are filing a motion in bankruptcy court rejecting the Sales and Service Agreement(s) between Chrysler Motors LLC and the dealership listed above. Upon approval from the court, your agreement will be rejected on or about June 9, 2009.
>
> We intend to maintain "business as usual" with you until the rejection takes place. We intend to honor warranty and incentive payments, during the period that you remain an active dealer subject to available financing. It is necessary to work together to make this transition as seamless as possible to your customers. After rejection, we want to work with you to assist in the redistribution of new vehicles and parts to ease the burden on you. Attached to this letter, please find further details regarding the transition period. Your business center will be in touch to offer assistance.
>
> These are extraordinary times, and they call for extraordinary efforts. It is with a sense of profound sadness

---

provision is both reasonable and of material significance to the franchise agreement relationship, and provided that the dealer has been notified in writing of the failure within one hundred eighty (180) days prior to termination, cancellation or nonrenewal. A protest may be filed in accordance with the provision of section 49-1617, Idaho Code." Idaho Code Ann. § 49-1614(4). However, the Idaho Code provides that a franchise agreement cannot be terminated because its owner has a franchise agreement with another automobile manufacturer. Idaho Code Ann. § 49-1614(5). Furthermore, Idaho law provides that "[t]he manufacturer shall have the burden of proof under this section concerning the issue of good cause, which shall include, but not be limited to, termination, nonrenewal or cancellation of any franchise agreement by the manufacturer for insolvency, license revocation, conviction of a felony, fraud by a dealer or failure by a dealer to comply with a provision of the franchise agreement, where the provision is both reasonable and of material significance to the franchise agreement relationship." Idaho Code Ann. § 49-1614(6).

> that we must take this step and reject some of our dealer Sales
> and Service Agreement(s), but it's a necessary step in the
> process of pursuing and completing the sale of our assets to
> the new company. We wish there was a better way, but there
> isn't.
>
> We are grateful for the support you and your company
> have provided Chrysler over the years and we wish you the
> best under these circumstances.

PX178.

The justification for rejecting Taylor's Chrysler franchises in bankruptcy were explained by Peter Grady, Chrysler's Director of Dealer Operations at the time of the Chrysler bankruptcy. In his testimony, Mr. Grady explained that Chrysler examined several criteria in selecting which franchisees to reject in bankruptcy. These criteria, he further explained, grew out of an earlier voluntary effort by Chrysler to rationalize or reduce its dealership network under a program called "Project Genesis." Project Genesis, which is discussed in greater detail later in the opinion, identified several criteria which Chrysler employed in an effort to get all of its dealers to sell all Chrysler brands under one roof and to ensure that each such dealer would have sufficient market share to maximize profitability. The Project Genesis criteria were modified in the month leading up to the Chrysler bankruptcy when the option of rejecting franchise agreements in bankruptcy without regard to state law became more likely.

As discussed in more detail *infra* by the plaintiffs' bankruptcy expert Judge Fitzgerald and the government's bankruptcy expert Judge Gerber, under the Bankruptcy Code, executory contracts can be rejected in bankruptcy without regard to state law in order to preserve estate assets. Judge Fitzgerald and Judge Gerber also explained that rejecting a franchise agreement in bankruptcy is legally distinct from terminating a

franchise agreement. Rejection excuses the party filing for bankruptcy from having to continue performance under the contract. To the extent the contracting party has a breach of contract claim arising from the rejection of the agreement, the contracting party, here the franchisee, has an unsecured claim in the bankruptcy.

According to Mr. Grady, Chrysler consulted with Fiat, the New Chrysler owner, to determine which franchisees out of the total number of 3100 should have their franchise agreements rejected in bankruptcy. Eventually Chrysler selected 789 franchisees for rejection. In determining which 789 franchisees to reject in bankruptcy, Mr. Grady testified that Chrysler examined the following: (1) whether the franchise was meeting its Minimum Sale Responsibility ("MSR")[8], (2) the franchise's Scorecard for Sales,[9] Share, Shipments, Warranty, etc., (3) whether the franchise facility had adequate capacity and met Chrysler's standards, (4) the franchise location, (5) the franchise's financial strength, (6) the franchise's management, (7) whether the franchise had a "dual" or competitor's dealership under the same roof, and (8) whether it was a single point franchise, meaning it did not have all three Chrysler brands under one roof. Tr.3598:8-3602:21.

---

[8] Each franchise agreement required franchisees to meet MSR. Steven Landry, Chrysler's Executive Vice President of sales and marketing, explained that the MSR was calculated by taking the number of new Chrysler vehicles registered in a state and comparing that number to the number of total new vehicles registered in that state to determine the market share for Chrysler vehicles in that location. Tr.3471:14-3472:19. An MSR was then set based on the number of new vehicles the franchisee would need to sell for Chrysler to maintain its market share. *Id.* Put another way, the MSR was used to determine if a dealership held the same market share in its sales locality as Chrysler held either on the state or national level. *Id.*

[9] Mr. Grady explained that each dealer received a scorecard which was "made up of a total of 1000 points, and the detail within the scorecard mainly focused on sales versus targets, market share within the dealer's geographic area, shipments versus targets, and then customer profile targets," customer satisfaction, and warranty work. Tr.3599:7-3600:2.

Mr. Grady explained that Taylor's three franchises were rejected by Chrysler in bankruptcy because together they had only met 36% of its MSR, sold less than 100 new Chrysler vehicles the previous year, and were co-located under one roof with a Chevrolet franchise. Tr.3809:23-3810:23; DX1315.

After Taylor received the May 13, 2009 letter informing it that all of its Chrysler franchise agreements would be rejected, Taylor sold its remaining new Chrysler brand vehicles either "a few thousand dollars over net . . .[but] for far less than [Taylor] paid Chrysler to purchase them[,]" "for net cost, meaning that [Taylor] made no profit on them despite housing and advertising the vehicles for months[,]" or by "trad[ing] [the] remaining Chrysler new inventory, Chrysler for GM, with another dealer who had been notified that his GM franchise would be terminated." Tr.294:13-25. Regarding the Chrysler parts Taylor had in stock, Taylor explained that the dealership "traded some parts to the same terminated General Motors dealer, to the extent [it] could, and used some of the parts on Chrysler vehicles that [it] continued to service. [Taylor] eventually threw the remaining parts in the dumpster." Tr.295:4-8. Finally, Taylor disposed of Chrysler specialized tools and equipment in an auction "but could only earn pennies on the dollar." Tr.295:11-13.

In December 2009, eight months after Chrysler had filed for bankruptcy, Congress enacted Section 747 of the Consolidated Appropriations Act of 2010, Pub. L. 111-117 ("Section 747") to allow dealerships to seek a franchise with New Chrysler under an arbitration program. If a dealer won in arbitration it would receive a customary and usual letter of intent to enter into a franchise agreement with New Chrysler. Taylor elected not to participate in the arbitration program "because there was nothing left and [Taylor]

would have had to buy something [it] previously owned, and it would have cost a lot of money." Tr.326:14-17.

Taylor's 2010 financial statement for its Chevrolet franchise showed that Taylor received a net income of $94,122 from that dealership. DX614. As noted, Taylor continues to operate as a Chevrolet dealer to the present day. Tr.299:10-13.

Taylor claims that the rejection of its three Chrysler franchise agreements in the Chrysler bankruptcy amounts to a taking because the government coerced Chrysler into bankruptcy with a plan that included the rejection of its franchise agreements. Taylor claims it is entitled to just compensation. Plaintiffs' valuation expert Diane Anderson Murphy,[10] based on instructions she received from the *Alley's* plaintiffs' counsel, provided valuation opinions for two dates: December 2008 and April 2009. During closing argument, counsel for the *Alley's* plaintiffs stated that April 30, 2009 was the date of any "taking" by the government and that the compensation the *Alley's* plaintiffs are seeking is based on the value of their franchise, as determined by Ms. Murphy, on that date. *See* Tr.5097:23-5098:14, Tr.5109:22-5110:5. In addition to Ms. Murphy's valuation

---

[10] As will be described in further detail *infra*, Ms. Murphy is a Director with the Valuation Services Group of Moss Adams LLP. She is the coauthor of several versions of the National Automobile Dealers Association's dealership valuation guide and she has managed or staffed well over 1,500 dealership appraisal projects.

opinions, plaintiffs relied on the opinion testimony of the plaintiffs' three other experts: David Berliner,[11] Judge Judith Fitzgerald,[12] and Maryann Keller.[13]

As discussed in greater detail *infra*, Ms. Murphy opined that the economic loss Taylor sustained from the rejection of its franchise agreements on either date of taking she examined is equal to Taylor's entire Chrysler dealership as an ongoing business. According to Ms. Murphy, although the franchise agreement is an intangible asset, its value is equal to all the net income generated by the dealership as well as the physical assets associated with those income streams. Thus, in valuing the franchise agreements on the dates selected, she considered the income streams from not only new car sales and warranty work, which are expressly derived from Chrysler's obligations under the franchise agreements, but also the net income from used car sales and non-warranty service work.

---

[11] As will be described in further detail *infra*, Mr. Berliner is the partner in charge of BDO's Business Restructuring Services Group with advisory and consulting experience in the areas of business restructuring, reorganizations, Section 363 sales, and debtor-in-possession financing. He has worked on bankruptcy cases involving the liquidation of large corporations such as Sports Authority Holdings, Malibu Lighting Corporation, Furniture Brands International, American Home Mortgage, and Pillowtex Corporation.

[12] As will be described in further detail *infra*, Judge Fitzgerald is a former United States Bankruptcy Judge who sat in the Western District of Pennsylvania for over twenty-five years, the District of Delaware for twenty years, the Eastern District of Pennsylvania for eight years and in the District of the United States Virgin Islands for nine years. During her tenure as a Bankruptcy Judge she presided over hundreds of Chapter 11 bankruptcies, including cases that involved the assumption or rejection of executory contracts such as franchise agreements and licenses.

[13] As will be described in further detail *infra*, Ms. Keller is the Principle at Maryann Keller & Associates who provides automotive-related advisory services to companies, investors, and professional firms. She has advised clients on issues across the automotive supply chain, from component companies to retail sales.

In valuing Taylor's franchise, Ms. Murphy also made several assumptions regarding the fate of Chrysler in a "but for world" without government financial assistance. Ms. Murphy assumed that all of Chrysler's assets would have been sold in bankruptcy to a third party. She also assumed that the new Chrysler would either (1) continue indefinitely to produce all of Chrysler's product lines or (2) continue indefinitely with production of only the Chrysler trucks. She assumed production under either scenario would not have been interrupted during the bankruptcy and that the franchisees would have continued to receive new cars and/or trucks to sell without significant interruption. Ms. Murphy further assumed that Taylor (and all the other *Alley's* plaintiff franchiseeships she valued) would have had their franchise agreements assumed by any new Chrysler owner and thus would have been able to continue as Chrysler franchisees without interruption. Ms. Murphy further testified that the terms of the franchise agreements assumed by Chrysler's new owner would not be altered by the new owner. Finally, she assumed that the economy on both dates was recovering and would grow at a healthy rate.[14]

Ms. Murphy based her valuations for Taylor on financial statements Taylor submitted to Chrysler for 2004, 2005, 2006, 2007, 2008, and from January to May 2009. PX181, PX187, PX188, PX189, PX182, PX184. These financial statements reported income on Taylor's three major income streams: new car sales, used car sales, and fixed services (warranty service, customer pay service, and parts). In addition, for plaintiffs,

---

[14] Much of Ms. Murphy's testimony was devoted to explaining the local economy of each of the *Alley's* plaintiffs' market and how those economic conditions were improving during the early portion of 2009.

like Taylor, with franchise agreements with another automobile manufacturer, Ms. Murphy applied a "used to new formula" to determine the proportion of new car sales, used car sales, service, and parts that should be attributed to only to the Chrysler franchise. Based on this "used to new formula," Ms. Murphy calculated that Taylor's Chrysler franchises gave Taylor a net income of $117,514 in 2004, $75,901 in 2005, $89,634 in 2006, $103,287 in 2007, $83,555 in 2008, and $24,200 from January to May 2009. *See* PX244.1B.

Using the above-cited income amounts and the assumptions she made about Chrysler and the economy, Ms. Murphy opined that the value of Taylor's franchise agreements, in a "but for world" without government assistance, would have been worth: (1) $686,000 where Chrysler enters bankruptcy but continues to produce cars and trucks or (2) $558,000 for where Chrysler enters bankruptcy but continues to produce only trucks. Tr.1406:6-7.

### B.    Cedric Theel Inc.

Cedric Theel testified on behalf of the Cedric Theel Inc. ("Theel") dealership which for the years at issue was located at 3955 Trenton Drive Bismarck, North Dakota. Theel was incorporated under the laws of North Dakota. The dealership included a Dodge franchise at the time of the alleged taking. Theel also had a Toyota franchise at the time of the alleged taking.

Theel was incorporated in 1983 and in 1985 Theel purchased a Dodge dealership in Bismarck, North Dakota. Tr.408:4-24. The Dodge franchise agreement that was eventually rejected in bankruptcy was awarded to Theel on February 1, 2000. In 1990

Theel obtained the right to sell Mitsubishi. Tr.409:14-15. In 1992 Mr. Theel and his wife purchased the Toyota and Hyundai dealership that was next door to the Theel Dodge dealership and placed ownership of that dealership under a new company, Cedric Theel Ltd. In 1995, the Dodge and Toyota dealerships were consolidated under one roof and under the ownership of Theel. Tr.408:4-409:21.

The Dodge franchise agreement that Theel entered into in February 2000 is identical in form and substance to the Dodge franchise agreement described and quoted in the preceding section describing the Taylor franchise agreements and is not repeated here. *See* PX191 (Dodge Agreement). Mr. Theel explained that he understood regardless of the above-quoted termination provisions in his franchise agreement that his Dodge franchise agreement was also subject to state law protection. [15] Tr.417:7-13.

On May 13, 2009, Theel received a letter from Chrysler stating that its Dodge franchise agreement would be rejected in bankruptcy. The letter is identical to that received by Taylor and the other representative plaintiffs in this case. DX449. Mr. Grady, Director of Dealer Operations, explained that Theel's Dodge franchise agreement was rejected by Chrysler in bankruptcy because Theel's MSR was only 70%, it was a single Dodge franchise dealer, and it had a dual dealership with Toyota. Tr.3801:4-3803:14; DX1315.

---

[15] North Dakota law provides that a manufacturer may not "[a]ttempt or threaten to terminate, cancel, or fail to renew or substantially change the competitive circumstances of the dealership contracts for any reason other than failure of the automobile or truck retailer to comply with the terms of the contract between the parties, if the attempt or threat is based on the results of a circumstance beyond the retailer's control, including a natural disaster in the dealership market area or a labor dispute." N.D. Cent. Code Ann. § 51-07-02.3(5) (West 2009).

After Theel received the May 13, 2009 letter informing it that its Dodge franchise agreement would be rejected, Theel had "about 60 new Dodge vehicles on hand at the time." Tr.421:15. Theel sold "most of the new Dodge cars to customers at fire sale prices . . . [and] [s]ome [other dealers] bought the remainder of [its] new Dodge inventory" all at a loss. Tr.421:22-24. Theel also had "approximately $200,000 in Dodge parts" which it sold "to a warehouse for 25 to 75 percent less than what [it] paid for them." Tr.422:2-6. Additionally, Theel "tried to convert [the] servicing area for Toyota servicing, but a lot of the equipment was not suited for Toyotas, including all of the diesel engine service equipment, which was for Dodge vehicles only." Tr.422:20-23. Theel also sold a $30,000 sign that it had purchased shortly before its Dodge franchise was rejected to another Chrysler dealer for only $16,000. Tr.423:10-13. Mr. Theel testified that he elected not to participate in the Section 747 arbitration process because he never got an answer as to why his Dodge franchise was terminated. Tr.452:4-8. Theel's 2010 financial statement for its Toyota franchise showed that Theel earned a net income of $606,447 from that dealership. DX621. Theel's 2011 financial statement shows that its Toyota dealership earned a net income of $674,499. DX653. Theel continues to operate as a Toyota dealer to the present day.

Theel claims that the rejection of its Dodge franchise agreement in the Chrysler bankruptcy amounts to a taking and, for the same reasons as relied on by Taylor, seeks just compensation. As with Taylor, Theel relies on Ms. Murphy to establish the value of the franchise agreement at the time of the alleged taking. After reviewing Theel's 2004, 2005, 2006, 2007, 2008 and January to May 2009 financial statements, DX77, DX107, DX139, DX197, DX312, Ms. Murphy calculated that Theel's Dodge franchise agreement

generated a net income of $130,323 in 2004, $175,006 in 2005, $97,377 in 2006, $142,333 in 2007, and $69,279 in 2008. *See* PX244.1E.

Using these values and her assumptions, Ms. Murphy calculated the amount of just compensation Theel is seeking for the claimed taking of its Dodge franchise agreement. Under Ms. Murphy's income valuation approach, the amount of just compensation Theel is seeking for the claimed taking of the franchise agreement on April 30, 2009 is either (1) $709,000 where Chrysler enters bankruptcy but continues to produce cars and trucks or (2) $621,000 for where Chrysler enters bankruptcy but continues to produce only trucks. Tr.1406:12-13.

### C.    Mansfield Motor Group/Whitey's Auto Group

Dirk Schluter testified on behalf of Mansfield Motor Group, d/b/a Whitey's Auto Group ("Whitey's") which for the years at issue was located at 1493 Park Avenue West, Mansfield, Ohio. Whitey's was incorporated under the laws of Ohio. The dealership included a Chrysler franchise at the time of the alleged taking. Tr.817:12-13. Whitey's also had a Lincoln-Mercury franchise under the same roof as the Chrysler franchise at the time of the alleged taking. Whitey's was incorporated in 1947 and received its first Chrysler franchise agreement in the mid-1960s. Tr.818:14-17, 819:16-18.

In August 2001, Whitey's was awarded a new Chrysler agreement when Mr. Schluter and his brother became the new owners of Whitey's. Tr.820:5-15. The 2001 franchise agreement is the agreement that was rejected in the Chrysler bankruptcy. The Chrysler franchise agreement that Whitey's entered into in August 2001 is identical in form and substance to the Chrysler franchise agreement described in the preceding section regarding Taylor & Sons. PX224. Mr. Schluter explained that he understood that

28

regardless of the above-cited termination provisions that his franchise agreement was also

subject to state laws precluding the termination of franchise agreements under state law.[16]

Tr.824:15-21.

On May 13, 2009 Whitey's received a letter from Chrysler stating that its Chrysler

franchise agreement would be rejected in bankruptcy. The letter is identical to the ones

received by other representative plaintiffs in this case. PX239. Mr. Grady, Director of

Dealer Operations, explained that Whitey's Chrysler franchise was rejected by Chrysler

in bankruptcy because it only met 45% of its MSR, was a dual dealership with a Lincoln

franchise, and was only a single Chrysler franchise dealer. Tr.3806:21-3803:13; DX1315.

After Whitey's received the May 13, 2009, it was able to "place[] [its] [new]

inventory with another dealer, [although it] lost money on the vehicles." Tr.831:15-17.

Whitey's also lost money on its "inventory of used Chrysler vehicles because [it] could

no longer sell them with a certified status of used cars and with the manufacturer

---

[16] Ohio law provides that "no franchisor shall terminate or fail to continue or renew a franchise except for good cause." Ohio Rev. Code Ann. § 4517.54(A) (West 2009). Ohio law also provides that "[i]n determining whether good cause has been established by the franchisor for terminating or failing to continue to renew a franchise, the motor vehicle dealers board shall take into consideration the existing circumstances, including, but not limited to: (1) The amount of retail sales transacted by the franchisee during a five-year period immediately preceding such notice as compared to the business available to the franchisee; (2) the investment necessarily made and obligations incurred by the franchisee to perform its part of the franchise; (3) the permanency of the franchisee's investment; . . . (7) the extent and materiality of the franchisee's failure to comply with the terms of the franchise and the reasonableness and fairness of the franchise terms . . . ." Ohio Rev. Code Ann. § 4517.55(A) (West 2009). Ohio law also specified that "[n]otwithstanding the terms, conditions, or provisions of any franchise or waiver, the following do not constitute good cause for terminating or failing to continue or renew a franchise: (1) Refusal by the franchisee to purchase or accept delivery of any new motor vehicle, parts, accessories, or any other commodity or service not ordered by the franchisee; (2) The fact that the franchisee or the owner of any interest therein, owns, has an investment in, participates in the management of, or holds a license for the sale of the same or any other line-make of new motor vehicle; . . . (5) Failure of the franchisee to achieve any unreasonable or discriminatory performance criteria." Ohio Rev. Code Ann. § 4517.55(B) (West 2009).

warranty," and sold them often at a loss. Tr.831:18-22. Whitey's lost money on the

inventory of Chrysler-specific parts although it was able to use some of the parts in

customer-pay service. Tr.832:14-18. Whitey's also "threw out the remaining Chrysler

signage, as well as the Chrysler brochures and other advertising material." Tr.832:20-23.

Whitey's filed a request for arbitration and received $10,000 in settlement from New

Chrysler. Tr.833:15-21.

In August of 2008 Whitey's acquired franchise agreements to sell Volvo and

Mercedes-Benz vehicles. Whitey's financial statement for its Lincoln, Volvo, and

Mercedes-Benz franchises showed that Whitey's earned a net income of $157,562 in

2010, the first full year without the Chrysler franchise. Tr.891:17-19; DX1493.

Whitey's claims that the rejection of its Chrysler franchise agreement in the

Chrysler bankruptcy amounts to a taking for the same reasons as relied on for plaintiffs

Taylor and Theel. Whitey's relies on Ms. Murphy for the valuation of the franchise

agreement. Ms. Murphy, after reviewing Whitey's 2005, 2006, 2007, 2008, and January

to May 2009 financial statements, PX223, PX233, calculated that Whitey's Dodge

franchise agreement resulted in a net income of $195,853 in 2004, $127,940 in 2005,

$159,309 in 2006, $120,535 in 2007, $61,415 in 2008 and $30,292 between January and

May 2009. PX244.1D.

Using these values and her assumptions, Ms. Murphy calculated the amount of just

compensation Whitey's is seeking for the claimed taking of the franchise agreement.

Under Ms. Murphy's income valuation approach, the amount of just compensation

Whitey's is seeking for the April 30, 2009 taking date is either (1) $524,000 where

Chrysler enters bankruptcy but continues to produce cars and trucks, or (2) $292,000 for

where Chrysler enters bankruptcy but continues to produce trucks. Tr.1406:10-11.

### D.      RFJS Company, LLC

Robert L. Frederick II and John Scotford Jr. testified on behalf of RFJS Company,

LLC ("RFJS"), which for the years at issue was located at 7871 Market Street Boardman,

Ohio. RFJS was incorporated under Ohio state law. Tr.967:13. The dealership at the time

of the rejection of the franchise agreements included Chrysler, Dodge, and Jeep

franchises. Tr.972:14-15. RFJS did not have any franchise agreements with other auto

manufacturers at that time. RFJS was formed in 2006. Mr. Fredrick contributed the

Dodge franchise agreement that he owned to RFJS and Mr. Scotford contributed the cash

that was used to purchase a Chrysler/Jeep dealership. Tr.966:34-967:8. The Dodge

franchise agreement that Mr. Fredrick contributed was awarded to RFJS in October 2006.

DX130. This Dodge franchise agreement was identical in form and substance to the

franchise agreements described above.

RFJS's Chrysler and Jeep franchise agreements, however, were different from

those described above. RFJS's "Sales and Service Agreement[s]" contained different

terms. DX131; DX132. Instead of having an indefinite franchise agreement that could

only be terminated upon specified events, RFJS's Chrysler and Jeep franchise agreements

provided that they only continued "in effect until the expiration of 24 months after the

execution date at which time this Term Agreement will terminate automatically without

notice to or by either party." *Id.* The agreements went on to state that "[i]f this Term

Agreement is not terminated as provided herein or in Paragraph 28 of said Terms and

Provisions, and thus continue in effect for the period set forth in the immediately

forgoing Paragraph, [Chrysler], at the expiration of such period, will enter into the Standard Chrysler Corporation Sales and Service Agreement current at the date of said expiration, for such specified [Chrysler] vehicles with DEALER, provided that DEALER has fulfilled each and every condition set forth in [the Agreement]." *Id.* RFJS received its Term Sales and Service Agreements for its Chrysler and Jeep franchises on October 27, 2006. *Id.* As part of the term franchise agreements RFJS had to build a satisfactory dealership facility at 7870 Market Street, Boardman, Ohio within twelve months of the execution of the Chrysler and Jeep franchise agreements. *Id.*

As of October 2007, RFJS had not met its obligation to build a facility at 7871 Market Street to Chrysler's standards. On May 20, 2008, RFJS got a one-year extension of its Chrysler and Jeep franchise agreements in order to complete the construction of a facility at 7871 Market Street. DX253.

Mr. Fredrick and Mr. Scotford testified that they understood that, despite the above-cited termination provisions, their Chrysler, Dodge, and Jeep franchise agreements were subject to state laws and could not be terminated or not renewed unless certain criteria were met.[17]

---

[17] Ohio law provides that "no franchisor shall terminate or fail to continue or renew a franchise except for good cause." Ohio Rev. Code Ann. § 4517.54(A) (West 2009). Ohio law also provides that "[i]n determining whether good cause has been established by the franchisor for terminating or failing to continue to renew a franchise, the motor vehicle dealers board shall take into consideration the existing circumstances, including, but not limited to: (1) The amount of retail sales transacted by the franchisee during a five-year period immediately preceding such notice as compared to the business available to the franchisee; (2) the investment necessarily made and obligations incurred by the franchisee to perform this part of the franchise; (3) the permanency of the franchisee's investment; . . . (7) the extent and materiality of the franchisee's failure to comply with the terms of the franchise and the reasonableness and fairness of the franchise terms . . . ." Ohio Rev. Code Ann. § 4517.55(A) (West 2009). Ohio law also specified that "[n]otwithstanding the terms, conditions, or provisions of any franchise or waiver, the following do not constitute good cause for terminating or failing to continue or renew a franchise: (1)

On May 13, 2009, RFJS received a letter from Chrysler stating that its Chrysler, Dodge, and Jeep franchise agreements would be rejected in bankruptcy. The letter is identical to that received by the other representative plaintiffs in this case. Tr.970:17-19. Mr. Grady, Director of Dealer Operations, explained that RFJS's Chrysler, Dodge, and Jeep franchise agreements were rejected by Chrysler in bankruptcy because RFJS dealership was an excess point, i.e. a location that Chrysler determined was no longer valuable and because the dealership was operating at a loss and had been placed on a finance hold by Chrysler Financial.[18] DX1315.

After RFJS received the May 13, 2009 letter informing it that its Chrysler, Dodge, and Jeep franchise agreements would be rejected, "all of [its] new cars either ended up being retailed or wholesaled to other dealers [it] had good relationships with," but "that really didn't help[.]" Tr.972: 7-10. RFJS "made the best deal [it could for] parts. [Its] tools and equipment were sold at an auction," but it got "virtually nothing." Tr.972:20-

---

Refusal by the franchisee to purchase or accept delivery of any new motor vehicle, parts, accessories, or any other commodity or service not ordered by the franchisee; (2) The fact that the franchisee or the owner of any interest therein, owns, has an investment in, participates in the management of, or holds a license for the sale of the same or any other line-make of new motor vehicle; . . . (5) Failure of the franchisee to achieve any unreasonable or discriminatory performance criteria." Ohio Rev. Code Ann. § 4517.55(B) (West 2009).

[18] Leland Wilson, the Chief Financial Officer of Chrysler Financial between 2007 and 2010, explained the significance of a dealer being placed on a financial hold and not being able to obtain floor plan financing to finance their purchase of new and used cars. He explained that floor plan financing involved dealers "order[ing] cars through Chrysler, Chrysler would ship those cars to the dealers. Each of those dealers that [Chrysler Financial] financed would have a dealer . . . credit line" that would be used to finance the purchase. Tr.3855:9-11. He went on to explain that "the first lien collateral [for the loan] was the vehicle" and that when the car was sold the proceeds were used to pay off the loan the dealer incurred to purchase the car and allowed the dealer to continue purchasing new vehicles. Tr.3855:17-23. RFJS was one of the Chrysler franchisees that relied on Chrysler Financial for floor plan financing. "Financial hold" meant that Chrysler Financial was no longer willing to extend floor plan financing to RFJS and thus it could not obtain new inventory through its Chrysler Financial credit line. Tr.3806:3-8.

25. Ultimately, RFJS "shut down the dealership" and "did not consider staying open as a service and used car dealership because [its] business ran on the new car franchise." Tr.973:1-11. After its Chrysler, Dodge, and Jeep franchise agreements were rejected, RFJS pursued arbitration under Section 747 and settled with New Chrysler for $200,000. Tr.1029:13-25. Because RFJS did not continue as either a new car dealership or used car and service dealership there are no financial statements for RFJS past June 2009.

RFJS claims that the rejection of its Chrysler, Dodge, and Jeep franchise agreements in the Chrysler bankruptcy amounts to a taking of its franchises for the same reasons relied on by Taylor, Theel, and Whitey's. RFJS relies on Ms. Murphy's valuation as the basis for the just compensation it is seeking. Ms. Murphy, after reviewing RFJS's 2006, 2007, 2008, and January to May 2009 financial statements, PX153, calculated that RFJS's Chrysler, Dodge, and Jeep franchise agreements resulted in a net income of $104,940 in 2006, $331,375 in 2007, lost $45,125 in 2008, and earned $24,065 from January to May 2009. PX244.1F.

Using these values and her assumptions, Ms. Murphy calculated the amount of just compensation RFJS is seeking for the claimed taking of the franchise agreements. Under Ms. Murphy's income valuation approach, the amount of just compensation RFJS seeks for the claimed taking for the April 30, 2009 date is (1) $1,766,000 where Chrysler enters bankruptcy but continues to produce cars and trucks, or (2) $1,329,000 for where Chrysler enters bankruptcy but continues to produce only trucks. Tr.1406:14-15.

### E.    Jim Marsh American Corporation

Jim Marsh testified on behalf of Jim Marsh American Corporation ("Marsh") which for the years at issue was located 8555 West Centennial Parkway, Las Vegas,

Nevada. Tr.367:7. Marsh is incorporated under the laws of Nevada. The dealership included a Chrysler and Jeep franchise at the time of the alleged taking. In early 2009, Marsh purchased a Kia, Suzuki, and Mitsubishi dealership. Tr.379:9-12. The Suzuki dealership closed in 2014 when Suzuki filed for bankruptcy and Marsh sold the Mitsubishi dealership in 2017. Tr.378:23-25. Marsh still operates a Kia dealership. The Chrysler and Jeep franchise agreements that were rejected by Chrysler in the Chrysler bankruptcy were awarded to Marsh on December 21, 2000. Tr.367:21-25. Prior to receiving these franchise agreements, Marsh had other Chrysler and Jeep franchise agreements dating back to 1995 and 1971. Tr.366:17-367:20. Marsh's 2000 Chrysler and Jeep franchise agreements were identical in form and substance to those of the other representative plaintiffs in this case. DX44.

Mr. Marsh explained that he knew that state laws protected his franchise agreements from unjust termination and testified that throughout his several decades of experience as a new vehicle franchise owner he had never heard of an involuntary termination of a franchise agreement other than when an owner was convicted of a felony or some form of fraud.[19] Tr.369:21-370:2.

---

[19] Nevada state laws provide that "[n]otwithstanding the terms of the franchise, a manufacturer or distributor shall not terminate or refuse to continue any franchise unless it has received the written consent of the dealer or: (a) It has given written notice of its intention to the dealer and the Director; and (b) Either the following conditions occurs: (1) The dealer does not file a protect with the Director within the time allowed by this section; or (2) After the dealer has filed a protest and the Director has conducted a hearing on the matter, the Director issues an order authorizing the manufacturer or distributor to terminate the franchise or permit it to lapse." Nev. Rev. Stat. Ann. § 482.36352(1) (West 2009). Furthermore, Nevada state law states that "[i]n determining whether good cause has been established for permitting a manufacturer or distributor to terminate, refuse to continue, modify or replace a franchise, the Director shall consider without limitation: (1) The amount of business transacted by the dealer, as compared to the business available to the dealer . . . (2) The investment necessarily made and obligations incurred by the dealer to perform its part of the franchise . . . (6) The extent of the dealer's

On May 13, 2009, Marsh received a letter from Chrysler stating that its Chrysler and Jeep franchise agreements would be rejected in bankruptcy. The letter is identical to that received by the other representative plaintiffs in this case. PX147. Mr. Grady, Director of Dealer Operations, explained that Marsh's Chrysler and Jeep franchise agreements were rejected by Chrysler in bankruptcy because Marsh had only met 38% of its MSR, it lacked a Dodge franchise agreement, and because Chrysler wanted a third-party candidate to run a Chrysler, Dodge, and Jeep dealership in a different part of Las Vegas. DX1315.

After Marsh received the May 13, 2009 letter informing it that its Chrysler and Jeep franchise agreements would be rejected, it had to "liquidate [its] inventory of new cars, leaving [it] with an inventory of Chrysler-specific tools that [it[ could no longer use for warranty service and which [it] could no long use to access the manufacturer's computer to perform new car service." Tr.373:8-12. Also, Marsh "obtained most of [its] used car inventory from trade-ins associated with the purchase of new cars [and] [l]osing new car sales meant [it] had fewer used cars to sell." Tr.373:13-16. Marsh also "lost the after-sale income and the after-market warranties and service contracts that [it] could no longer sell in connection with the sale of Chrysler-Jeep projects." Tr.373:16-19. Marsh participated in the Section 747 arbitration process and won a letter of intent from New Chrysler. In January 2017, Marsh opened a new Chrysler-Jeep dealership but was required to spend significant amounts of money to open this new dealership. Tr.374:11-18.

---

failure, if any, to comply with the terms of the franchise." Nev. Rev. Stat. Ann. § 482.36355 (West 2009).

Marsh claims that the rejection of its Chrysler and Jeep franchise agreements in the Chrysler bankruptcy amounts to a taking for the same reasons relied on by plaintiffs Taylor, Theel, Whitey, and RFJS. Marsh relies on Ms. Murphy's valuations of his franchise agreements to support a claim for just compensation. Ms. Murphy, relying on the same income streams and same calculation methods as described above, and after reviewing Marsh's 2004, 2005 2006, 2007, 2008, and January to May 2009 financial statements, PX145, calculated that Marsh's Chrysler and Jeep franchise agreements resulted in a net income of $860,020 in 2004, $1,032,818 in 2005, $1,396,370 in 2006, $932,272 in 2007, $816,019 in 2008, and earned $746,431 from January to May 2009. PX244.1G.

Using these values and her assumptions, Ms. Murphy calculated the amount of just compensation Marsh is seeking for the claimed taking of the franchise agreement. Under Ms. Murphy's income valuation approach, the amount of just compensation Marsh seeks for the claimed taking of the franchise agreement for the April 30, 2009 date is (1) $8,972,000 where Chrysler enters bankruptcy but continues to produce cars and trucks or (2) $7,037,000 for where Chrysler enters bankruptcy but continues to produce only trucks. Tr.1406:14-15.

### F.     Livonia Chrysler-Jeep

Collen and David MacDonald testified on behalf of Livonia Chrysler-Jeep ("Livonia") which for the years at issue was located at 30777 Plymouth Road, Livonia, Michigan. Livonia is incorporated under the laws of Michigan. The dealership included a Chrysler and Jeep franchise at the time of the alleged taking. Tr.1290:5-9.

The Chrysler and Jeep franchise agreements that were rejected in the Chrysler bankruptcy were awarded to Livonia on April 24, 1998. These Chrysler and Jeep franchise agreements were identical in form and substance to the franchise agreements that the other representative plaintiffs had with Chrysler. PX136. Both Mr. and Mrs. MacDonald explained that they understood that, regardless of the termination terms in those agreements, the agreements could only be terminated consistent with the franchise laws in Michigan.[20] Tr.1293:5-14.

On May 13, 2009, Livonia received a letter from Chrysler stating that its Chrysler and Jeep franchise agreements would be rejected in bankruptcy. The letter is identical to that received by the other representative plaintiffs in this case. PX139. Mr. Grady, Director of Dealer Operations, testified that Livonia's Chrysler and Jeep franchise agreements were rejected by Chrysler in bankruptcy because Chrysler did not like the location of the dealership and thought that it would be more profitable to move the Chrysler and Jeep franchises to a Dodge dealership a few miles away. DX1315.

After it received the May 13, 2009 letter informing it that its Chrysler and Jeep franchise agreements would be rejected, Livonia had to "sell [its] parts inventory and new car inventory at a substantial loss." Tr.1295:21-23. Additionally, Livonia was unable to get out of contracts, such as an advertising contract, and "had to continue to pay them, though [it] no longer needed their services." Tr.1295:23-1296:1. Livonia participated in

---

[20] Michigan law provides that an automobile manufacturer can only terminate or not renew a franchise agreement if they have acted in good faith and have good cause. Mich. Comp. Laws Ann. § 445.1567. Michigan law provided that the following alone did not constitute good cause for termination: a change in ownership of the dealership, refusal of the dealership to purchase or accept delivery of any automobile parts; or if the owner of the dealership has a franchise with another auto manufacturer. Mich. Comp. Laws Ann. § 445.1568.

the Section 747 arbitration process and was ultimately awarded a letter of intent from

New Chrysler and has since signed new Chrysler and Jeep franchise agreements with

New Chrysler. Tr.1362:5-25.

Livonia claims that the rejection of its Chrysler and Jeep franchise agreements in

the Chrysler bankruptcy amounts to a taking for the same reasons relied on by the other

*Alley's* plaintiffs. Livonia relies on Ms. Murphy's valuation to support the amount of just

compensation seeks. Ms. Murphy, relying on the same income streams and same

calculation methods as described above, and after reviewing Livonia's 2006, 2007, 2008,

and January to May 2009 financial statements, calculated that Livonia's Chrysler and

Jeep franchise agreements resulted in a net income of $659,903 in 2006, $595,052 in

2007, $718,631 in 2008, and $130,224 from January to May 2009. PX244.1A.

Using these values and her assumptions, Ms. Murphy calculated the amount of just

compensation Livonia is seeking for the claimed taking of the franchise agreement.

Under Ms. Murphy's income valuation approach, the amount of just compensation

Livonia is seeking for the claimed taking of the franchise agreement on the April 30,

2009 taking date is (1) $4,464,000 where Chrysler enters bankruptcy but continues to

produce cars and trucks or (2) $3,705,000 for where Chrysler enters bankruptcy but

continues to produce only trucks. Tr.1406:4-5.

### G.     Barry Dodge Inc.

Andrew Riexinger testified on behalf of Barry Dodge Inc. ("Barry"), which for the

years at issue was located at 4579 South Main Street, Brockport, New York. Barry was

incorporated under the laws of New York. Barry's dealership included Chrysler, Dodge,

and Jeep franchises at the time of the alleged taking.

The Chrysler and Dodge franchise agreements that were rejected in the Chrysler bankruptcy were awarded to Barry on August 9, 1993. The Jeep franchise agreement that was rejected in the Chrysler bankruptcy was awarded to Barry on December 19, 1997. Barry's Chrysler, Dodge, and Jeep franchise agreements are identical in form and substance to the other franchise agreements owned by the other representative plaintiffs. PX2. Mr. Riexinger also testified that he understood that, regardless of the termination provisions in these franchise agreements, state law precluded the termination of dealerships for unjust reasons.[21] Tr.1218:23-1219:1.

On May 13, 2009, Barry received a letter from Chrysler stating that its Chrysler, Dodge, and Jeep franchise agreements would be rejected in bankruptcy. The letter is identical to that received by the other representative plaintiffs in this case. PX4. Mr. Grady, Director of Dealer Operations, explained that Barry's Chrysler, Dodge, and Jeep franchise agreements were rejected by Chrysler in bankruptcy because it only met 42% of its MSR and because it was considered an excess point because Chrysler wanted to reduce the number of dealers in the Brockport area. DX1315.

After Barry received the May 13, 2009 letter informing it that its franchise agreements would be rejected it had to "salvage what money [it] could from [its] existing inventory." Tr.1220:14-16. Barry "sold [its] inventory of vehicles to other [dealers] and

---

[21] New York state law provides that a franchisor cannot terminate or refuse to renew a franchise "except for due cause, regardless of the terms of the franchise." N.Y. Vehicle and Traffic Law § 463.2(d)(1). New York state law specifies that "[i]f the termination is based upon performance of the dealer in sales and services there shall be no due cause if the dealer substantially complies with the reasonable performance provisions of the franchise during such cure period and no due cause if the failure to demonstrate such substantial compliance was due to factors which were beyond the control of such dealer." N.Y. Vehicle and Traffic Law § 463.2(e)(3).

parts to one of [its] former competitors . . . for 50 grand." Tr.1220:16-18. Barry also "sold some of [its] specialized tools to former competitors, which [it] could no longer use since [it] no longer provided warranty services for new vehicles." Tr.1220:18-21. Barry continued to operate under the name "Barry's Auto Center" as a used car dealership that also sells campers and cargo trailers. Tr.1221:7, Tr.1221:16-17. Barry's 2010 financial statement for its used car dealership showed that it earned a net income of $239,417. DX618. Barry chose not to file for arbitration under Section 747. Tr.1269:13-16.

Barry claims that the rejection of its Chrysler, Dodge, and Jeep franchise agreements amounts to a taking for the same reasons as relied on by the other *Alley's* plaintiffs. Barry relies on Ms. Murphy's valuations to support the amount of just compensation it seeks. Ms. Murphy, relying on the same income streams and same calculation methods as described above, and after reviewing Barry's 2004, 2005, 2006, 2007, 2008, and January to May 2009 financial statements, calculated that Barry's Chrysler, Dodge, and Jeep franchise agreements resulted in a net income of $172,181 in 2004, $68,367 in 2005, $55,878 in 2006, $186,534 in 2007, $163,704 in 2008, and earned $124,052 from January to May 2009. PX244.1C.

Using these values and her assumptions, Ms. Murphy calculated the amount of just compensation Barry is seeking for the claimed taking of the franchise agreement. Under Ms. Murphy's income valuation approach, the amount of just compensation Barry is seeking for the April 30, 2009 taking date is (1) $1,124,000 where Chrysler enters bankruptcy but continues to produce cars and trucks, or (2) $859,000 for where Chrysler enters bankruptcy but continues to produce trucks. Tr.1406:8-9.

### H.    Guetterman Motors

Jack Guetterman testified on behalf of Guetterman Motors ("Guetterman"), one of the two representative *Colonial* plaintiffs, which for the years at issue was located at 2210 Sycamore Street, Cairo, Illinois. Guetterman was incorporated under the laws of Illinois. Guetterman's dealership included Chrysler, Dodge and Jeep franchises as well as a Ford franchise at the time of the alleged taking.

The Chrysler, Dodge and Jeep franchise agreements that were rejected in the Chrysler bankruptcy were awarded to Guetterman on February 11, 1993. Guetterman's Chrysler, Dodge, and Jeep franchise agreements are identical in form and substance to the other franchise agreements owned by other representative plaintiffs. DX16 (Chrysler Agreement), DX21 (Dodge Agreement), DX22 (Jeep Agreement). Mr. Guetterman also testified that he understood that, regardless of the termination provisions in these franchise agreements, state law precluded the termination of dealerships for unjust reasons.[22] Tr.2179:6-10.

---

[22] Illinois state law provides that an automobile manufacturer cannot terminate or fail to renew a franchise agreement without good cause and without giving sufficient notice as outline in Illinois state law. 815 Ill. Comp. Stat. Ann. § 710/4(d)(6). The Illinois Board of Motor Vehicles determines if there is sufficient good cause not to renew or cancel a franchise and Illinois law provides that it shall consider, but is not limited to, the following factors: "(1) The amount of retail sales transacted by the franchise during a 5-year period immediately before the date of the notice of proposed actions as compared to the business available to the franchisee. (2) The investment necessarily made and obligations incurred by the franchisee to perform its part of the franchise. (3) The permanency of the franchisee's investment. . . . (5) Whether the franchisee has adequate moto vehicle sales and service facilities, equipment, vehicle parts, and service personnel to reasonably provide for the need of the customers of the same line make of motor vehicles handled by the franchisee. . . . (7) The extent and materiality of the franchisee's failure to comply with the terms of the franchise and the reasonableness and fairness of those terms. . . ." 815 Ill. Comp. Stat. Ann. § 710/12(d).

On May 13, 2009, Guetterman received a letter from Chrysler stating that its Chrysler, Dodge, and Jeep franchise agreements would be rejected in bankruptcy. The letter is identical to that received by the other representative plaintiffs in this case. Mr. Grady, Director of Dealer Operations, explained that the Guetterman Chrysler, Dodge and Jeep franchise agreements were rejected by Chrysler in bankruptcy because the dealership only met 53% of its MSR, was considered an excess point in the Cairo area, was placed on a financial hold by Chrysler Financial, and had a competitive dual Ford dealership attached to the Chrysler showroom. DX1315.

After Guetterman received the May 13, 2009 letter, Mr. Guetterman testified that Chrysler only bought "back $18,754 of parts for 68 cents on the dollar" and that the dealership was unable to sell its remaining Chrysler parts. Tr.2180:2-10. Mr. Guetterman explained that the "cost of the remaining parts is over $100,000." Tr.2180:6-7. Mr. Guetterman also testified that he "attempted to negotiate with the New Chrysler through [the] St. Louis dealer placement manager . . . but [it] was turned down." Tr.2176:15-19. Mr. Guetterman further testified that he "paid the initial fee and got a date to proceed" under the Section 747 arbitration process, but that before the arbitration date, New Chrysler offered Guetterman a letter of intent for a new franchise agreement. Tr.2176:21-25. Mr. Guetterman explained that he did not accept the letter of intent because it imposed new requirements which have required between $1 million and $2 million in new investments. Tr.2177:12-15.

Guetterman's 2010 financial statement for its Ford franchise, which it expanded into space previously dedicated for Chrysler vehicles, showed that Guetterman received a net income of $120,920 from that dealership. DX613. Guetterman's 2011 financial

statement for its Ford franchise showed that Guetterman received a net income of $82,813 from that dealership. DX648. Guetterman continues to operate as a Ford dealer to the present day.

Guetterman claims that the rejection of its three Chrysler franchise agreements in the Chrysler bankruptcy amounts to a taking based on the same theory of coercion relied on by the *Alley's* plaintiffs and discussed *infra*. Guetterman is seeking just compensation in various amounts based on two different "but for" Chrysler Chapter 11 liquidation scenarios. Unlike, the *Alley's* plaintiffs, discussed above, Guetterman relies on the testimony of Ted Stockton[23] as its valuation expert. As will be explained in greater detail later in the opinion, Mr. Stockton's valuation approach is very different from the one employed by Ms. Murphy. For example, while Ms. Murphy assumes that at least some Chrysler cars or trucks will continue to be produced in her "but for world," Mr. Stockton assumes that Chrysler would have been liquidated in a Chapter 11 bankruptcy and that Chrysler vehicles would no longer have been produced. He assumes that there would be no new vehicles manufactured once Chrysler entered into bankruptcy. He assumed, however, that Chrysler parts would continue to be produced by entities that would have licensed Chrysler's name and would have offered those parts to the dealers for a price.

Ms. Murphy and Mr. Stockton also used different methods to calculate just compensation. Ms. Murphy calculated the amount of just compensation based on the income valuation approach assuming each of the *Alley's* plaintiffs would have continued

---

[23] As will be described in further detail *infra*, Mr. Stockton is the Vice President of Economics Services at the Fontana Group Inc. During his employment at Fontana he has worked 30,000 hours, focused on issues related to the automotive retail industry, and has conducted studies of hundreds of franchise operations that sell a wide array of branded vehicles.

as franchisees with a new Chrysler car manufacturer. Mr. Stockton calculated just compensation based largely on a "lost profits" method.

Specifically, Mr. Stockton posited two "but for worlds" where Chrysler liquidates in bankruptcy at some point in April 2009. The two "but for worlds" are as follows (1) a Chapter 11 bankruptcy where there is an orderly wind-down of Chrysler's operations and Guetterman continues to operate under its existing franchise agreements either for (i) three years or (ii) seventeen months, depending on how long the wind-down takes to complete, and (2) immediate liquidation of Chrysler in which Guetterman's Chrysler dealership continues to operate indefinitely as a "branded" Chrysler dealer, under a licensing agreement with third party. Mr. Stockton testified that these "but for worlds" were provided to him by counsel. Tr.2544:17-21.

Under the orderly wind-down scenarios that either last for three years or seventeen months, Mr. Stockton made the following assumptions. He assumed that the franchise agreements were not terminated in bankruptcy and are kept in effect for the period of the wind-down. He further assumed that the United States would have guaranteed the warranty obligations for the incumbent Chrysler customers. As part of this scenario, Mr. Stockton assumed that Chrysler would attempt to sell off-lease vehicle returns to the Chrysler franchisees which would provide the plaintiffs with additional used cars to sell during the wind-down period.

Under the second scenario, immediate liquidation, Mr. Stockton testified that he assumed that the United States would have again guaranteed the warranty obligations for the incumbent Chrysler customers. He further assumed that a consortium of Chrysler dealerships would have acquired the rights to certain propriety parts and intellectual

property, i.e. the Chrysler brand, in the Chrysler bankruptcy and that the plaintiffs would have been able to operate as Chrysler branded dealerships for the purposes of serving and selling used Chrysler vehicles, although not with any franchise agreement.[24] Under this second scenario, there is no "Chrysler" and thus no continuing franchise agreement between Chrysler and the plaintiffs. Further, under this second scenario, the plaintiffs would continue as "branded" dealers for between seven to ten years.

To set a value for what was "taken" by the government in Mr. Stockton's "but for world," Mr. Stockton calculated how much net profit Guetterman lost under these two liquidation scenarios by using Guetterman's 2006, 2007 and 2008 financial statements. DX138, DX196, DX311. Under Mr. Stockton's approach, the amount of just compensation Guetterman is seeking varies depending on the scenario, as follows: (1) $122,761 for the immediate liquidation scenario; (2) $112,942 for a Chapter 11 three-year orderly wind-down scenario; and (3) $61,047 for a Chapter 11 17-month orderly wind-down scenario. Tr.2456:11-19.

## I.     Mike Finnin Motors

Mike Finnin testified on behalf of Mike Finnin Motors ("Finnin"), the second *Colonial* plaintiff, which for the years at issue was located at 4355 Dodge Street, Dubuque, Iowa. Finnin was incorporated under the laws of Iowa. Finnin's dealership included Chrysler and Jeep franchises as well as a Kia franchise acquired in 2007.

---

[24] Mr. Stockton also testified on cross examination that if a consortium of dealers did not purchase the proprietary parts and intellectual property from Chrysler during the Chrysler bankruptcy, some unidentified third party would have and then would have licensed these parts and the brand to the Chrysler plaintiffs, who would thus have been able to continue as Chrysler-branded dealers. Tr.2446:5-10.

The Chrysler and Jeep franchise agreements that were rejected in the Chrysler bankruptcy were awarded to Finnin on November 21, 1994. Finnin's Chrysler and Jeep franchise agreements are identical in form and substance to the other franchise agreements owned by the other representative plaintiffs. DX29 (Jeep Agreement), DX32 (Chrysler Agreement). Mr. Finnin also testified that he understood that, regardless of the termination provisions in these franchise agreements, state law precluded the termination of dealerships for unjust reasons.[25]

On May 13, 2009, Finnin received a letter from Chrysler stating that its Chrysler and Jeep franchise agreements would be rejected in bankruptcy. The letter is identical to that received by the other representative plaintiffs in this case. DX446. Mr. Grady, Director of Dealer Operations, explained that Finnin's Chrysler and Jeep franchise agreements were rejected by Chrysler in bankruptcy because the dealership only met 66% of its MSR and because Chrysler believed that a nearby Dodge dealer was a better dealer and wanted that dealer to have the Finnin Chrysler and Jeep franchises. DX1315.

After Finnin received the May 13, 2009 letter, Finnin lost use of half of a "10,000 new square foot showroom at [its] main facility" that was dedicated to its Chrysler and

---

[25] Iowa state law provides that a "franchiser shall not terminate or refuse to continue any franchise unless the franchiser has first established, in a hearing held under the provisions of this chapter, that both of the following apply: a. The franchiser has good cause for termination or noncontinuance. b. Upon termination or noncontinuance, another franchise in the same line-make will become effective in the same community, without diminution of the motor vehicle service formerly provided, or that the community cannot be reasonably expected to support such a dealership." Iowa Code Ann. § 322A.2(1) (West 2009). Iowa state law further provides that "[u]pon hearing, the franchiser shall have the burden of proof to establish that under the provisions of this chapter the franchiser should be granted permission to terminate or not continue the franchise, or to enter into a franchise establishing an additional motor vehicle dealership, or to alter a franchisee's community." Iowa Code Ann. § 322A.9 (West 2009).

Jeep franchises. Tr.2244:19-21. Finnin also lost the income it could have derived from "selling the Jeep-Chrysler products, not selling those trade [ins], not performing warranty work on the Chrysler-Jeep vehicles, not selling parts to our individual clients and our wholesale accounts, and . . . the blue-sky value for the franchise." Tr.2249:1-8. Finnin "sought to get [its] Chrysler franchise back through 747 arbitration [and] spent over $180,000 trying to get it back, but it was denied by the arbitrator." TR2249:9-12. Finnin's 2010 financial statement from the Kia franchise that had been co-located with its Chrysler franchises showed that Finnin received an annual net profit of $291,742 from that dealership. DX620. Finnin's 2011 financial statement from its Kia franchise showed that it received an annual net profit of $473,108 from that dealership. DX650.

Finnin claims that the rejection of its Chrysler and Jeep franchise agreements in the Chrysler bankruptcy amounts to a taking of its two franchises based on a theory of coercion that is the same as that relied on by the *Alley's* plaintiffs. Finnin is seeking just compensation in various amounts depending on two different "but for" liquidation scenarios posited by its valuation expert Mr. Stockton. As explained above regarding Guetterman, Mr. Stockton posits two "but for worlds" where Chrysler liquidates in bankruptcy to establish the value of Finnin's franchise agreements. Mr. Stockton calculated the profit Finnin allegedly lost based on these two liquidation scenarios by using Finnin's 2006, 2007 and 2008 financial statements. DX137, DX195, and DX310. Under Mr. Stockton's valuation approach, the amount of just compensation Finnin is seeking is as follows: (1) $1,591,912 for the immediate liquidation scenario; (2) $1,391,138 for the three-year orderly wind-down scenario; (3) $775,040 for the 17-month orderly wind-down scenario. Tr.2453:15-19.

## II.  SUMMARY OF PLAINTIFFS' FACT AND EXPERT EVIDENCE

### A.  Plaintiffs' Fact Witnesses

#### i.  Steven Rattner

Steven Rattner testified for both the plaintiffs and the United States at trial. He explained that he was appointed by Timothy Geithner, President Obama's Secretary of Treasury, at the end of February 2009 to head a newly formed Auto Team Task Force ("Auto Team") at the United States Department of Treasury.[26] According to Mr. Rattner, his role was to assemble and oversee "a team of people who were going to address the growing crisis in the automobile industry [in 2008-09] and . . . come up with some policies to ameliorate the situation." Tr.1607:7-10. He remained in this position from February 2009 until July 2009. Tr.1607:12-15.

Mr. Rattner testified that he understood that his job on the Auto Team "was a restructuring exercise in that the Government had put some bridge loans into [Chrysler] at the end of 2008 . . . [and] it would be the [Obama] Administration that would have to figure out what, if anything, the Government should do, could do by the way of permanent financing to make [Chrysler] viable." Tr.1623:8-18. Mr. Rattner explained that in carrying out the goals of the Auto Team there was a principle called "shared sacrifice" which meant they "felt that all the stakeholders in [Chrysler] . . . were going to

---

[26] Mr. Rattner came to the Auto Team with a journalism and finance background. Mr. Rattner was a reporter for the New York Times for over eight years and had been an investment banker for both Lehman Brothers and Lazard Freres before cofounding a private equity firm, the Quadrangle Group. Tr.1606:15-1607:4. After leaving the Auto Team, Mr. Rattner returned to his earlier work in finance and today he is chairman and chief executive officer of Willett Advisors, which manages the personal and philanthropic assets of former New York City Mayor Michael Bloomberg. Tr.1607:16-23.

have to make sacrifices and share in them." Tr.1626:11-16. These sacrifices, Mr. Rattner testified, would come from "the lenders, the shareholders, the employees, the workers, the suppliers, and the dealers." Tr.1627:7-9. Mr. Rattner explained that, for the lenders, this meant that they would not be able to recover the entirety of the outstanding debt that Chrysler owed to them. Tr.1628:3-12. Mr. Rattner testified that, for the employees, shared sacrifice was that their contracts would be renegotiated and that Chrysler's obligations to them would be restructured or reduced. Tr.1628:15-17. At that time, the shared sacrifice of the auto dealers was not discussed.

Mr. Rattner explained that prior to Obama taking office, Chrysler had received a bridge loan from the Trouble Asset Relief Fund ("TARP") from the Bush Administration in the amount of $4 billion on December 31, 2008, and that under the terms of the bridge loan Chrysler was required to submit a "Viability Plan" to the U.S. Department of Treasury by February 17, 2009. DX996. Mr. Rattner explained that Chrysler was required to produce "a plan showing how, in their judgment, with whatever tools and adjustments or financial support or whatever it was that they thought they needed, a plan that would allow them to become profitable again and remain viable or profitable . . . for the indefinite future." Tr.1630:5-12.

Chrysler's Viability Plan was prepared by Chrysler, with the help of Robert Manzo, a restructuring specialist from the Capstone consulting firm who was retained by Chrysler starting in 2008. Tr.3928:18-24; DX1056. In its plan, Chrysler offered the following three options: (1) a stand-alone plan, in which Chrysler would continue with the same management but with an additional $5 billion from Treasury and $6 billion from the Department of Energy for a total of $11 billion in additional government funding, (2)

an alliance with Fiat plan, under which the two companies would work together to rebuild Chrysler with lighter and more fuel efficient vehicles and also would receive $11 billion in additional government funding, and (3) an orderly wind-down of Chrysler in bankruptcy plan, which would require $24 billion in debtor-in-possession or "DIP" financing for a two-year wind-down of operations to allow for the continued production of cars and trucks. Tr.1720:9-25; DX1056. Upon receiving Chrysler's Viability Plan, members of the Auto Team and their experts, including Mr. Mosquet,[27] were asked to review Chrysler's plan. Mr. Ronald Bloom,[28] Mr. Rattner's deputy who later testified for the government, was primarily responsible for reviewing Chrysler's Viability Plan along with other members of the Auto Team including Brian Osias and Clay Calhoon.[29] After reviewing Chrysler's Viability Plan, the Auto Team determined that Chrysler could not survive under the terms proposed. On March 30, 2009 President Obama announced that Chrysler's Viability Plan was rejected, and that Chrysler would be given until the end of April to revise its Viability Plan. DX1133.

Mr. Rattner testified that the Auto Team gave serious consideration to allowing Chrysler to liquidate in bankruptcy without government involvement but came to

---

[27]As discussed *infra*, Mr. Mosquet is a senior partner and managing director in the Detroit office of Boston Consulting Group. Since 2005, Mr. Mosquet has worked mainly in the automotive industry. Tr.1858:7-1859:14.

[28] As discussed *infra*, Mr. Bloom was the deputy to Mr. Rattner and later became the head of the Auto Team. Tr.2685:7-15. Mr. Bloom, prior to joining the Auto Team, had worked for the United Steelworkers Union from 1996 to 2008, where he negotiated their collective bargaining contracts and managed their relationship with Wall Street firms interested in investing in steel companies that are unionized. Tr.2682:25-2683:7.

[29] Brian Oasis testified, as discussed in greater detail *infra*, that he was an analyst who worked alongside with Mr. Calhoon and by March 2009 was focused exclusively on Chrysler. Tr.3138:21-3139:2.

understand that Chrysler needed to survive in some form so that its suppliers would also

survive. Specifically, Mr. Rattner testified that if Chrysler was no longer making cars and

trucks and instead was liquidated "many of those suppliers would have also been forced

into some form of liquidation, and the problem was not just those jobs that were lost, but

suppliers in this industry typically do not supply just one manufacturer. They supply

multiple, maybe all of them. And so you have Ford, you would have GM, you would

have Toyota, and all the people who operate in the south, potentially not being able to get

parts they needed to make their cars, and it was not inconceivable -- and I don't think we

were being doomsday folks to say this -- that we thought the whole industry could shut

down, at least for a bit, in a Chrysler liquidation." Tr.1725:9-22. Mr. Rattner also

explained that the Obama Administration was concerned about unemployment,

particularly in the auto industry, and therefore concluded that keeping Chrysler alive was

important for this reason as well. Tr.1725:8-22.

After Chrysler's initial Viability Plan was rejected by the Auto Team, but before

another plan was submitted, Mr. Rattner explained that the Auto Team largely took

control of Chrysler's viability planning and began meeting with Chrysler's stakeholders,

including its creditors, represented by JP Morgan (the administrative agent for the nearly

$7 billion in debt owned by Chrysler's first lien lenders), Fiat (Chrysler's prospective

purchaser), the United Auto Workers ("UAW"), and suppliers. The evidence established

that many of these meetings took place without Chrysler management present.[30] As Mr.

---

[30] The evidence established that Chrysler, without the Auto Team's support, continued to work on an alternative Viability Plan that required government assistance, but which Chrysler hoped would meet the government's requirements without Chrysler having to enter bankruptcy. As

Rattner testified, "between March 30th and the end of April, [the Auto Team], Chrysler, ultimately the banks, the UAW, various interested parties, attempted and ultimately succeeded in negotiating a set of go-forward arrangements that each party could live with and that [the Auto Team] determined would allow Chrysler to achieve viability." Tr.1636:10-15.

Mr. Rattner testified that in his role as leader of the Auto Team he negotiated with Chrysler's first lien lenders, represented by JP Morgan. Tr.1650:4-1651:16. Mr. Rattner testified in detail how the Auto Team set the terms and pace of the negotiations with JP Morgan, where he understood that his "first offer was not going to be [his] last offer, so [he] deliberately started low[.]" Tr.1652:15-18. He explained that he "spent a good bit of time -- many hours in a short period of time negotiating with [JP Morgan] and [JP Morgan] negotiating with [the] other [lenders]" to try and modify the terms of the $7 billion in loans so that Chrysler would not have to file for bankruptcy, but that those negotiations failed. Tr.1653:21-1654:11. Eventually, the first lien lenders received $2 billion in an agreement approved by the Bankruptcy Court. Tr.1653:8-11.[31]

Mr. Rattner testified that his deputy, Mr. Bloom, was charged with negotiating an arrangement with UAW. Tr.1637:4-15. Mr. Rattner testified that the Auto Team "[sat] down with UAW and attempted to negotiate some restructuring of the [employee's]

---

described in more detail in the discussion of Mr. Nardelli and Mr. Bloom's testimony, this effort by Chrysler failed.

[31] As discussed *infra*, JP Morgan's advisor John Haeckel testified that after reviewing Chrysler's Viability Plan, he came to believe that the first lien lenders would never get more than $2 billion from Chrysler if Chrysler entered bankruptcy without government assistance. He thus advised JP Morgan to accept the government's proposal to relinquish the debt held by first lien lenders for the government's $2 billion. Tr.2865:25-2866:3.

contract and of Chrysler's obligation to [its employees]." Tr.1628:15-17. These

negotiations eventually led to UAW pension funds receiving shares in New Chrysler.

Specifically, under the prepackaged bankruptcy plan, negotiated by the government's

Auto Team, in exchange for forgiving $8 billion in fixed obligations owed by Chrysler to

the UAW's Voluntary Employees' Beneficiary Association Plan or "VEBA," UAW

agreed to accept a $4.6 billion unsecured note and stock in New Chrysler. Tr.2720:7-13.

Mr. Rattner explained that the Auto Team also took charge of the negotiations

with Fiat regarding a potential merger with Chrysler. Mr. Rattner described it as "a kind

of three-way negotiation in which Chrysler, Fiat, and the U.S. Government all

participated." Tr.1636:16-24. The evidence established that under the final negotiated

prepackaged bankruptcy plan, Fiat would take over management of New Chrysler and

receive stock in new Chrysler. Fiat would not, however, have to pay Chrysler for its

interest in New Chrysler. Mr. Rattner stated that consistent with its financing role, the

government had to approve the deal with Fiat. Tr.1636:25-1637:3. Mr. Rattner

acknowledged that the government's power in this circumstance is known as the "Golden

Rule," meaning "he who has the gold makes the rules." Tr.1683:9-12.

Mr. Rattner explained that reducing the number of Chrysler franchises was in

Chrysler's proposed Viability Plan before the government got involved and thus was

always a part of Chrysler's viability planning. Tr.1665:13-20. Known in the auto industry

as "dealership rationalization," the government understood from Chrysler's submissions

that Chrysler planned to reduce the total number of franchisees and wanted to combine all

brands under one roof to make Chrysler viable. *Id.* For this reason, "dealer

rationalization," which was initiated by Chrysler well before the financial crisis, was

always going to be part of a final Chrysler Viability Plan. Tr.1665:13-20, Tr.1641:12-21, Tr.16380:14-17. Mr. Rattner, explained however, that the Auto Team "never got into the question of which dealers, how, or anything of that sort" but rather was looking at it from a macro level of how many. Tr.1664:20-1665:12. He also agreed that one of the positives of moving forward with a Chrysler bankruptcy was that it would allow Chrysler to reduce its dealership network without having to comply with state franchise laws, which, as identified in the footnotes for each representative plaintiff, provide significant protections to car franchisees and limit the circumstances under which dealerships can be terminated. Put another way, bankruptcy would allow Chrysler to reject franchise agreements without having to first comply with state laws. Tr.1642:13-25.

Mr. Rattner further explained that the government had hoped that Chrysler would not have to file for bankruptcy and testified that up to the last minute the government was willing to provide funding under the terms the government negotiated with Chrysler's lenders and others. Tr.1653:24-25, Tr.1654:9-11. However, he also testified that everyone understood from the beginning of the Auto Team's review of Chrysler's Viability Plan that bankruptcy was an option. Tr.1640:6-22, Tr.1642:4-11. When JP Morgan was not able to get an agreement from all of Chrysler's lenders, the government concluded that if Chrysler, in some form, was going to continue to manufacture cars and trucks, Chrysler would have to file for bankruptcy under the terms the Auto Team negotiated. Tr.1661:12-18.

Per the court's pre-trial order, the government also elicited testimony and evidence from Mr. Rattner during the plaintiffs' case-in-chief. In his testimony for the government, Mr. Rattner explained that Chrysler understood that "it could not be viable unless it had

significant sacrifice" from all interested parties including dealers, shareholders, suppliers, the UAW, and credit groups. Tr.1719:12-16. He explained that he understood at the time that JP Morgan and the other first lien lenders would not provide Chrysler with any financing in order to allow Chrysler to continue to operate as an ongoing concern while in bankruptcy. Without this debtor-in-possession or "DIP" financing, Chrysler could not continue to manufacture new cars and trucks. Thus, if Chrysler was to continue to make cars and trucks during bankruptcy, Mr. Rattner explained that Chrysler needed the federal government's assistance. Tr.1722:13-1723:5. Mr. Rattner also made clear in his testimony that the Auto Team never targeted specific dealers for rejection. Tr.1737:1-6.

### ii. Xavier Mosquet

The plaintiffs also presented the testimony of Xavier Mosquet to support their coercion claim. Mr. Mosquet is a senior partner and managing directing for Boston Consulting Group ("BCG") in its Detroit office, and was an advisor to the Auto Team. Tr.1858:7-20. Mr. Mosquet explained that BCG is a "managing consulting firm present in several countries around the world" that gives advice to corporations about operation issues. Tr.1858:21-1859:14. He explained that he is an expert in the automotive industry and further explained that BCG was retained by the Auto Team in 2009, with Mr. Mosquet as the team leader, to analyze the Viability Plans submitted by GM and Chrysler in February 2009. Tr.1859:24-1860:12.

Regarding the Chrysler Viability Plan, Mr. Mosquet explained that Chrysler's plan was not viable. The plaintiffs, however, focused Mr. Mosquet's testimony on his understanding of Chrysler's "Project Genesis" plan, which, as described above in connection with the testimony of the individual plaintiffs, was a voluntary Chrysler

program designed to reduce or "rationalize" Chrysler's dealership network without forced

dealership closures. Tr.1873:3-6, Tr.1874:3-8, Tr.1885:19-23. Mr. Mosquet testified that

neither he nor anyone else at BCG criticized Project Genesis. Tr.1909:17-1910:8. He also

testified that, in comparison to GM, which had not begun to rationalize its dealership

network, BCG had concluded that Chrysler had already done significant dealership

closures and was thus ahead of GM. PX704; Tr.1892:13-20. Mr. Mosquet testified that

BCG concluded that Chrysler had "already gone through a significant number of low

performing consolidations." Tr.1936:15-20; PX704. Mr. Mosquet further testified that

BCG concluded that any further reduction in the dealership network could result in

eliminating additional good dealers with "limited upside potential." Tr.1894:11-17;

PX704.

Mr. Mosquet explained that in evaluating Chrysler's Viability Plan, BCG had not

done any analysis concerning whether further reducing the number of Chrysler dealers

would positively impact Chrysler's sales or increase its profitability. He also testified that

no one at BCG had analyzed the health of the overall dealership network. Tr.1900:11-

1901:5, Tr.1901:15-18. He testified that he understood that Fiat's plan for the Chrysler

dealerships was the same as Project Genesis. Tr.1882:1-4. Mr. Mosquet concluded by

stating that only Chrysler was in the position to determine the appropriate size of its

dealership network. Tr.1962:12-23, Tr.1963:4-6.

### iii.    Alfredo Altavilla

In accordance with the court's pre-trial order, the court allowed the parties to

introduce the video deposition of Alfredo Altavilla, Fiat's Head of Business Development

and CEO of Fiat Powertrain Technology, in lieu of his attendance at trial. In his

deposition, Mr. Altavilla testified regarding the negotiations between the government and Fiat and regarding Fiat's interest in the size and composition of Chrysler's dealership network.

Mr. Altavilla explained that there had been an initial term sheet negotiated between Fiat and Chrysler regarding an "alliance" before the Auto Team got involved. He testified that the second term sheet between Fiat and Chrysler was significantly renegotiated by the Auto Team. Depo. 60:8-25. Specifically, Mr. Altavilla explained that during his first meeting with Mr. Bloom from the Auto Team, Mr. Altavilla learned that the government would be Fiat's "main counterpart for executing the alliance[.]" Depo. 67:20-68:5. He went on to explain that the second term sheet had no provisions that were promoted or suggested by Chrysler and that in negotiating the second term sheet it was understood that the Auto Team expected additional concessions from both sides. Depo. 177:15-178:3. Mr. Altavilla explained, however, that neither in the first or second term sheet executed between Chrysler and Fiat was there any mention of reducing the dealership network by a specific number of dealers. Depo. 154:4-22, Depo. 152:23-153:4. Mr. Altavilla testified that part of the reason that Fiat was interested in Chrysler was because Chrysler had an extensive dealership network. Depo. 140:20-25. He testified that Fiat eventually came to understand from Chrysler why a reduction in the size of the dealership network made sense and deferred to Chrysler's judgment when Chrysler proposed accelerating Project Genesis with the more ambitious "Project Tiger."

Ultimately, Project Tiger became the basis for Chrysler deciding which franchise agreements to reject in the bankruptcy.[32] Depo. 146:4-147:11.

## B. The Plaintiffs' Experts

### i. Dr. Donald Marron

The plaintiffs presented the testimony of Dr. Donald Marron, Ph.D., an economist and Institute Fellow and Director of Economic Policy Initiatives at the Urban Institute in Washington D.C. and president of Marron Economics, LLC, an economic consulting firm. Tr.2047:1-6. Dr. Marron was called to explain why, in his view, the terms the Auto Team negotiated in its prepackaged bankruptcy plan did more than protect the government's financial interests. Dr. Marron opined that the government's negotiated terms were designed to achieve valid public policy goals including saving jobs and pensions.

Dr. Marron holds an A.B. in mathematics from Harvard University and a Ph.D. in economics from the Massachusetts Institute of Technology and is an expert in the fields of public finance and industrial organization. Tr.2047:7-11. From 2002 through early 2009, Dr. Marron served in senior economic policy positions in the United States Congress and the White House. Tr.2047:19-21. His positions included being the Executive Director of the Joint Economic Committee, Acting Director of the Congressional Budget Office ("CBO"), and Senate-confirmed member of the Council of Economic Advisors. Tr.2047:21-25. In his role at CBO he "directed a staff of about 230 employees that were charged with working on a broad range of economic and budget

---

[32] As will be discussed in greater detail *infra,* Project Tiger was a plan proposed by Chrysler in April 2009 just before it entered bankruptcy. DX1167.

issues." Tr.2047:25-2048:2. From August 2007 until January 2009 he served at the White

House Council of Economic Advisors as a consultant, then senior economic advisor, and

then as member where he was "actively engaged in responding to the financial crisis,

including the creation and use of the Troubled Asset Relief Program." Tr.2048:5-11. He

has published numerous articles and papers on the economics of public policy and has

provided testimony to committees of the U.S. Congress on more than twenty occasions.

Tr.2048:19-24.

Dr. Marron offered several opinions relevant to the government's motivation in

providing Chrysler with financial support during the economic crisis and opined that the

government, in providing funding and in requiring certain actions in exchange for

government financing, was acting in its governmental capacity and not simply as a

private lender. Dr. Marron's opinions are summarized as follows.

First, Dr. Marron opined that "[t]he United States experienced a remarkably severe

financial crisis and economic downturn starting in 2007. The main causes include[d]

excesses in mortgage lending and fragility of a highly leveraged financial system reliant

on ample liquidity." He further testified that "[g]overnment policy errors contributed to

the financial crisis and the severity of the economic downturn." Tr.2055:23-2056:4.

Second, Dr. Marron opined that "[t]he government had unique power to combat

the financial crises and was correct to use it. Many companies directly benefited from

that support, but the purpose was not to help individual companies. Instead, the goal was

to support essential parts of the economy, and, in so doing, stem job losses and avoid an

even more severe economic downturn. The Chrysler . . . bailout[], for example, [was]

intended to support the domestic auto industry as a whole, including suppliers and other

auto manufacturers[.]" Tr.2058:25-2059:10. Dr. Marron explained that having learned its lesson from inaction during the Great Depression, the government acted in order "to support the economy as a whole and [to] avoid a downturn as severe or worse than in the Great Depression." Tr.2061:17-19.

Third, Dr. Marron testified that it was his opinion that "[t]he government did not act in a commercial manner in rescuing Chrysler. The government did not have a commercial motive. It sought to protect the broader economy, not earn a commercial return. The government did not seek commercial returns. Instead, it gave Chrysler substantial subsidies." Tr.2062:24-2063:4. Dr. Marron explained that during the financial crisis the "government did not have a commercial motivation in enacting TARP" but rather aimed to support the American economy and prevent job loss. Tr.2063:10-14. Dr. Marron noted that the government's concern of "shared sacrifice" is not something a private lender would have considered but is a public policy consideration made by the government when acting in its governmental capacity. Tr.2065:5-9. Additionally, Dr. Marron opined that the "government knowingly subsidized Chrysler, offering financial terms much more generous than private investors would accept" and that this was further evidence that the government was not acting as a private lender. Tr.2065:9-11. Dr. Marron acknowledged that "[s]ome of the government's actions did parallel those a commercial lender or financier might take" but that ultimately "[t]he Chrysler bailout as a whole was decidedly non-commercial." Tr.2065:10-13, Tr.2065:24-25.

Fourth, Dr. Marron testified that it was his opinion that the government was not acting as a private lender because the loans to Chrysler were highly subsidized. Tr.2066:1-6. Specifically, Dr. Marron explained that "the government did not invest in

the companies on commercial terms" but rather "expected to lose money." Tr.2066:6-8.

In support of his opinion, Dr. Marron relied on contemporaneous reports by the Office of

Financial Stability ("OFS"), the CBO, and the Office of Management and Budget

("OMB"). He noted that OFS in 2009 published three estimates of the Automotive

Industry Financing Program,[33] with subsidy rates ranging from 43% to 60%, meaning

that the government understood that it would not likely receive repayment. PX257. For

example, Dr. Marron explained that in its first estimate OFS calculated that the

government had made $75.9 billion in loans and equity investments to auto companies

but that the securities it received were worth only $30.5 billion. Tr.2068:8-15. Dr. Marron

noted that this meant the $45.4 billion difference was a subsidy to the auto companies,

which was about 60% of the overall investment. *Id.* Dr. Marron explained that for the

other two estimates calculated by OFS, the subsidization rate was consistent with the first

estimate. Dr. Marron went on to explain that the CBO and OMB reported similar

numbers and subsidization rates. Based on these rates, Dr. Marron concluded that the

government acted in its governmental capacity and not as a private lender when it bailed

out Chrysler. Tr.2076:9-15.

Dr. Marron acknowledged on cross examination that all the reports that he relied

on included figures that encompassed all or nearly all of the government's loans to the

auto industry and not just to Chrysler. Tr.2126:8-2129:20. Additionally, on cross

examination, Dr. Marron acknowledged that New Chrysler repaid all its federal loans to

---

[33] This program provided capital to both Chrysler and GM as well as their captive finance companies, Chrysler Financial and General Motors Acceptance Corporation, and auto part suppliers. Tr.2117:18-25.

the United States. He explained, however, "when the loans were first made, the analysts would have assumed there was some probability of default and that would have been built into their estimated subsidy rate . . . [a]nd by the end, where it turned out after the fact that this loan didn't default, that adjustment goes away." Tr.2138:12-24.

### ii.   David Berliner

David Berliner, who received a B.A. degree in economics from Lafayette College and an M.B.A. from the University of Michigan, also testified for the plaintiffs. He is a licensed Certified Public Accountant as well as a Certified Insolvency and Restructuring Advisor and a Certified Turnaround Professional. Tr.100:3-7. Mr. Berliner is currently a partner at BDO, an international accounting, tax and consulting firm, where he oversees business restructuring and turnaround services. Tr.99:21-100:8. He has been involved in several bankruptcy cases involving the liquidation of "large corporations including Sports Authority Holdings, Malibu Lighting, Furniture Brands International, American Home Mortgage, and Pillowtex Corporation." Tr.101:7-11. He also "served as the financial advisor to the official committee of unsecured creditors in the bankruptcy of Daewoo Motor America, Inc." Tr.101:18-20.

Mr. Berliner offered his opinion that "the Chrysler dealers whose franchises were terminated and made worthless in June 2009 would have fared better and their franchises would have retained significant value if the U.S. Government had not acted as it did in 2009." Tr.102:3-7. Specifically, Mr. Berliner testified that "absent the financial assistance from the Government, Chrysler would have filed for an ordinary liquidation in bankruptcy and would not have terminated existing dealer franchises as it did in 2009" and "under this but for scenario . . . the rejected dealers would have generated revenues

63

and earnings for a period of at least 20 months or longer during a Chrysler 2009 liquidation, and therefore, the rejected dealership franchises would have had substantial value." Tr.102:8-19. Mr. Berliner posits that had the government not gotten involved in providing financial assistance to Chrysler, Chrysler would have begun a Chapter 11 liquidation bankruptcy with debtor-in-possession or DIP financing so that Chrysler could continue manufacturing at least some of Chrysler's vehicle lines with valid warranties. He further opined that Chrysler would not have rejected any franchise agreements if Chrysler had entered Chapter 11 without government assistance. Tr.131:5-18.

Mr. Berliner explained that, in his view, had the government not provided assistance to Chrysler, Chrysler would have sold its assets in a Section 363 bankruptcy sale. Although described in more detail by former Bankruptcy Judge Judith Fitzgerald, plaintiffs' bankruptcy expert, Mr. Berliner explained that "Section 363 sales are any sale of a debtor's assets conducted under the authority of the Bankruptcy Court . . . and may include individual assets belonging to the debtor, a combination of assets, or substantially, all of the debtor's assets." Tr.131:20-25. Mr. Berliner explained that in his opinion Chrysler "would have begun a Section 363 asset sale process to attempt to sell its valuable vehicle lines, such as Jeep, Dodge Ram Truck, and Town & Country/Dodge Minivan[.]" Tr.132:7-11. Mr. Berliner testified that "more than one potential bidder would have submitted a qualifying bid . . . and Chrysler would have held an auction in order to select the highest and best bid." Tr.135:20-24. Mr. Berliner explained that he based his conclusion on the assumption that "[b]idding would have been competitive, in part due to the interest in obtaining the valuable Chrysler brands and also in part, out of concern that a competitor might win one of these or more of these iconic brands at too

low a price," and because through bankruptcy the assets would be taken free and clear of all liens and claims. Tr.135:24-136:6.

Mr. Berliner further explained why he believed that Chrysler would have likely received DIP financing. Tr.137:5-6. Mr. Berliner stated that "[i]f the debtor does not have sufficient cash to conduct the asset sales and to cover the costs of the liquidation process, the debtor will seek Bankruptcy Court permission to obtain debtor-in-possession or DIP financing to provide the necessary funds." Tr.137:20-24. Mr. Berliner reasoned that a debtor would seek DIP financing because "[i]f the debtor has only limited funds to conduct a sale process, then the liquidation sales must be done in an accelerated time frame which generally results in lower prices than an orderly sale process." Tr.137:8-12. Mr. Berliner opined that Chrysler would have sought and would have obtained some DIP financing from "its secured lenders, Cerberus [the then-owner of Chrysler], a stalking horse bidder for the Chrysler brands, or a state government [where] a plant producing Chrysler's valuable brands was located." Tr.138:10-14. Mr. Berliner testified that these entities would have been incentivized to provide DIP financing in order "to ensure the liquidation process and sale of assets was done over a reasonable time frame and in an orderly manner" to maximize the value of the assets. Tr.138:19-24. Mr. Berliner went on to state that "even if no DIP financing was provided to Chrysler . . . one or two brands would have still been sold, maybe at a lower sales price" and the "Chrysler dealers would still have been able to continue providing service and parts and selling used vehicles to their customers and still may have received some new vehicles to sell in the future from the acquirer of the brands." Tr.129:11-23.

Mr. Berliner next opined that warranty work would continue at all the plaintiffs' franchises because, in his view, the government would have put into place some type of warranty program to guarantee the outstanding warranties of Chrysler car owners. Mr. Berliner explained that he believed that "[i]f nothing else, the government would likely have insisted that there was a warranty program to ensure public safety, consumer protection, and prevent the collapse of the U.S. automotive industry. Tr.140:7-11. Specifically, Mr. Berliner testified that "given the large number of Chrysler vehicles on the roads in early 2009 . . . a recall warranty program would have been put in place in a Chrysler 2009 liquidation." Tr.141:2-6.

Regarding the plaintiffs' franchises, Mr. Berliner opined that "no Chrysler dealers would have been immediately terminated in a Chrysler 2009 liquidation." Tr.141:7-9. Mr. Berliner testified that "there was no short-term benefit to Chrysler rejecting dealership agreements" and that Chrysler would not have rejected any agreements in bankruptcy. Tr.144:15-17, Tr.144:23-145:2.

Mr. Berliner testified that he supported his opinions based on evidence he examined from three other automobile bankruptcies in the United States: Daewoo Motors America, Saab America, and American Suzuki Motor Company. Mr. Berliner explained that Daewoo Motors America ("DMA") was the U.S. import and distribution arm of Daewoo Motor Company, which in 2002 had a network of 525 dealerships. Tr.145:14-19. He explained that DMA was forced to file for Chapter 11 bankruptcy in the United States in 2002 after its parent company was placed into reorganization status in South Korea. Tr.145:20-24. Mr. Berliner testified that "[a]s part of the DMA bankruptcy, the company entered into long-term agreements with the buyer of Daewoo to provide service, warranty

repairs and Daewoo parts to the U.S. market through the DMA dealership network" and that "approximately 450 of the DMA dealers entered into agreements with the buyer and remained in business for many months, providing service and warranty repair work and selling used cars." Tr.145:24-146:8.

Next, Mr. Berliner testified regarding the fate of Saab America after Saab Automobiles went into bankruptcy. He testified that, following that bankruptcy, the 188 dealers in the dealership network stayed open for a period of time to service cars and sell used vehicles. Tr.146:13-22. Finally, Mr. Berliner testified about the American Suzuki Motor Corporation ("Suzuki") bankruptcy in 2012. Mr. Berliner explained that at the time Suzuki filed for bankruptcy, it had "220 automobile dealerships, 900 motorcycle/ATV dealerships, and over 780 outboard marine dealerships." Tr.146:24-147:2. Mr. Berliner explained that Suzuki undertook an orderly liquidation process where it entered into a Service and Parts Agreement with its dealers where Suzuki would honor all warranties and allow the dealers to continue to provide warranty service and sell the remaining new automobiles. Tr.147:8-22.

Mr. Berliner testified these historic examples of prior auto bankruptcies together with his expert opinions supported his conclusion that "Chrysler dealers would have continued in business, earning profits by performing a range of services for a period of time" if Chrysler had filed for Chapter 11 bankruptcy without government assistance. Tr.149:10-13. He testified that "[s]ome of the valuable Chrysler brands, such as Jeep, Dodge RAM trucks, and minivans, would be sold to an acquirer in a 363 sale" and that the "acquirer would seek to restart production as soon as possible, likely sometime in late 2009 or 2010." Tr.149:13-17. Mr. Berliner concluded that if the 363 purchaser did not

have an existing dealership network, the Chrysler dealers could potentially continue in business indefinitely and have their franchise agreements assumed by the new manufacturer. Tr.149:18-23. Mr. Berliner acknowledged that even if the Section 363 acquirer in bankruptcy had a dealership network, "there would be some transition period of one to two years after the Section 363 sale where it would be necessary for the acquirer to utilize the existing Chrysler dealers to sell new vehicles and provide service and warranty repairs until the acquirer's dealer network was ready." Tr.149:24-150:5. Mr. Berliner explained that during this transition period, the Chrysler dealers would be able to continue to provide service and warranty work and sell some new Chrysler vehicles as well as used vehicles, and, at the end of the transition period, would either remain dealers or would wind-down their operations. Tr.150:6-13. Mr. Berliner reiterated that dealers would have had a "minimum of 20 months and potentially longer" from the date of the filing of a Chrysler bankruptcy in a "but for world" without government funding, and that the plaintiffs would have been able to derive profits from their operations for this period. Tr.151:1-7.

On cross examination, Mr. Berliner admitted that it is not uncommon for a debtor in bankruptcy to reject executory contracts, like franchise agreements, as Chrysler did in its bankruptcy, based on its business judgment. Tr.194:5-15, Tr.195:5-6. Mr. Berliner also admitted on cross examination that he had no opinion as to who would have acquired Chrysler's assets in a 363 sale. Tr.197:10-14. He explained that he "believed" that there would be an acquirer, that the sale would occur within four to six months, and that, as a result, the plaintiffs would have had sixteen to twenty months to perform service and warranty work. Tr.201:8-17, Tr.153:12-20. Mr. Berliner further admitted on cross

examination that some of the Chrysler franchisees would likely have had their agreements rejected in the bankruptcy and that only some would have been given new franchise agreements with the Section 363 purchaser. Tr.203:19-204:25. In this connection, Mr. Berliner explained that he assumed that Chrysler franchisees would have access to financing to purchase new cars from Chrysler (known as floor plan financing) and that there would be DIP financing in place to allow Chrysler to orderly wind-down in a bankruptcy. Tr.230:1-6, Tr.233:16-24.

Finally, regarding the other auto bankruptcies he relied on, Mr. Berliner admitted on cross examination that there were some important distinctions between those bankruptcies and what would have happened to Chrysler had the government not intervened. First, he acknowledged that franchise agreements were rejected in the Saab bankruptcy. Tr.262:22-263:10, Tr.153:12-20. Next, he acknowledged that the Suzuki bankruptcy involved an auto distributor going bankrupt, and not the manufacturer. Finally, in the case of Suzuki, he acknowledged that the manufacturer continued to provide financial assistance that would not have been available to Chrysler in a "but for world" bankruptcy. Tr.263:23-265:10.

### iii.   Maryann Keller

The plaintiffs presented the testimony of Ms. Maryann Keller, an automotive industry expert with decades of experience conducting automotive industry financial research and analysis. She is currently the principle of Maryann Keller & Associates, a position she has held since January 2001. Tr.1070:17-22. She holds a bachelor's degree in chemistry from Rutgers University and a master's degree from Bernard Baruch School at the City University of New York. Tr.1073:14-17. She has "advised clients on issues

across the automotive supply chain, from component companies to retail sales area."
Tr.1071:11-14. Ms. Keller has been "qualified as an automotive expert in three
proceedings, the first in the International Court of Arbitration in Hong Kong; a second in
the State of Virginia; and, finally, in the Bankruptcy Court in New York City."
Tr.1071:18-22. She has lectured about the automotive industry at Columbia University,
Harvard, NYU, MIT, and the Economic Club of Detroit. Tr.1072:19-21. Ms. Keller has
also authored two books on the automotive industry and written columns on the
automotive industry for the Christian Science Monitor, Motor Trend Magazine, and
Automotive Industries. Tr.1072:23-1073:1.

Ms. Keller testified that she was asked to opine on what would have happened if
"the federal government had not provided financial assistance to Chrysler LLC in 2009
[and] the company would have restructured in a bankruptcy proceeding." Tr.1073:18-22.
She testified that in her opinion Chrysler's assets that would have attracted multiple
buyers and that Chrysler would have continued to manufacture vehicles during the
bankruptcy. She also opined that plaintiffs would have been able to continue to sell
Chrysler vehicles and would not have rejected any franchise agreements in a bankruptcy
without government involvement. Tr.1074:11-1075:1.

Ms. Keller testified that the most prized assets of Chrysler would have been the
Jeep brand, the Dodge RAM truck brand, and the Chrysler family of minivans.
Tr.1076:2-14. Ms. Keller testified that there would likely have been at least 12 companies
interested in purchasing Chrysler's assets and continuing to manufacture Chrysler
vehicles. She explained that without having to abide by UAW contracts and pay union
wages she believed Chryslers' assets would become more valuable and would have

attracted more interest from potential purchasers. Tr.1086:12-21. She identified the

following entities as potential purchasers of Chrysler's assets: The Blackstone Group;

The Fiat Group, Ford Motor Company, Geely, General Motors, Magna International,

Inc., Mahindra & Mahindra Limited, PSA Peugeot Citroen, Renault, Tata Motors,

Tracinda Corp., and Volkswagen Group. Ms. Murphy testified as to why each of these

entities was in a position financially to purchase Chrysler's vehicle lines in a Section 363

sale and why it would have made financial sense for them to do so. Tr.1086:22-1102:23.

First, Ms. Keller testified that in her opinion the Blackstone Group would "have

targeted Chrysler's physical assets in addition to its brands and intellectual property."

Tr.1087:7-9. Ms. Keller explained that she believed the Blackstone Group would be a

potential Section 363 purchaser in part because it was a large private equity firm with

"$31.8 billion in assets under management with $821.3 million in revenues" during 2007

and that it had attempted to acquire "Chrysler in the spring of 2007 from Daimler" but

had lost to Cerberus. Tr.1087:1-6.

Second, Ms. Keller testified that Fiat also would have been a potential Section 363

purchaser because "the combination of these two companies was ideal . . . Fiat's

expertise was small fuel-efficient cars while Chrysler's expertise was trucks and sport

utility vehicles" and because "Fiat had the ability to make Jeep a major international

brand and to add Italian designed cars to the North American portfolio." Tr.1089:8-19.

She explained that Fiat, which paid nothing for Chrysler under the government's

prepackaged bankruptcy plan, was in a financial position to purchase Chrysler's assets

because in 2007 it had earned €2.1 billion on €59 billion in revenue. Tr.1088:2-7.

Third, Ms. Keller opined that Ford would have been a potential bidder because its financial conditions were "impressive" in 2007, with $13 billion in cash on hand and access to more than $10 billion in credit in 2008. Tr.1090:1-3. Ms. Murphy testified that she believed "Ford had the wherewithal to have been a bidder for select Chrysler assets that complemented its . . . portfolio including the Jeep brand." Tr.1090:3-6.

Fourth, Ms. Keller opined that Geely, a Chinese automotive manufacturing company headquartered in Hangzhou, Zejiang would have been a potential Section 363 purchaser. Ms. Keller explained that "[b]y the end of 2007, Geely recorded, in Hong Kong dollars, 11.3 billion in revenues and recorded . . . record breaking profits of Hong Kong dollars [of] 320 million before taxes." Tr.1090:7-10. She explained that she believes that at the time of a Chrysler bankruptcy, Geely was "well capitalized for both domestic and international growth." Tr.1090:15-16. Ms. Keller further testified that Geely's subsequent "acquisition of Lotus and its subsequent acquisition of Volvo demonstrated its ability and willingness to acquire international automotive assets that would add to its brand portfolio and its technical expertise." Tr.1090:17-21. Ms. Keller also noted that Geely "actually attempted to purchase some or all of Fiat Chrysler in 2018" to further support her opinion that Geely would have been an interested bidder in Chrysler's assets if there had been an open Section 363 sale. Tr.1091:11-14.

Fifth, Ms. Keller opined that General Motors could have been a potential buyer of "select Chrysler brands that complemented its own product portfolio, especially Jeep after it discontinued the Hummer brand," after GM emerged from bankruptcy at some point in 2008. Tr.1092:8-13.

Sixth, Ms. Keller testified that Magna International, a Canadian global automotive part supplier, could have been a prospective bidder on Chrysler's assets in the event of an open Section 363 auction. Ms. Keller explained that Magna in 2007 "had over 25 billion in revenue and over 68 million in net income." Tr.1092:16-17. Ms. Keller testified that "Magna was financially tied to Chrysler as a major supplier of components for all Chrysler vehicles" and thus would have had an interest in bidding for Chrysler's assets. Tr.1092:19-21. She went on to explain that in 2007, when Chrysler was for sale, Magna had made a bid of $4.7 billion and that Magna would likely attempt to purchase Chrysler's assets again in a Section 363 sale. Tr.1092:22-1093:1.

Seventh, Ms. Keller testified that Mahindra & Mahindra Limited ("Mahindra"), an automotive and farm equipment manufacturer based in Mumbai, India, would have been another potential purchaser of Chrysler's assets in a Chrysler bankruptcy. Ms. Keller explained that by "the end of fiscal year 2008, ending March 31, 2008, Mahindra had produced more than 2 million vehicles . . . [and had a] gross income . . . [of] $3.05 billion." Tr.1093:18-25. Ms. Keller testified that she believed that Mahindra would have been interested in purchasing Chrysler's assets because "it would have benefited from entering the global light vehicle segment on a major scale" and "would have targeted Chrysler's Jeep and Dodge truck brands." Tr.1094:1-9. Ms. Keller also noted that her opinion was supported by the fact that Mahindra representatives met with Chrysler in early 2008 to discuss the possible acquisition of certain Chrysler assets. Tr.1094:5-7.

Eighth, Ms. Keller testified that PSA Peugeot Citroen ("PSA"), a French automobile company, would be another likely bidder on Chrysler's assets in a bankruptcy. She explained that in 2007, PSA had earned a profit of €1.8 billion and had

sold over 3.4 million vehicles. Tr.1094:15-18. She opined that "PSA had been seeking to

return to the United States . . . [and] the French Government had guaranteed financial

assistance to PSA during the financial crisis." Tr.1094:15-24. Ms. Keller stated that

PSA's interest in Chrysler's assets would have stemmed from the fact that "the Chrysler

product portfolio would fill gaps, especially for light trucks in [PSA's] portfolio . . . and

the Chrysler acquisition would have provided a [United States] dealer body . . . that

would have granted [PSA] franchises to those dealers without the burden of having

dealers make additional facilities investments." Tr.1094:24-1095:8.

Ninth, Ms. Keller testified that Renault, the second largest auto manufacturing

company in France, would have also been an interested bidder. Ms. Keller explained that

in 2007 Renault generated €40.6 billion in revenue and earned 2.7 billion in profit, and

that it would have likely been interested in returning to the United States market through

an acquisition of Chrysler assets. Tr.1095:18-25.

Tenth, Ms. Keller testified that Tata Motors ("Tata"), an automobile manufacturer

based in Mumbai, India, would have also been a potential bidder on Chrysler's assets in

order to expand its international market share. Ms. Keller explained that "Tata wanted to

become an international automaker" which is evidenced by its 2008 acquisition of Jaguar

Land Rover from Ford and the fact that in early 2008 Tata was in talks with Chrysler

about selling the Jeep brand in India. Tr.1096:17-1097:18.

Eleventh, Ms. Keller opined that Tracinda Corp, a privately-owned investment

company based in Beverly Hills, California, would have been another potential

purchaser. Ms. Keller explained that "on April 5th, 2007, Tracinda made a $4.5 billion

cash offer to DaimlerChrysler for its U.S.-based unit" and that it would have likely made

similar efforts to purchase Chrysler's assets in bankruptcy in 2009. Tr.1098:3-6. Ms. Keller also explained that Tracinda would have been a likely 363 purchaser because it had made other forays into the automotive industry by purchasing large amounts of shares in GM and Ford. Tr.1098:9-19.

Finally, Ms. Keller opined that the Volkswagen Group ("VW") would have been a potential purchaser of Chrysler's assets in a Section 363 sale. She explained that in 2007 VW had earned €6.5 billion in pre-tax profit and "was a financially strong company and had previously acquired auto companies and successfully integrated them into its business." Tr.1098:24-1099:3. Ms. Keller testified that although VW had success in many global markets, "its presence in the North American market lagged because the company did not have what are called crossover sport utility vehicles [and] pickup trucks," which a purchase of Chrysler's assets in a 363 sale would have provided. Tr.1099:3-7.

Ms. Keller went on to explain, after listing the 12 different potential Section 363 purchasers, that her conclusion that some company would have purchased Chrysler's assets and made use of its vehicle lines is supported by historical examples in the automotive industry. She explained that "[t]he modern auto industry is notable for the willingness of buyers to purchase the assets of financially distressed, even bankrupt automakers." Tr.1100:5-7. She further testified that Chrysler brands like Jeep would have attracted a number of buyers both for the name recognition and the distribution network. For example, Ms. Keller noted that the Jeep brand was purchased by Chrysler in 1987 when it bought American Motors. Tr.1101:25:1102:18. She explained that Chrysler made this purchase even though American Motors was in financial distress and that Chrysler

decided to preserve the dealership network in order to preserve an expertise in Jeep service and a distribution network. Tr.1102:24-1103:11.

Ms. Keller also pointed to the sales of MG Rover, Lotus, Saturn, Hummer, and Saab, including some while the brand was in bankruptcy. She explained that each of these brands attracted potential buyers despite less than ideal financial conditions, which, in her opinion, demonstrated that automakers have an appetite for purchasing brands with name recognition in order to revitalize them. Tr.1104:15-1105:16 (MG Rover), Tr.1105:17-1106:10 (Lotus), Tr.1106:11-1109:8 (Saturn), Tr.1109:9-1110:7 (Hummer), Tr.1110:8-1111:19 (Saab). She went on to explain that economic indicators predicted a rebound in auto sales which would have made Chrysler's assets even more valuable. Specifically, Ms. Keller relied on the fact that S&P 500 was up 25% between March and May 2009, the Consumer Confidence as measured by the University of Michigan was up 20% in the same time period, and gas prices were on the decline. Tr.1112:7-1113:9. She also noted that used vehicle values are a "effective predictor of future auto demand" and that used vehicle prices were steadily increasing though the first half of 2009. Tr.1114:25-1115:3.

Ms. Keller testified that all these factors indicated that there would have been a strong market for Chrysler's assets with many potential bidders, which would have resulted in higher value for Chrysler and in turn its creditors had the government not intervened. She opined that it was because the government intervened that other willing purchasers did not come forward. Tr.1121:3-25. Ms. Keller further explained that "Chrysler would have been a highly desirable partner for a number of the world's automakers because of its brand recognition, its desirable truck portfolio, and other vehicle offerings. And the company coming out of bankruptcy would have been freed of

those debt obligations and labor costs that were really [Chrysler's] major liabilities."
Tr.1121:11-17.

On cross examination, Ms. Keller admitted that she was not offering an opinion as
to which of the companies discussed would have purchased Chrysler's assets in a Section
363 sale or how much those companies would have had to pay for Chrysler's assets.
Tr.1123:11-23, Tr.1124:2-14. She also admitted that in preparing her testimony she did
not conduct an analysis of how profitable any of Chrysler's products lines were at the
time. Tr.1151:23-1152:9. Additionally, throughout her cross examination she admitted
that for the 12 companies she proffered as potential Section 363 buyers, she did not
consider such factors as whether those companies had ever expressed an interest in
buying Chrysler, or had the financial ability to pay for Chrysler's assets in an amount
sufficient to meet its debt, at the time of the Chrysler bankruptcy in April 2009.
Tr.1155:21-24, Tr.1159:22-25, Tr.1160:15-16.

Ms. Keller was confronted on cross examination with an article from May 31,
2009 in the New York Times in which she was quoted as saying that she believed that
Chrysler as well as GM had too many dealer showrooms to be profitable and that there
was an advantage in reducing these dealers in bankruptcy.[34] Tr.1148:1-1149:11.
Government counsel also asked Ms. Keller about an April 30, 2009 article she authored,
published in the Detroit News, where she espoused the belief that Chrysler was a failing

---

[34] In her May 31, 2009 New York Times article Ms. Keller is quoted as saying that "GM and
Chrysler bore costs associated with their huge dealer networks, which they can now streamline
[and] [o]nly through bankruptcy could this be accomplished without huge expenses and litigation
with individual dealers." Tr.1148:3-8.

auto manufacturer that had been written off by its owner Cerberus, that no entity would step in to provide Chrysler with sufficient money to keep Chrysler going, and that the best result that could be hoped for the Chrysler-Fiat alliance was that not too much money was lost.[35] Tr.1180:19-22, Tr.1182:25-1184:15; DX1602.

### iv. Judge Judith Fitzgerald

The plaintiffs also offered the opinion testimony of the Judith Fitzgerald, a retired federal bankruptcy judge. Judge Fitzgerald was "sworn into the Western District of Pennsylvania [as a bankruptcy judge] on October 30, 1987, [and] sat for nearly twenty-six years before [her] retirement in May 2013." Tr.521:7-11. She was also "designated to sit in the District of Delaware for twenty years, the Eastern District of Pennsylvania for eight, and the District of the United States Virgin Islands for nine." Tr.521:12-16. Prior to serving as a bankruptcy judge, she served for "12 years as an Assistant United States Attorney in the Western District of Pennsylvania." Tr.521:17-19. She has taught numerous law classes on commercial transactions, bankruptcy, and contracts. Tr.521:25-522:2. She is currently "a shareholder, member of the board, and vice president of the law firm of Tucker Arensberg, PC, which is based primarily in Pittsburgh, Pennsylvania." Tr.520:21-24. Judge Fitzgerald testified that she was retained by the plaintiffs "to look at but for scenarios that would address what Chrysler may have been able to do . . . in the absence of government action, and to compare that with the real world franchise

---

[35] In the Detroit News article Ms. Keller wrote "Daimler and Cerberus have written off their investment in [Chrysler]." She explained that Cerberus "seemed to know [it was] acquiring a hollow auto business since [it] immediately spoke about forming partnerships and affiliations to compensate for the lack of homegrown models." She explained that she believed that Chrysler would need more than $6 billion to continue and that she could not "imagine any lender stepping up with new loans." DX1602.

terminations that occurred in the actual Chrysler bankruptcy case." Tr.522:11-17. Judge

Fitzgerald explained that she arrived at three opinions: (1) Chrysler could not have

survived outside of bankruptcy without government assistance, (2) plaintiffs' dealerships

would have retained value as part of Chrysler's sale of assets, restructuring, or merger

with another entity in a bankruptcy proceeding, and (3) plaintiffs' franchises would have

had value during an orderly wind-down of Chrysler regardless of whether there was a

sale of Chrysler assets. Tr.562:20-563:22.

    Judge Fitzgerald began her opinion testimony by describing the bankruptcy

process and how the Chapter 11 bankruptcy was applied to Chrysler. Tr.574:10. She

explained that United States bankruptcy law serves several basic purposes including (1) a

means by which a debtor can process creditor claims as a collective rather than on an

individual basis, (2) providing a fresh start for a debtor, (3) preserving going concern

values, (4) strengthening a company's balance sheets, and (5) offering a liquidation

alternative to entities that would not be able to reorganize without the bankruptcy

process. Tr.574:11-24. Judge Fitzgerald explained that when a debtor files for bankruptcy

it must provide the court with schedules and statements of its financial affairs which

includes a list of known claims against the debtor. Tr.575:10-24. Judge Fitzgerald

testified that a corporation would choose a Chapter 11 bankruptcy because it "is designed

to keep the company's management operation[al] . . .during its bankruptcy" while it

attempts to negotiate how the claims of its creditors are handled and how to reorganize.

Tr.577:7-18.

    Judge Fitzgerald explained that when a company files a voluntary petition for

bankruptcy it creates an estate that "is comprised of all the property and property interests

of the debtor . . . in order to maximize[e] its value to pay creditors." Tr.578:20-579:4. In a

Chapter 11 bankruptcy, "the debtor remains in possession and has the status of a trustee

for most purposes." Tr.579:7-9. She went on to explain that "creditors" are prioritized

with secured creditors having the highest priority followed by unsecured creditors.

Tr.579:25-580:15.

Next, Judge Fitzgerald explained the role of the Section 363 asset sale. She

explained that Section 363 sales are used to dispose of a debtor's assets while it

determines its longer-term needs. Tr.587:3-7. Judge Fitzgerald testified that "[d]ebtors

frequently prosecute motions to sell assets during their bankruptcies . . . [because they]

are typically brought as 'free and clear' proceedings, so that the purchaser can acquire the

assets without the debtor's liabilities, including contingent and unliquidated claims."

Tr.588:24-589:5. She further explained that "[g]enerally, a debtor will retain professional

advisors with skill in selling the particular assets available to provide an estimate of their

value and/or to market them through a private sale or at auction." Tr.589:17-20. "When a

debtor proposes to sell valuable assets, it is customary to file a motion to establish bid

procedures that set out . . . the time frame and terms on which due diligence can be

conducted, identifies the assets to be sold, how to qualify a purchaser, and any required

deposit." Tr.589:24-590:4.

Judge Fitzgerald also testified about the executory contracts, i.e., the franchise

agreements held by the plaintiffs with Chrysler. Tr.591:4-10. Judge Fitzgerald explained

that a debtor can either assume the executory contract, assign it to a third party, or reject

the executory contract pursuant to Section 365 of the Bankruptcy Code. Tr.591:11-16.

"Rejection of an executory contract such as a franchise agreement is merely a breach that

indicates that the debtor will no longer perform." Tr.592:5-7. Judge Fitzgerald testified

that bankruptcy judges "are aware that rejection is not the same as termination and the

consequences of rejection are governed by applicable nonbankruptcy law." Tr.592:7-10.

She explained that rejection of an executory contract only frees the debtor from an

obligation to perform and that the other party to the executory contract can recover

damages by filing an unsecured debt claim in the bankruptcy. Tr.592:5-593:11. Judge

Fitzgerald explained that, based on her experience with the rejection of executory

contracts in bankruptcy proceedings, the rejection order in the Chrysler bankruptcy was

not typical because it contained provisions enjoining the plaintiffs from holding

themselves out as authorized dealers or performing services or maintenance on Chrysler

vehicles, which effectively terminated the franchise agreements rather than just

announcing, through rejection, Chrysler's intent not to perform its obligations under the

franchise agreement. Tr.595:4-10.

Next, Judge Fitzgerald explained that collective bargaining agreements and

pension obligations, although executory contracts, are treated differently from other

executory contracts in bankruptcy. Tr.597:17-23. Judge Fitzgerald opined that the

government "had a strong motivation in driving the sale to Fiat that included Fiat's

assumption of much of Chrysler's debt" because "[h]ad Chrysler gone out of business

and terminated the pension plans, the Government would have had a substantial outlay of

funds from the Pension Benefit Guaranty Corporation, called the PBGC, to the retirees."

Tr.598:24-599:5. Judge Fitzgerald opined that without government involvement, the new

Chrysler entity would have entered negotiations about having to assume the employer's

obligations. Tr.600:17-25.

Judge Fitzgerald testified about the use of cash collateral in a Chapter 11 bankruptcy. She explained that cash collateral is defined by Section 363(a) of the Bankruptcy Code as cash, deposit accounts, and other cash equivalents. Tr.601:10-18. Judge Fitzgerald went on to explain that a debtor in bankruptcy can only use cash collateral with the creditor's consent or a court order. Tr.601:18-20. Judge Fitzgerald testified that, in her experience, "the debtor and lender will negotiate the terms of a cash collateral order and stipulate to the terms of the use of cash collateral and the form of adequate protection" for the creditor. Tr.602:5-8.

The final element of a Chapter 11 bankruptcy about which Judge Fitzgerald testified concerned DIP financing. She explained that during a bankruptcy a debtor can obtain and incur normal unsecured debt that it would normally incur during the course of operating its business. Tr.602:22-25. However, Judge Fitzgerald explained that in order to incur secured or DIP debt, the debtor needs the bankruptcy court's approval. Tr.603:6-7. She explained that DIP financing has "superpriority" status and gets paid ahead of all other claims, including the secured debt that was previously incurred. Tr.603:24-604:2. She explained that secure creditors have a right to and often object to the proposed DIP financing. Tr.603:20-23. Judge Fitzgerald explained that few creditors will provide DIP financing as a secondary lien and that a secured lender often will provide the DIP financing to avoid further deterioration of its collateral and to maximize the recovery it can receive from the bankruptcy. Tr.606:16-22.

It is against this backdrop that she offered the following three opinions about the differences between the government's negotiated bankruptcy plan and what she opined would have occurred if Chrysler had filed for a Chapter 11 bankruptcy without the

government's terms. First, Judge Fitzgerald opined that during an orderly wind-down in a Chapter 11 bankruptcy, "Chrysler would carry out its obligation to maximize value," which would involve hiring experts, analyzing the value of its assets, marketing and selling those assets, assuming or rejecting supplier contracts in accordance with the sale of viable lines, rejecting unnecessary executory contracts, and distributing the proceeds of sales to creditors. Tr.630:8-23. Judge Fitzgerald explained that, in her opinion, based on the Viability Plan that Chrysler submitted to the government, Chrysler would have had over $1 billion in cash at the time of the bankruptcy filing and that she believed the bankruptcy court would have authorized the use of the cash collateral to maximize Chrysler's value for Chrysler's creditors. Tr.632:10-15.

Judge Fitzgerald opined that the Chrysler wind-down would have played out in the same manner as the bankruptcies of Hostess and American Suzuki Motors Corporation ("AMSC"). Tr.649:12-652:12. Judge Fitzgerald testified that both the Hostess and AMSC bankruptcies are indicative of how the Chrysler bankruptcy would have proceeded because they involved an orderly wind-down and asset sale of a large corporation which retained its stores and dealers during the bankruptcy. *Id.* Judge Fitzgerald explained that as part of the wind-down in bankruptcy, plaintiffs' franchises would have been retained because the dealers would have preserved the economic value of Chrysler's assets. In support of this contention, Judge Fitzgerald also relied on the bankruptcies of Daewoo Motor America and Saab Cars North America, where the respective companies' dealers remained functioning through the course of the bankruptcy to maximize value for creditors. Tr.657:2-658:1. She explained that "[d]ealerships were not liabilities of Chrysler, and as a liquidating entity, Chrysler would not have received any direct benefit

in the form of cash or liquid assets from an expedited termination of dealerships."

Tr.661:12-16. Thus, Judge Fitzgerald concluded that in an "orderly wind-down, Chrysler

likely would have made every effort to support the franchises, to keep them in operation

while going out of business sales are undertaken and the bankruptcy was administered.

Chrysler dealerships would have remained in business, servicing and maintaining

vehicles and providing parts for as long as there were Chrysler cars, minivans and trucks

on the highway." Tr.662:1-8.

Second, Judge Fitzgerald opined that if Chrysler were sold in a Section 363

bankruptcy sale, the plaintiffs' franchise agreements would have been assumed and

would have continued to have value. Tr.681:24-682:7. She explained that she believed

that to "minimize their losses and maximize their recoveries, the first lien lenders likely

would have worked with Chrysler through a Chapter 11 to effectuate a sale of Chrysler's

core business as a going concern" which would have included providing "defensive" DIP

financing. Tr.682:22-683:1. Judge Fitzgerald explained that at the time of a Chrysler

bankruptcy, lenders were beginning to provide DIP financing at record levels. Tr.694:3-7.

She further explained that in "the context of a 363 sale for the core business to a strategic

buyer, it is improbable that the buyer would have agreed to have been bound by the

existing terms of the UAW collective bargaining agreement[.]" Tr.699:1-5. Judge

Fitzgerald further stated that "as part of a sale of assets to a strategic buyer, the buyer . . .

would have analyzed each one of the executory contracts . . . to determine whether the

contracts should be assumed and assigned to the buyer or rejected by the estate."

Tr.703:24-704:4. Judge Fitzgerald concluded that in her 363 sale scenario, Chrysler

would not have benefited from the rejection of its franchise agreements, and Chrysler's

dealers would have been able to continue their business operations and preserve their value during the bankruptcy and potentially for as long as there were new cars and used cars that needed service and maintenance. Tr.705:18-23.

Finally, Judge Fitzgerald opined that, regardless of whether Chrysler pursued an orderly wind-down or was sold in a 363 sale, she believed that the dealerships would not have had their franchise agreements rejected and thus could have continued in operation servicing cars and selling used cards during the course of any bankruptcy for at least several months. Tr.710:7-20.

On cross examination, Judge Fitzgerald clarified several of the assumptions underlying her opinions. First, she admitted that she assumed that the government would provide a warranty program to cover Chrysler's outstanding warranties. Tr.742:5-16. Second, she assumed that in absence of government financial assistance, dealers would have helped fund Chrysler's bankruptcy or would have purchased Chrysler's assets. Tr.743:22-744:7.

On cross examination, Judge Fitzgerald conceded that Chrysler would have required between $12 to $20 billion dollars in DIP financing in order to stay operational. She further conceded that her reliance on the Hostess bankruptcy, which only required $75 million in DIP financing, and the Daewoo bankruptcy, which required only $1.65 million in DIP financing, were not analogous to Chrysler's situation. Tr.785:17-786:2, Tr.799:20-800:17. Similarly, she conceded that the because American Suzuki received DIP financing from its parent company, it was also very different from the circumstances Chrysler faced. Tr.789:20-794:4.

### v.   Diane Anderson Murphy

The *Alley's* plaintiffs, as noted above, presented Diane Anderson Murphy as their valuation expert. Ms. Murphy was tasked with valuing each of the *Alley's* plaintiffs' franchise agreements for purposes of determining lost economic value in a "but for world" without government financial assistance to Chrysler. Ms. Murphy is the director of the valuation services group of Moss Adams LLP. Tr.1398:19-22. She began working at Moss Adams in 1994 and currently leads Moss Adams' "business appraisal practice within the firm's automotive and dealer service practice, which focuses on automobile, heavy equipment, commercial truck, RV, motorcycle, and power sports dealers." Tr.1398:23-1399:3. She is an accredited senior appraiser in business valuation with the American Society of Appraisers and has been active in business appraising for over thirty years. Tr.1399:4-8. As a member of Moss Adams' automotive and dealer services practice, she has provided valuation and value-related consulting services to well over 1,500 dealership appraisal projects that range from single-point dealerships to groups of dealerships. Tr.1399:13-19. She has "served as coauthor for several versions of the National Automobile Dealers Associations' dealership valuation guide." Tr.1400:9-14. She is also an associate member of the of the National Association of Dealer Counsel, a member of the American Society of Appraisers, and a member of the Washington State Auto Dealers Association. Tr.1400:24-1401:3. She explained that she was "engaged to provide a valuation opinion as of two dates, December 31, 2008 and April 30, 2009 . . . under two scenarios, continued production of Chrysler cars and trucks and continued production of only Chrysler trucks[.]" Tr.1401:9-15.

Ms. Murphy explained that she was tasked with determining the economic value of the *Alley's* plaintiffs' franchise agreements in a "but for world" without government financial assistance. She testified that she employed the "standard fair market value, which is the price, expressed in terms of cash equivalents, at which property, here the Chrysler franchise, would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller." Tr.1403:1-6. Specifically, she explained that she used the income approach to determine the value of the plaintiffs' franchises at these two times. Tr.1404:16-19. Ms. Murphy testified that she considered numerous factors including those related to the national economic outlook, the local economic outlook, and the historical sales and profitability of the franchises in formulating her values for each franchise. Ms. Murphy explained that her assumptions were that the government would provide no financial assistance, that Chrysler entered bankruptcy on the date of the valuation, and that the franchise agreements were in full force and effect on the valuation date.[36] Tr.1407:4-23.

Ms. Murphy then testified about her valuation methodology. First, she explained that in valuing the franchise agreements held by the plaintiffs she "considered only the Chrysler franchise-related assets" owned by the plaintiffs, which included all intangible assets/income streams including used car sale and customer pay work. Tr.1410:18-1411:16. She explained that in her many years of experience in valuing dealerships she "cannot recall a single instance where a purchaser of a franchised dealership sought to pay only for the revenue streams associated with the new car department, OEM [original

---

[36] As discussed *supra*, the *Alley's* plaintiffs are no longer relying on the December 31, 2008 date and thus Ms. Murphy's calculations for that date are not evaluated in this opinion.

equipment manufacturer – here, Chrysler] parts and sales and warranty repairs and not for the additional departments of the dealership franchise, including used car sales, customer pay and other parts and service." Tr.1411:17-1412:2. Ms. Murphy opined that the franchise agreement, although only enumerating specific rights of the franchisee, is always valued as both the rights guaranteed, such as new car sales, but also other income streams that are clearly derived from those rights. Tr.1412:3-12. She explained that this is further supported by the terms of the franchise agreement, which require that the franchisees have facilities to handle new and used vehicle sales as well as have sufficient parts stocked for both warranty and customer pay work. Tr.1415:7-15; DX1224. Additionally, Ms. Murphy explained that Chrysler also "required its franchised dealers to report all departmental operations in monthly financial reports submitted to [Chrysler]." Tr.1416:5-7.

Next, Ms. Murphy explained how she was able to separate the used cars for "dual" dealer plaintiffs, i.e. dealers with franchise agreements with two different manufacturers or OEMs, when the financial statements provided by the plaintiffs only identified total used car sales and did not break them down by the OEM. Tr.1417:4-14. She explained that "[u]nder the used-to-new formula, one assumes that the sale of used cars follows the same rate of sales as branded cars, both Chrysler and non-Chrysler." Tr.1417:14-17. She explained that she also used the used-to-new formula to estimate the proportion of service and parts income streams, which on the income statements are also not separated by manufacturer. Tr.1417:23-1418:2.

Ms. Murphy explained that she considered three different valuation approaches before deciding on the income approach: the income approach, market approach, and

asset-based approach. Tr.1418:13-1419:1. Under the income approach, "estimated future returns are discounted to present value at an appropriate rate of return for the investment." Tr.1418:15-17. Under the market approach, "market transactions involving companies that are similar to the subject business" are used to set the price of a franchise. Tr.1418:18-22. Finally, the asset-based approach values the assets minus the liabilities of the business. Tr.1418-23-1419:1. Ms. Murphy explained that she chose to value the plaintiffs' franchises using the income approach "because it represents the amount a prudent investor would pay for the franchisee's expected future cash flows based on market rates of return and the franchise's specific risks." Tr.1419:2-6.

Ms. Murphy explained that in applying the income approach, "expected future returns from an investment in the form of cash flows are discounted to present value at an appropriate rate of return for the investment." Tr.1425:22-25. She explained that "[t]he selected discount rate . . . should reflect the degree of uncertainty or risk associated with returns and returns available from alternative investments," and that the higher the uncertainty, the higher expected rate of return, which results in a lower value for investment. Tr.1425:25-1426:5. She explained that in her income approach she used a discounted cash flow analysis, where "future cash flows are discounted to present value using an appropriate discount rate or rate of return." Tr.1427:23-1428:4. Cash flows are forecasted for a discrete period; Ms. Murphy explained that she used a period of five years and then projected growth at a constant rate in perpetuity. *Id.* Ms. Murphy further explained that she "applied a discounted cash flow analysis whereby cash flow is defined as earnings before interest and taxes, commonly referred to as EBIT, minus income taxes on EBIT, plus noncash expenses, plus or minus adjusted working capital changes, minus

capital expenditures, equals free cash flow, which we call debt free, and all of this cash flow is before any non-flooring interest expense [i.e. the cost of borrowing to buy cars from the manufacturer]." Tr.1428:11-18.

She explained that "the first step in valuing a company is typically an examination of the dealership's historical cash flow and an investigation into the history, location, and general background of the dealership to provide a context for the business and its financial results." Tr.1433:11-15. Ms. Murphy explained that she used a historical trend over approximately five years preceding the valuation dates. Tr.1433:22-23. Ms. Murphy then made adjustments to the earnings that she believed would be representative of normalized results in income flow by identifying atypical expenses or sales and removing them from the trend. Tr.1433:24-1434:3. She also took into consideration the industry's financial health, local area economic expectations, and other factors that may affect potential cash flow. Tr.1434:16-22. Based on this valuation method, Ms. Murphy calculated what she believed each of the *Alley's* plaintiffs' franchise agreements were worth on the two valuation dates she was given by counsel.

Set forth below are the franchise valuations and amount of just compensation she calculated for each of the *Alley's* plaintiffs based on the assumptions she was given for the April 30, 2009 taking date:

| Plaintiff | Cars & Trucks Continue Production | Trucks Continue Production |
|---|---|---|
| Livonia Chrysler Jeep, Inc. | $4,464,000 | $3,705,000 |
| Taylor-Parker Motor Co. | $686,000 | $558,000 |
| Barry Dodge, Inc. | $1,124,000 | $859,000 |
| Whitey's Inc. | $524,000 | $292,000 |
| Cedric Theel, Inc. | $709,000 | $621,000 |
| RFJS Company, LLC | $1,766,000 | $1,329,000 |
| Jim Marsh American Corp. | $8,302,000 | $6,512,000 |

Tr.1406:2-20.

On cross examination, Ms. Murphy clarified that her valuations of the franchise agreements included not only discounted cash flow but also tangible assets such as equipment, parts, land, and cash that would be included in a sale. Tr.1542:2-22. Additionally, she clarified that all her valuations assumed that the dealerships were ongoing businesses. Tr.1548:9-11. She admitted on cross examination that it would have been difficult for vehicle customers and for auto dealers to finance their inventory through borrowings on the valuation dates she was given, but that she did not consider how those issues would have impacted the value of the franchise agreements. Tr.1563:12-19. She further admitted that she assumed that there would be no disruption in the plaintiffs' ability to sell new cars at any time and that if there were a disruption it would change her income assumptions and thus would change her valuation. Tr.1747:9-14.

### vi.   Dr. John Nevin

Dr. John R. Nevin, Ph.D., an Emeritus Professor at the University of Wisconsin, Madison, School of Business, testified on behalf of the *Colonial* plaintiffs. Tr.1965:16-19. He holds a B.S. in Marketing from Southern Illinois University (1965) and a Master of Science degree in Marketing (1968) and Doctor of Philosophy in Marketing (1972)

from the University of Illinois. Tr.1965:19-23. He has over "40 years of experience in analyzing, research[ing], and teaching in the field of channel distribution and distribution supply chain management." Tr.1968:3-5. In 1970, Dr. Nevin was appointed to an assistant professorship at the School of Business at the University of Wisconsin, Madison, became an associate professor in 1977, a full professor in 1983, and an emeritus professor in 2012. Tr.1966:4-8. He was the executive director of the Granger Center for Supply Chain Management from 1992 to 2016 as well as the Executive Director for the Center for Brand and Product Management from 2003 to 2007 and 2010 to 2013. Tr.1966:13-18. Dr. Nevin has served as a member of the Editorial Board for the Journal of Marketing, the Journal of Retailing, the International Marketing Review, Advances in Distribution Channel Research, and the Journal of Marketing Channels. Tr.1967:8-12.

Dr. Nevin explained that he was retained by the *Colonial* plaintiffs to explain the nature of franchise agreements, the underlying rational for the franchise business model, the history of auto dealership franchising and its regulatory environment, and how market value of an auto dealership is determined. Tr.1967:15-1968:1. He was not asked and did not present a valuation of the franchise agreements for the two *Colonial* plaintiffs.

Dr. Nevin explained that "[i]n the most general sense, a franchise is a legal agreement between two independent parties whereby one of those parties, the franchisor, grants a license to the other party, the franchisee, to sell the trademarked product or service, and, in return, receives a payment or royalty and conformance to quality standards." Tr.1968:17-22. Dr. Nevin testified that "the strategic essence of the franchise business model can be accurately explained by identifying three critical components of

the franchise system: the brand, the operating system, and the ongoing support provided by the franchisor to the franchisee." Tr.1970:12-16. He went on to explain that "the brand creates the demand, allowing the franchisee to initially obtain customers," "the operating system essentially delivers the promise, thereby allowing the franchisee to maintain customer relationships and to build loyalty," and finally, "the ongoing support and training provides the impetus for growth, offering the franchisee the tools and tips to expand its customer base and build its market share." Tr.1970:17-1971:2.

Dr. Nevin explained that there were "two different types of franchises, a product distribution or traditional franchise and a business format franchise." Tr.1971:3-8. Dr. Nevin explained that the plaintiffs' franchise agreements with Chrysler were product distribution or traditional franchises where "the franchisor provides relatively little in the way of management and marketing assistance to the franchisees." Tr.1971:9-11. He explained that auto companies choose to distribute their product through franchisees because it allows for expansion with limited capital and human resources, reduction in distribution costs, and access to individuals who are highly motivated and know the local market. Tr.1972:15-20.

Dr. Nevin then went on to explain the history of auto dealer franchise agreements in the United States. Specifically, he noted that there were, beginning in the 1950s, federal and state laws "passed to address the perceived inequality in the power relationship between the auto manufacturer and auto dealers and the concern over the large capital investments in acquiring or building dealerships and sustaining their operations." Tr.1976:14-18. Dr. Nevin explained that state laws protect franchisees from being terminated, protect a franchise's business territory, and provide several other

protections. Tr.1977:8-1980:1. He explained that "a franchised automobile dealer's exclusive territory is a valuable property right." Tr.1980:4-5.

Dr. Nevin testified how automobile franchises are typically valued, including the concept of "blue sky" value in a dealership. He explained that dealerships are valued by adding the market value of the franchisee's tangible assets – real estate, inventory, furniture, fixtures, equipment, etc. – to the franchise's intangible value, which in the auto dealership industry is known as "blue sky," or good will. Tr.1982:3-8; PX284. Dr. Nevin went on to explain that "[t]he lower the perceived risk associated with a franchisee's expected pre-tax earnings, the higher the blue sky multiple in the resulting franchise valuation." Tr.1982:24-1983:2. Dr. Nevin testified that a number of commercial services accurately estimate blue sky value for auto brand franchises by considering such things as "earning growth expectation of the franchise, buyer demand for the products in the franchise, real estate, market vehicle preferences in the market, market representation, other dealers, and customer relations," and that the "blue sky" multiple usually ranges between two and eight times net profits from all income streams of the dealership. Tr.1984:14-1985:3.

Importantly, in the same article that Dr. Nevin relied on to explain "blue sky" value, the authors explained that a dealership may not have any "blue sky" or intangible value when there are extreme economic circumstances. The article "Auto Dealership Valuation: A Discussion of Applicable Methods, Part 1" stated "[t]here are rare instances when the net asset value is appropriate, such as when a dealership is valued in a liquidation setting, or during severe economic uncertainty, such as the Great Recession of 2008 and 2009. During the recession there were few dealership transactions, and it was

not uncommon for the dealerships that did sell, particularly domestic dealerships
(General Motors, Ford, and Chrysler), to sell at or near net asset value." PX295.

### vii.    Edward Stockton

Edward Stockton testified as the *Colonial* plaintiffs' valuation expert. Mr.
Stockton has a bachelor's degree in economics for Western Michigan University and a
master's degree from the Department of Agriculture in resource economics at the
University of Arizona, where his concentration was applied econometrics. Tr.2337:7-11.
Mr. Stockton is currently the Vice President of Fontana, a company that "provides highly
focused economic consulting services and expert testimony regarding the retail motor
vehicle industry and other industries throughout the United States." Tr.2337:12-17. Mr.
Stockton testified that during his time at Fontana he has performed 30,000 hours of work
focused on issues related to the retail automotive industry, which includes studies on
franchised operations that have sold various vehicle lines. Tr.2338:1-13. Mr. Stockton
has provided expert testimony on behalf of the consumer class in the Volkswagen diesel
emissions lawsuit and a lawsuit against Wells Fargo concerning the opening of
unauthorized accounts, where he consulted on issues related to compensation and
economic loss. Tr.2339:19-2340:20.

Mr. Stockton testified that he was retained to "calculate value associated with the
Finnin and Guetterman dealerships under two families of scenarios. The first is . . .
call[ed] the historical scenario, and this is not based on a hypothetical world. This is
based on an estimate of the value of their franchises historically at the time of the taking.
The second is, in a liquidation scenario, . . . the question whether Finnin and Guetterman
could demonstrate value to continuing operations or have incremental value generated

from their franchises within liquidation." Tr.2342:4-15. He went on to explain that he "wasn't asked to consider whether there would be a successor OEM [ another car manufacturer] or a continuation of new vehicles. I don't have an opinion that there would or would not be." Tr.2342:15-18.

Before explaining his assumptions and calculations, Mr. Stockton explained his overall understanding about how a businesses' economic value is determined. Mr. Stockton explained that he understands the economic value of a business to be "equal to the discounted present value of the expected benefits provided by the firm to its owner." Tr.2348:15-19. Mr. Stockton further explained that a "discounted present value is the point of indifference between the acquisition or sale of a certain current amount of profit or benefit and an uncertain future amount." Tr.2348:24-2349:3. Mr. Stockton ultimately explained that "the economic value of the firm reflects the sum of current and expected future earnings after accounting for present judgments of risk, uncertainty, relative return, and liquidity." Tr.2350:17-20.

Mr. Stockton also testified that he believed that the "the property allegedly taken from Plaintiffs consisted of their Chrysler brands' franchises; namely, Chrysler and Jeep from Finnin and Chrysler-Jeep-Dodge RAM from Guetterman. Used here, the franchise includes items of value such as rights to use and display trademarks, contractual protections, territorial distinction, limited right to territorial exclusivity, access to training and marketing materials, opportunities associated with new products, statutory protections applied to franchisees, rights to purchase proprietary parts, products, tools, repair codes, market information, access to residual product demand in the market, and other elements of value associated with franchise operations." Tr.2356:3-16. He went on

to explain that both Finnin and Guetterman were dual dealers which required a valuation based on the removal of economic value of capacity of their overall dealership operations. Tr.2357:5-14. However, he noted that "[t]he sale of a firm is not generally or necessarily equal to the economic value of the firm to its owners." Tr.2358:3-5.

Mr. Stockton testified that fair value "is an unbiased price at which a firm would change hands under an orderly exchange, in the absence of compulsion, where both parties enter the transaction with relevant and symmetrical knowledge." Tr.2358:18-21. However, Mr. Stockton testified that he was unable to calculate fair value for either the Guetterman or Finnin franchises because "[t]he factual circumstances surrounding the valuation of the Plaintiffs' dealerships at the time of the alleged taking creates a fissure between the prices at which the Plaintiffs' property might have sold and the concept of just compensation for the property taken." Tr.2359:4-9, Tr.2590:12-16 (explaining that fair market value "didn't exist at that time"). Instead he explained that "it is possible to form reasonable and reliable estimates of the economic value of property allegedly taken from plaintiffs by evaluating the profit stream that franchises would have generated." Tr.2360:16-20. He further explained that he calculated two sets of values: (1) historical values, i.e., the value of plaintiffs' franchise agreements if Chrysler had continued, and (2) "but for" values, i.e., the profits that plaintiffs would have earned if Chrysler had liquidated. He explained that in creating his calculations he only looked at financial data through December 2008. Tr.2363:23-24. He went on to explain that in his "but for world" he looked at "the incremental value that ongoing franchise affiliation would have conveyed to Plaintiffs in a liquidation environment versus what actually occurred." Tr.2365:9-12.

For his "but for world" scenario, Mr. Stockton testified that he "selected an effective date of May 2009 to assess incremental profitability but considered dealership data only through December 2008," which he maintained employed data that was highly conservative in calculating lost profit. Tr.2365:22-24. He further explained that in his liquidation analysis he did not assume a purchase of Chrysler or any value flowing from the production of new vehicles; he did, however, assume that Chrysler retains a minimum infrastructure throughout the bankruptcy and that its warranties would still be honored. Tr. 2366:5-20.

Mr. Stockton then detailed his assessment of the risk factors in his historical and "but for" scenarios. He explained that in "the historical scenario, the Government agrees to support ongoing Chrysler operations, but in connection with this agreement, mandates the rationalization of the dealer network, which ultimately results in a reduction in the count of Chrysler dealerships by approximately 25 percent." Tr.2413:16-21. Mr. Stockton explained that for Finnin he posited four fair value valuations and two profit contribution valuations in order to show that Finnin had value in his historical scenario. Mr. Stockton explained that in his four fair value valuations, he assumes that Finnin sells its Chrysler and Jeep franchises to a purchaser that "already holds the facility capacity to incorporate those lines" and who has some underutilized personnel capacity so that it can do so by adding non-facility fixed expenses equal to 66.7-75%. Tr.2424:15-21. Then he either gave a terminal multiple of either four or five. He further explained that he analyzed Finnin's profit contribution analysis for 2006 to 2008, financial statements from 2006 through 2008, Finnin's new and used vehicle and parts and service sales volume from 2006 to 2008, the sale volume forecast for the Chrysler group, and the Dealer Cut

Discount Factor. Tr.2434:17-2437:18. As a result, Mr. Stockton concluded, based on the following historical scenarios, that Finnin would have had the following values:

| | |
|---|---|
| Fair Value Based on 2/17/2009 Chrysler Viability Plan, One-Fourth reduction in Projected Non-Building Related Fixed Expenses and Terminal Value Calculated Using Multiple of 4 | $1,242,192 |
| Fair Value Based on 2/17/2009 Chrysler Viability Plan, One-Fourth reduction in Projected Non-Building Related Fixed Expenses and Terminal Value Calculated Using Multiple of 5 | $1,358,928 |
| Fair Value Based on 2/17/2009 Chrysler Viability Plan, One-Third reduction in Projected Non-Building Related Fixed Expenses and Terminal Value Calculated Using Multiple of 4 | $1,465,048 |
| Fair Value Based on 2/17/2009 Chrysler Viability Plan, One-Third reduction in Projected Non-Building Related Fixed Expenses and Terminal Value Calculated Using Multiple of 5 | $1,602,843 |

Tr.2452:9-2453:1.

Mr. Stockton went on to explain that for his historical scenario he also proffered two valuations based on a profit contribution analysis. He explained that he estimated the sales volume of the business based on the 2006-08 averages for Finnin, taking into consideration Chrysler's forecasts in its February 2009 Viability Plan. Tr.2438:17-24. He further explained that "[t]he baseline figures also do not incorporate any benefit from restructure or the fact that survival would have occurred in a market with fewer intrabrand competitors." Tr.2439:9-12. Furthermore, Mr. Stockton noted that he spoke with Finnin's banker and was told that "Finnin regularly left its credit lines untapped and had extensive credit available," and thus would have been able to properly finance the dealership in the future. Tr.2440:23-2441:1. Mr. Stockton next explained that he applied a discount rate of 25% to Finnin, which means that for every dollar that Finnin could be expected to earn he would only count 75 cents. Tr.2442:7-10. Based on these

assumptions, Mr. Stockton posited two different profit contribution values based on

different terminal value multiples:

| | |
|---|---|
| Profit Contribution Value Based on 2/17/2009 Chrysler Viability Plan and Terminal Value Calculated using Multiple of 4 | $3,247,903 |
| Profit Contribution Value Based on 2/17/2009 Chrysler Viability Plan and Terminal Value Calculated using Multiple of 5 | $3,554,167 |

Tr.2453:5-10.

It was against this background (which was based on the government having given

assistance to Chrysler but where the franchise agreements were not rejected) that Mr.

Stockton offered his final opinions on value for each of the franchises in the "but for

world" where the government did not provide Chrysler with financial assistance and the

franchise agreements were not rejected. He explained that he had several alternative

valuations, the first being "an immediate liquidation of Chrysler in which dealerships

continue operation indefinitely. The second is a Chapter 11 scenario in which Chrysler's

dealer network continues to operate for three years. The third contemplates an orderly

wind-down of operations over a 17-month period." Tr.2442:19-24. He explained that he

did not consider scenarios where the purchaser of Chrysler's assets continues the

manufacture and sale of new vehicles, and that he did not attempt to calculate the fair

value for these scenarios because there were too many complications. Tr.2442:24-

2443:10.

For the first Chapter 11 scenario, Mr. Stockton assumed that the government

would guarantee warranty obligations for incumbent customers and that the dealerships

would acquire the rights to certain proprietary parts and would continue to be able to

operate as branded Chrysler dealers. Tr.2446:5-10. For the second Chapter 11 scenario,

Mr. Stockton assumed that the Chrysler dealership network would survive for another

three years, and he discounted any value of operations for longer than three years and

allowed for the ongoing service of existing customers to include used vehicles, parts, and

customer pay and warranty service. Tr.2445:8-17, Tr.2446:21-25. Finally, he testified

regarding his third scenario – an orderly-wind-down scenario in which, using the same

assumptions as in the Chapter 11 scenario, he examined if the dealerships would continue

for only seventeen months. Tr.2445:18-22. Mr. Stockton explained that for each of these

scenarios he calculated the used car sale volume based on new sales volume between

2006 and 2008 and that he calculated warranty work based on three prior years of new

vehicles sales, while customer pay was based on seven years of prior sales of new

vehicles. Tr.2450:8-2451:16.

Based on these assumptions and calculations, Mr. Stockton came to the following

conclusions as the Finnin's value in a "but for world" without government financing:

| Chrysler Liquidation Scenario | $1,591,921 |
| Chrysler Chapter 11 Scenario | $1,391,138 |
| Chrysler Orderly Wind-Down Scenario | $775,040 |

Tr.2456:15-19.

Next, Mr. Stockton explained how he applied the valuation scenarios he used to

value Finnin to value Guetterman's franchise agreements. Mr. Stockton acknowledged

that he could not demonstrate that Guetterman would have had fair value had Chrysler

not rejected his franchise agreements in the Chrysler bankruptcy because "it is not clearly

demonstrable that Guetterman's value would have intersected with those of a hypothetical buyer such that an exchange could be developed." Tr.2454:20-23. Rather, Mr. Stockton explained that the profit contribution was the best way to determine Guetterman's historical value and that he employed a 40% discount rate to account for the risk of possible termination. Tr.2455:23-2456:3. The valuations were as follows:

| | |
|---|---|
| Profit Contribution Value Based on 2/17/2009 Chrysler Viability Plan and Terminal Value Calculated using Multiple of 4 | $114,106 |
| Profit Contribution Value Based on 2/17/2009 Chrysler Viability Plan and Terminal Value Calculated using Multiple of 5 | $124,434 |

Tr.2456:11-16.

Finally applying the same methodology and assumptions as outlined in his Finnin testimony, Mr. Stockton posited the following "but for" valuations for Guetterman:

| | |
|---|---|
| Chrysler Liquidation Scenario | $122,761 |
| Chrysler Chapter 11 Scenario | $112,942 |
| Chrysler Orderly Wind-Down Scenario | $61,047 |

Tr.2456:16-19.

On cross examination, Mr. Stockton admitted that he was neither a certified public accountant, accredited in business valuation, or a bankruptcy expert. Tr.2474:12-2475:1. Mr. Stockton also clarified that he had "valued the suite of benefits associated with the franchise" and that he has not valued any other benefits. Tr.2479:25-2480:2.

III.   **THE GOVERNMENT'S FACT AND EXPERT EVIDENCE**

    A.   **The Government's Fact Witnesses**

        i.   **Robert Nardelli**

Robert Nardelli was the CEO of Chrysler from late 2007 until early 2009. Mr. Nardelli explained that as CEO of Chrysler his job was to "provide oversight to [his] direct-reports, to lay out a strategic plan and provide . . . day-to-day operational inputs." Tr.3332:4-10. He explained that under Chrysler's corporate structure, Chrysler had a board of managers responsible for providing "oversight to the business, capital allocation, and strategic direction." Tr.3332:19-21. He explained that at the time he became CEO of Chrysler in 2007, Chrysler was doing well but that it began experiencing financial difficulty in early 2008. Tr.3333:24-3334:24. Mr. Nardelli testified that prior to his going to Congress in November 2008 for a bridge loan from the federal government, Chrysler had sought other loans "but it was kind of for naught." Tr.3337:8-10.

Mr. Nardelli testified that he thought Chrysler would run out of cash early in 2009 if it did not get a loan from the government, and that without government financing Chrysler would have to entered into bankruptcy at that time. Tr.3345:5-7, Tr.3345:1-14. Mr. Nardelli explained that Chrysler provided a Viability Plan to Congress in December 2008 which estimated that in order to wind-down Chrysler and provide its dealers with support and floor plan financing Chrysler would need between $17 to $20 billion. Tr.3348:16-3349:11; DX956. He testified that Chrysler had gone to its first lien lenders and was told that they would not provide Chrysler with the DIP financing it would need for an orderly wind-down of its operations. Tr.3358:4-22. He explained that during the

financial meltdown in 2008-09, dealers were having a difficult time obtaining the floor

plan financing needed to keep buying Chrysler's cars and trucks. Tr.3356:7-3358:3.

Mr. Nardelli testified that Chrysler's board of managers voluntarily approved the

terms of the $4 billion bridge loan Chrysler received from the federal government under

TARP on January 2, 2009. DX1000; Tr.3367:24-3370:22. Mr. Nardelli went on to testify

that after securing the government bridge loan, Chrysler "had been trying vigorously to

get the First Lien Lenders to agree to a debt restructuring acceptable to the U.S. Treasury

Department but that no progress had been made." Tr.3372:12-15; DX1263.

He testified that eventually Chrysler was presented with the prepackaged

bankruptcy plan negotiated by the Auto Team. Tr.3373:6-11. He further testified that

Chrysler understood that if it decided not to accept the prepackaged bankruptcy terms and

instead decided to enter Chapter 11 on its own, the government would provide $750

million to Chrysler to facilitate an orderly liquidation. *Id.* He explained that when

Chrysler voted in favor of the government's prepackaged Chapter 11 bankruptcy plan,

including the 363 sale to Fiat, he did not feel that he was being "forced" to vote in favor

of bankruptcy. He testified that every member of the board used "good business

judgment" when voting in favor of bankruptcy. Tr.3382:21-3383:17, Tr.3384:3-17.

In deciding to accept the prepackaged bankruptcy terms presented by the

government, Mr. Nardelli testified that he considered that if Chrysler did not accept the

prepackaged plan, Chrysler would have to cancel its warranties, stop new car production,

and force significant job losses. Tr.3384:21-3385:16. Mr. Nardelli explained that

Chrysler had spent months trying to reach an agreement with key stakeholders on

concessions that would allow Chrysler to reorganize outside of bankruptcy, but was

unable to achieve the needed concessions. He thus concluded that the government's prepackaged bankruptcy plan was the only option available to keep the Chrysler brand alive in some form. Tr.3387:13-3389:4.

On cross examination, Mr. Nardelli testified that when he went to Congress in November and December 2008, he had hoped that Chrysler would remain a stand-alone company and would be able to avoid bankruptcy. Tr.3403:13-21; DX956 ("Chrysler believes that participating in the restoration of [Chrysler's] long-term viability without a bankruptcy filing significantly improves the outcome for all constituents."). Mr. Nardelli testified on cross examination that Chrysler's proposed stand-alone plan had the support of Chrysler's entire board. Tr.3414:3-7. Mr. Nardelli did not recall Project Genesis or any Chrysler dealership reduction plans. Tr.3412:14-22. Mr. Nardelli testified that he disagreed with the government's decision to reject Chrysler's Viability Plan and that when Mr. Rattner and Mr. Bloom informed him on March 9, 2009 that the government was rejecting the February 2009 plan, he wrote a letter reaffirming Chrysler's position. Tr.3424:7-3427:17, Tr.3428:7-18; PX637. He emphasized, in his letter, that Chrysler's viability would be enhanced by a strategic partnership with another car manufacturer but that an alliance was not critical to Chrysler's long-term viability. PX637; Tr.3428:19-3429:4. Finally, he reinforced in his March 10, 2009 letter Chrysler's desire to not go through a bankruptcy. PX637; Tr.3429:13-22.

Mr. Nardelli testified that, up until Chrysler's board voted to go into bankruptcy, Chrysler was continuing to work on a stand-alone plan. Tr.3441:23-3443:13; DX1203. Mr. Nardelli explained that with the April 17, 2009 re-engineered plan Chrysler submitted to the Auto Team he still hoped that Chrysler would be able to secure $11

billion in government financing. Tr.3441:4-13; DX1203. Mr. Nardelli testified that his re-engineered April 2009 plan still proposed the voluntary consolidation of dealerships and did not call for the forced termination of any franchises. Tr.3444:1-19. Mr. Nardelli testified further on cross examination that after the Auto Team rejected his April 2009 re-engineered plan, Chrysler had "no more alternatives as far as going forward as a stand-alone business." Tr.3452:24-3453:7.

### ii.    Steven Landry

Steven Landry, the Executive Vice President of sales and marketing for North America and parts and service globally for Chrysler in 2008 and 2009 was called by the government to explain Chrysler's dealership rationalization, i.e., reduction programs. Tr.3458:5-6. Mr. Landry explained that he was in charge of the field organization that oversaw the dealership network. Tr.3460:2-16. He testified that he reported to Jim Press and that Peter Grady, Director of Dealer Operations, reported to him. Tr.3460:17-3461:9.

Mr. Landry testified about the history of the Chrysler dealership network and how beginning in 1998 Chrysler had been trying to reduce the number of Chrysler dealers. Tr.3463:24-3464:9. He explained that at first, Chrysler formulated "Project 2000" to try "to determine what is the right number of Chrysler dealers . . . [and] the best way to manage [Chrysler's] dealer network[.]" Tr.3464:10-15. Mr. Landry went on to explain that in 2003 Chrysler began "Project Alpha" to reduce the number of dealers. Tr.3465:9-14. He explained that Project Alpha "was designed to get three brands under one roof, give the dealer some elbow room," which grew in 2008 into Project Genesis, designed to reach the same goals as Project Alpha but at a faster rate. Tr.3479:14-3480:4. Mr. Landry further explained that in 2007 and 2008, Chrysler incurred some costs associated with the

dealership network, including providing material and salaried individuals to run the field organization to assist the dealers. Tr.3467:18-3468:9. Mr. Landry testified that in 2008 he believed that there were too many dealerships in Chrysler's dealership network. Tr.3479:10-21.

Mr. Landry explained that he helped prepare the "Washington Plan," which was part of the Viability Plan, and that the Washington Plan had included a reduction in the dealership network. Tr.3517:2-3519:7; PX548. Mr. Landry then testified that Project Genesis grew into Project Tiger within the framework of a Chrysler bankruptcy. Tr.3561:23-3562:5. He explained that Project Tiger grew out of Chrysler realizing that it could achieve the goals set forth in Project Genesis at a much faster rate through the rejection of franchises in bankruptcy. Tr.3564:11-13, Tr.3573:17-25.

Mr. Landry further explained that he had a role in setting the criteria to determine what dealers would have their franchises rejected in the April 2009 bankruptcy. Tr.3575:9-15. Mr. Landry explained throughout his testimony that Chrysler attempted to judge dealers based on a variety of factors including Minimum Sale Responsibility ("MSR"),[37] facilities, sales, etc., in order to retain the best dealers to preserve the Chrysler brand. Mr. Landry testified that the decision to reject the dealers in bankruptcy was necessary for Chrysler's survival. Tr.3611:23-3612:4.

---

[37] Each franchise agreement required franchisees to meet MSR. Mr. Landry explained that the MSR was calculated by taking the number of new Chrysler vehicles registered in a state and comparing that number to the number of total new vehicles registered in that state to determine the market share for Chrysler vehicles in that location. An MSR was then set based on the number of new vehicles the franchisee would need to sell for Chrysler to maintain its market share. Put another way, the MSR was used to determine if a dealership held the same market share in its sales locality as Chrysler held either on the state or national level.

On cross examination, Mr. Landry admitted that when Chrysler presented the Washington Plan, Chrysler believed that Project Genesis was a successful means for rationalizing its dealership network. PX548; Tr.3642:17-3643:16. He also admitted that it was Chrysler's position that the best way to rationalize the dealership network was through encouraging dealers to combine or sell to one another on a voluntary basis. Tr.3654:20-3655:7, Tr.3673:9-11. Mr. Landry admitted that he was opposed to a Chrysler bankruptcy and acknowledged that he sent an email to others within Chrysler stating to "Fight against 363" because they could "do it cheaper outside BK" and that he could move 650 dealers cheaper than bankruptcy would cost. PX646; Tr.3679:15-23.

### iii.    Peter Grady

As discussed above, Peter Grady, Director of Dealer Operations for Chrysler beginning in January 2009 until June 2009, also testified on behalf of the government. Tr.3758:15-17, Tr.3759:3-5. Mr. Grady explained that as the Director of Dealer Operations he oversaw the management of Chrysler's U.S. dealership network. Tr.3758:20-3759:2. He explained that Chrysler was trying to combine all of its brands under one roof in order to strengthen the profitability of its dealerships. Tr.3762:1-10. Mr. Grady testified that when Chrysler learned that bankruptcy was likely, Chrysler "viewed that as an opportunity to accelerate the rationalization of the dealer network." Tr.3763:20-24. He explained that he believed that dealer rationalization by rejecting franchise agreements in bankruptcy would increase Chrysler's profitability in the long term because it would allow for a leaner and more efficient dealership network, which would help maximize sales. Tr.3764:15-3765:11. He explained that in creating the criteria for those franchise agreements to reject in bankruptcy, Chrysler relied on

assessments of the dealers from the various regional business centers. Tr.3766:8-23. Mr. Grady testified that the government played no role in selecting the criteria for rejecting the 789 franchise agreements in bankruptcy, or in deciding which specific franchise agreements to reject. Tr.3766:25-3767:11.

Mr. Grady went on to explain that Fiat supported Chrysler's decision to reject 789 franchise agreements. Tr.3768:4-6. He explained that Chrysler worked with Fiat to determine the best dealership network for Chrysler after it emerged from bankruptcy. Tr.3768:8-18; DX1038. Mr. Grady testified that he worked with Piertro Gurlier, the head of network development for Fiat, and another Fiat executive in developing the final post-bankruptcy Chrysler dealership network. Tr.3768:19-3769:13.

As discussed above, Mr. Grady explained that 789 dealers were rejected based on an evaluation of eight criteria: (1) whether the franchise was meeting its MSR, (2) the franchise's Scorecard for Sales,[38] (3) whether the franchise facility had adequate capacity and met Chrysler's standards, (4) the franchise location, (5) the franchise's financial strength, (6) the franchise's management, (7) whether the franchise had a "dual" or competitor's dealership under the same roof, and (8) whether it was a single point franchise, meaning it did not have all three Chrysler brands under one roof. Tr.3598:18-3602:21.

---

[38] Mr. Landry explained that each year a dealer received a scorecard for its performance where the dealers' "service and parts operations, their profitability, their ability to go forward with working capital, [and] things of this nature, which are typical OEM dealer placement metrics." Tr.3766:14-19.

As discussed above, Mr. Grady then went through the criteria for each of the representative plaintiffs and explained why each was rejected. Mr. Grady explained that Taylor's three franchises were rejected because together they had only met 36% of its MSR, sold less than 100 new Chrysler vehicles the previous year, and were co-located under one roof with a Chevrolet franchise. DX1315. Mr. Grady testified that Theel's Dodge franchise agreement was rejected because Theel's MSR was only 70%, it was a single Dodge franchise dealer, and it had a dual dealership with Toyota. DX1315. Mr. Grady explained that Whitey's Chrysler franchise was rejected because it only met 45% of its MSR, was a dual dealership with a Lincoln franchise, and was only a single Chrysler franchise dealer. DX1315. Mr. Grady explained that RFJS's Chrysler, Dodge, and Jeep franchise agreements were rejected because the RFJS dealership was an excess point, i.e., a location that Chrysler determined was no longer valuable and because the dealership was operating at a loss and was placed on a finance hold by Chrysler Financial.[39] DX1315. Mr. Grady explained that Marsh's Chrysler and Jeep franchise agreements were rejected because Marsh had only met 38% of its MSR, it lacked a Dodge franchise agreement, and because Chrysler wanted a third-party candidate to run a Chrysler, Dodge, and Jeep dealership in a different part of Las Vegas. DX1315. Mr.

---

[39] Leland Wilson, the Chief Financial Officer of Chrysler Financial between 2007 and 2010 explained that "floor plan" financing involved dealers "order[ing] cars through Chrysler, Chrysler would ship those cars to the dealers. Each of those dealers that [Chrysler Financial] financed would have a dealer credit line" that would be used to finance the purchase. Tr.3855:9-11. He went on to explain that "the first lien collateral [for the loan] was the vehicle" and that when the car was sold the proceeds were used to pay off the loan the dealer incurred to purchase the car and allowed the dealer to continue purchasing more new vehicles. Tr.3855:17-23. RFJS was one of the Chrysler franchisees to which Chrysler Financial provided floor plan financing. "Financial hold" meant that Chrysler Financial was no longer willing to extend floor plan financing to RFJS and thus they could not obtain new inventory through their Chrysler Financial credit line.

Grady explained that Livonia's Chrysler and Jeep franchise agreements were rejected in the Chrysler bankruptcy because Chrysler did not like the location of the dealership and thought that it would be more profitable to move the Chrysler and Jeep franchises to a Dodge dealership a few miles away. DX1315. Mr. Grady explained that Barry's Chrysler, Dodge, and Jeep franchise agreements were rejected because it only met 42% of its MSR and because it was considered an excess point and Chrysler wanted to reduce the number of dealers in the Brockport area. DX1315. Mr. Grady explained that the Guetterman Chrysler, Dodge, and Jeep franchise agreements were rejected because the dealership only met 53% of its MSR, was considered an excess point in the Cairo area where Chrysler wanted to reduce its number of franchisees, was placed on a financial hold by Chrysler Financial, and had a competitive dual Ford dealership attached to the Chrysler showroom. DX1315. Finally, Mr. Grady explained that Finnin's Chrysler and Jeep franchise agreements were rejected because the dealership only met 66% of its MSR and because Chrysler believed that a nearby Dodge dealer was a better dealer and wanted that dealer to have the Finnin Chrysler and Jeep franchises so that this other dealer could have all three under one roof. DX1315.

On cross examination, Mr. Grady stated that he did not have any discussions with the United States government until May 11, 2009 regarding dealer rationalization but would not necessarily have been aware if there had been any conversations about dealership rationalization with other Chrysler officials and Treasury. Tr.3818:1-3819:10. Mr. Grady also acknowledged that the February 17, 2009 Viability Plan envisioned the continuation of Project Genesis, not involuntary dealership terminations. Tr.3824:12-15.

### iv.    Thomas LaSorda

The government called Thomas LaSorda, who was the CEO of Chrysler from September 2005 until August 2007 to testify. Tr.4342:21-23. Mr. LaSorda became the Vice Chairman and President of Chrysler when Cerberus bought Chrysler in 2007 until he retired on April 30, 2009. Tr.4343:2-24. Mr. LaSorda explained that during his tenure as CEO he consistently sought alliances and partnerships with other auto manufacturers from around the world. He testified that he wasn't, however, able to accomplish such an alliance by the time that Chrysler was purchased by Cerberus in 2007. Tr.4357:24-4358:22. He testified that he attempted to form an alliance with Nissan Renault, but nothing came of it. Tr.4359:6-9. He went on to explain that the purpose of seeking an alliance was to combine product lines and to attempt to get additional cash investment into Chrysler. Tr.4360:2-4361:23. He explained that he went to Honda, Kia, and Hyundai during this time frame but "[t]hey were not interested in doing any joint programs at all" and that Toyota also expressed no interest in an alliance with Chrysler. Tr.4365:11-22. He went on to explain that he also reached out to Volkswagen, various Chinese manufacturers, and Tata Motors, but he was rejected each time. Tr.4366:1-4368:3. He explained that he had no interest in forming an alliance with GM because such an alliance would essentially wipe Chrysler out and destroy all of its jobs and factories because of the extensive overlap in product lines between the two companies. Tr.4373:17-25. Mr. LaSorda testified that the only company that expressed any real interest in forming an alliance with Chrysler was Fiat, but that Fiat was not interest in injecting any cash into the alliance to help sustain Chrysler. Tr.4365:21-22, Tr.4379:10-20. He explained that

Fiat's interest was because Chrysler and Fiat had different product lines and that their markets did not overlap. Tr.4375:2-4377:17.

Mr. LaSorda testified that during the 2008-09 financial crisis he recognized the huge impact a Chrysler bankruptcy would have had, not only on Chrysler's employees and its dealers, but also on the companies that supplied Chrysler with auto parts. Tr.4382:11-4383:19. He explained that he supported the strategic partnership path that was outlined in Chrysler's February 17, 2009 Viability Plan because he knew that an alliance would be important to the long-term survival of Chrysler. Tr.4384:23-4385:5. He explained that at no time did he feel that the government was forcing an alliance with Fiat. Tr.4385:16-25. He further explained that he did not feel like the government had forced Chrysler into bankruptcy. Tr.4389:25-4390:3.

### v.   Robert Manzo

The government called Robert Manzo to testify. Mr. Manzo was the restructuring consultant from Capstone, hired by Chrysler in 2008 to address Chrysler's financial difficulties. He served "as the lead financial advisor to help lead [Chrysler] through the series of challenges that [it] faced regarding retaining their viability in terms of a stand-alone company." Tr.3928:18-24. Mr. Manzo explained that he worked on a daily basis with Chrysler management including CEO Bob Nardelli and CFO Ron Kolka. Tr.3930:8-12. He explained that when he was first contacted by Mr. Nardelli and Mr. Kolka, Chrysler was in financial straits due to the decline in its sales volume and its high cash burn rate of $2 billion. Chrysler's cash burn rate meant that Chrysler had three to four months to address its problems in before it ran out of cash. Tr.3931:18-3932:9.

Mr. Manzo explained that he was involved in Chrysler's plan to seek financial assistance from the government beginning in late 2008. Tr.3932:13-24. As part of that process, he explained he created a hypothetical liquidation analysis Tr.3936:10-23. He explained that as part of this analysis he assumed that all of Chrysler's manufacturing would cease and that Chrysler would have twenty-four to thirty months to complete an orderly liquidation. Tr.3937:13-20; DX1029. He testified that during that time frame there "are a number of operational, financial, and legal activities that are occurring" such as selling equipment off either directly or through auction and taking care of several outstanding issues. Tr.3939:13-24. He also explained that his liquidation analysis assumed Chrysler was the only auto manufacturer liquidating at the time and that if there were other liquidations it would lower the range Chrysler could recover for its assets. Tr.3940:5-15. Mr. Manzo explained that if any auto part suppliers went bankrupt during this period, those bankruptcies would have a negative effect on Chrysler's potential recovery. Tr.3940:21-3941:5. Mr. Manzo noted that if Chrysler filed for bankruptcy and received no government assistance, it would immediately cease operating as an ongoing concern. This would mean that Chrysler would have to shut down vehicle production during the bankruptcy process. Tr.3941:6-21.

Mr. Manzo discussed in detail his views on which Chrysler lines would likely be sold in a Section 363 bankruptcy sale. Initially, he determined that the Dodge Ram Truck, Jeep Wrangler, Dodge Challenger/Chrysler 3000, and Dodge Viper vehicle lines would be able to have likely been sold to a third-party purchaser. DX1029. He explained that these were the only profitable Chrysler lines in 2008. Tr.3941:25-3942:19. He further explained that due to the Great Recession, the proceeds from Chrysler's sale of the assets

in a liquidation would be depressed. Tr.3943:16-3944:23. Mr. Manzo ultimately

concluded that in a liquidation of Chrysler's assets in bankruptcy, the first lien lenders

would likely recover between $654 million to $2.6 billion on a total debt of nearly $7

billion. DX1029.

Mr. Manzo went on to explain that, in his liquidation analysis, he assumed that the

relaunch of any of the Chrysler product lines purchased by a third party would take

between twelve to twenty-four months. Tr.3944:24-3946:1. He also explained that in his

liquidation analysis he assumed that there would be no DIP financing, because he

understood that the first lien lenders were unwilling to loan Chrysler any more money.

Tr.3946:2-3947:18. He further explained that he assumed in his liquidation analysis that

no more warranty coverage would be provided by Chrysler. Tr.3954:4-9. Mr. Manzo also

talked about his meetings with John Haeckel, the restructuring advisor hired by JP

Morgan on behalf of the first lien lenders. Tr.3964:1-3. He explained that his

conversations with Mr. Haeckel were part of the back and forth a company conducts with

its creditors in order to fully understand the fiscal picture of the company facing

liquidation. Tr.3965:3-21.

Mr. Manzo testified that he was intimately involved in preparing many aspects of

Chrysler's February 2009 Viability Plan. Tr.3958:15-18. He explained that in a typical

commercial transaction companies will provide lenders with different alternatives as

Chrysler did in its February 2009 Viability Plan. Tr.3960:2-15. He went on to explain

that throughout the Viability Plan review process he participated in the negotiations with

the government, as is typical for a restructuring professional dealing with a company's

lenders. Tr.3968:3-17. He further explained that throughout this process he was

constantly briefing Mr. Nardelli on the Auto Team's negotiations. Tr.3969:22-3970:2. This included preparing a presentation about what Chrysler could expect if it had to go through a Chapter 11 bankruptcy. DX1083. Mr. Manzo testified that Fiat was very involved with the negotiations. Tr.3972:7-10. Mr. Manzo explained that he was part of the April 30, 2009 Chrysler board meeting where the board voted in favor of filing for bankruptcy under the prepackaged terms the Auto Team helped negotiate. Tr.3998:2-21.

On cross examination, Mr. Manzo admitted that when Chrysler filed its Viability Plan it clearly did not want to file for bankruptcy. Tr.4002:1-7. He further explained that up until the last minute Chrysler did not want to file bankruptcy, but that the government brought the negotiations to an end. Tr.4002:1-4003:25. Specifically, he recounted an email that the Auto Team's bankruptcy lawyer, Matthew Feldman, sent on the early morning of April 30, 2009, the day Chrysler was to file for bankruptcy, which explained that the Auto Team was not willing to negotiate any longer with the first lien lenders or any other interested party. PX538; Tr.4012:1-4013:10.

### vi.   Leland Wilson

The government also called Leland Wilson, the CFO of Chrysler Financial from 2007 until 2011, to testify. Tr.3851:1-9. Mr. Wilson explained that as CFO of Chrysler Financial he was responsible for "the traditional finance activities, accounting, financing, financial planning . . . treasury, capital markets . . . risk management . . . [and] insurance." Tr.3851:15-19. He explained that when Cerberus bought Chrysler it made Chrysler Financial a sister company that reported to the same holding company as Chrysler, rather than being a subsidiary of Chrysler. Tr.3852:7-10. Mr. Wilson testified that Chrysler Financial was the captive finance company for Chrysler and provided both

dealer floor plan financing to 75 to 80 percent of the dealers and retail financing to the customers. Tr.3852:25-3853:10. He went on to explain that Chrysler Financial provided financing for leasing Chrysler vehicles, which amounted to approximately twenty percent of Chrysler's business. Tr.3854:9-14. Mr. Wilson explained that Chrysler Financial also offered services to dealers such as capital and real estate loans and various insurance products. Tr.3854:24-3855:11.

Mr. Wilson explained how floor plan financing with Chrysler Financial worked for dealers. He testified that dealers would take out loans to purchase new cars from Chrysler, they would use those new cars as collateral for the loans, and when dealers sold the cars they would use the profits in order to pay off the loan and free up their credit line to purchase new cars and begin the cycle again. Tr.3855:12-23.

Mr. Wilson also testified about how Chrysler Financial operated. He explained that before 2008, Chrysler Financial had $30 billion to conduct its business with funding from a syndicate of banks. Tr.3857:3-18. The $30 billion was available for 364 days. *Id.* He explained that if Chrysler Financial went through the $30 billion it would then securitize its loans and sell them to investment firms in order to raise more money, which it would then loan out. Tr.3858:9-19. He testified that when the security market collapsed in 2008, Chrysler Financial could not sell asset-backed securities any longer and its creditors became less willing to offer financing. Tr.3860:1-8. He explained that when Chrysler Financial went to renew its financing in August of 2008, it could only get $23 billion. Tr.3862:17-20. He went on to explain that, because of its reduced financing capacity, Chrysler Financial had to become more conservative in its loaning practices

and, as a result, Chrysler was not able to sell as many cars to its dealers or customers. Tr.3869:18-21.

Mr. Wilson testified that Chrysler Financials' relationship with Chrysler was terminated at the end of April 2009 when Chrysler filed for bankruptcy. Tr.3903:1-4. Afterward, he explained that Chrysler Financial redirected itself to become a used car lender. Ultimately, Chrysler Financial was sold to TD bank in 2011. Tr.3905:10-3906:11.

On cross examination, Mr. Wilson admitted that his opinions about dealer's accessibility to floor plan financing and the health of the credit market were only his own. He stated that his conclusions about floor plan financing would not apply to the representative plaintiffs that did not have floor plan financing. Tr.3910:14-3911:21.

### vii.   John Haeckel

The government also called John Haeckel, a restructuring representative from Chilmark Partners, to testify. Tr.2846:5-2847-9. Mr. Haeckel was hired by JP Morgan and explained that JP Morgan was the lead agent that negotiated with Chrysler on behalf of the first lien lenders. Tr.2848:9-23. He explained that Chilmark was brought in to "advise JP Morgan and the bank group more broadly with respect to the loan that they had made to Chrysler." Tr.2850:13-15. He explained that he examined the prospects for the first lien lenders to recover the debt owned by Chrysler in a Chrysler bankruptcy. *See* Tr.2852:25-2853:9. He determined that the first lien lenders, as of April 30, 2009, would likely receive only $680 million on their $6.9 billion in debt if Chrysler did not receive government assistance. Tr.2865:25-2866:9. He testified that, based his review, he advised JP Morgan and the first lien lenders that the $2 billion buyout offered by the government

was more than they would recover if Chrysler filed for bankruptcy without government financing. Tr.2868:22-2869:8.

On cross examination, Mr. Haeckel testified that his analysis was based on a variety of assumptions that influenced his valuation and that a change to any of those assumptions could have had an impact on the value of Chrysler. Tr.2879:20-2880:25. He also testified that he did not come to any conclusions about Chrysler's plan to rationalize its dealership network or the appropriate size of the dealership network. Tr.2892:2-10. He also admitted that he did not personally know if any of the first lien lenders other than JP Morgan, which had refused to provide DIP financing, would have provided Chrysler with DIP financing or other funding if government financing was not available. Tr.2899:4-15.

### viii.    Ronald Bloom

The government called Ronald Bloom, Mr. Rattner's first Auto Team hire. Mr. Bloom was put in charge of hiring the rest of the Auto Team. Tr.2685:7-15. He described his position as Mr. Rattner's deputy and that after Mr. Rattner's departure in July 2009 he became the head of the Auto Team. Tr.2685:7-15. Mr. Bloom explained that while Mr. Rattner primarily focused on GM, he was the leader of the Chrysler team and was assigned to review Chrysler's Viability Plan. Tr.2685:16-21. He explained that Mr. Osias and Mr. Calhoon were on the Chrysler team and that others, including Mr. Wilson, Mr. Markowitz, and Mr. Malik, were on the GM team. Tr.2686:1-4.

Mr. Bloom testified that "[f]rom the start, the Auto Team followed two clear directives by Secretary Geithner and Director Summers regarding our approach to Chrysler and GM. The first directive was to behave in a commercial manner, ensuring all stakeholders were treated in accordance with business, not political considerations. The

second was to refrain from intervening in the day-to-day management of these companies." Tr.2686:12-19. He explained that "[a]lthough [the Auto Team] engaged in dialogue and discussion with company management about the companies' approaches, we were not to substitute our judgment about specific decisions for theirs." Tr.2686:22-25.

He testified regarding the long-term Viability Plan Chrysler submitted to Treasury on February 17, 2009. Tr.2687:1-19; DX1056. He explained that Chrysler made clear in its plan that it was "critical that each of Chrysler's constituents make significant sacrifices to accomplish our restructuring plan, including our creditor groups, shareholders, suppliers, dealers, the United Automobile Workers, and, of course, our own employees." Tr.2688:3-8. He testified that this was a sentiment that he also shared. Tr.2688:12-21. He went on to describe the three different paths Chrysler proposed. He noted that each required billions of dollars in additional government financial assistance beyond the $4 billion TARP loan. Tr.2689:1-3. He also noted that Chrysler represented that all its plans included a commitment to continue working "with its dealer body to rationalize the number of dealerships" to enhance Chrysler's long-term viability. Tr.2691:11-12; DX1058.

Mr. Bloom testified that upon receipt of the February 17, 2009 Viability Plan, he reviewed it to determine if restructuring Chrysler was viable and if Chrysler would be able to survive in the long term. Tr.2692:3-19. Mr. Bloom explained that in addition to the February 17, 2009 Viability Plan, Chrysler sent a confidential submission supporting its reasoning on February 18, 2009. Tr.2691:13-15; DX1058. As part of that submission, Chrysler offered an accelerated Project Genesis, whereby it proposed to reduce the

number of dealers from 3298 to 2005 over the course of four years. Tr.2822:1-10; DX1058. Mr. Bloom explained that "[t]he Auto Team spent hundreds of hours studying the Chrysler plan, analyzing it, testing its assumptions, and critiquing it, all to determine whether the plan was likely to lead to Chrysler's long-term viability." Tr.2693:8-12. Mr. Bloom further testified that "[a]mong other things, we analyzed whether a reduction in Chrysler's deal -- in Chrysler's dealership network would improve its chances at viability." Tr.2695:25-2696:3. Mr. Bloom went on to explain that "[a]fter studying the issue, we ultimately agreed with Chrysler, that their dealer network was too large, and we supported their plans to reduce the size of their dealer network." Tr.2696:14-18.

During the Auto Team's evaluation process, Mr. Bloom testified that he and other members of the Auto Team met with Mr. Nardelli at Chrysler's Warren Michigan truck plant on March 9, 2009. Tr.2697:15-22. He testified that after the meeting Mr. Nardelli wrote a letter to him and Mr. Rattner advocating for a Chrysler stand-alone plan. Tr.2697:23-2698:13.

Mr. Bloom testified that he and the Auto Team came to understand that if Chrysler was to remain a viable company, the government would have to support the auto part suppliers. This led to the Auto Supplier Support Program announced on March 19, 2009. Tr.2700:11-24; DX1095. He testified that the Supplier Support Program "was designed to provide suppliers with access to up to $5 billion in government-backed protection." Tr.2701:1-2.

Mr. Bloom explained that on March 30, 2009 the Auto Team concluded that "even though Chrysler had made meaningful changes to its cost structure in the years prior to 2009, a combination of a fundamentally disadvantaged operating structure and a limited

set of desirable products made stand-alone viability for Chrysler unlikely." Tr.2706:18-24. Mr. Bloom explained that on March 30, 2009 President Obama announced that the government had rejected Chrysler's Viability Plan, but that Chrysler would have thirty more days to form an alliance with Fiat that was acceptable, and that the government would provide up to $6 billion to help the plan succeed. Tr.2709:4-24; DX1137. Mr. Bloom explained that on that same day, President Obama announced a Warranty Commitment Program, "to give confidence to GM and Chrysler's customers" that the warranty for newly purchased cars would be honored. Tr.2711:17-2712:1; DX1137.

Having concluded that Chrysler would need to partner with Fiat to survive, Mr. Bloom testified that he "served as the principle negotiator during the Auto Team's negotiation of the term sheet with Fiat." Tr.2703:7-8. As a result of the negotiations, Chrysler and Fiat signed a new term sheet, in which "Fiat would contribute among other things, technology, management, and consolidated purchasing power in exchange for twenty percent of the equity in Chrysler, with the opportunity to receive an additional fifteen percent if certain performance targets were met." Tr.2704:23-2705:3. Additionally, the term sheet was conditioned on $6 billion in government loans, a restructuring of Chrysler debt, and an industrial restructuring of Chrysler, including its dealership network. Tr.2705:4-9.

Mr. Bloom testified that from March 31, 2009 until April 30, 2009 there were a series of meetings between members of the Auto Team and stakeholders in Chrysler, including Chrysler, Fiat, UAW, and JP Morgan. Tr.2712:23-2713:13. Mr. Bloom explained that although every party "worked hard to find a path to viability without bankruptcy, all parties, including Chrysler and Fiat, came to the conclusion in late April

2009 that the Fiat-Chrysler alliance could only be accomplished through a restructuring in bankruptcy." Tr.2715:11-15. Mr. Bloom stressed that "[u]ltimately, it was Chrysler's decision to accept the Government's financial assistance, to file for bankruptcy in April 2009, and to execute a master transaction agreement with Fiat on April 30th, 2009." Tr.2715:16-19. Mr. Bloom testified that the Auto Team "informed Chrysler that Treasury and the Government of Canada would provide up to $4.5 billion in debtor-in-possession financing to support Chrysler in bankruptcy if Chrysler elected to move forward with the Fiat alliance memorialized in the master transaction agreement." Tr.2716:4-9; DX1277, DX1287. He went on to explain "the Auto Team, including myself, talked with multiple banks in an effort to raise debtor-in-possession financing from private sources instead of the Government. Although we would have welcomed a private entity providing financing, no private entity was interested, therefore leaving the Government as the lender of last resort." Tr.2716:20-2717:1. Mr. Bloom maintained "[a]lthough the sacrifices made by Chrysler and its stakeholders were difficult, the alternative to Chrysler's successful restructuring was liquidation, which would have been worse for everyone concerned." Tr.2719:11-14.

Mr. Bloom testified regarding the dealerships, "Early on in our evaluation process, Chrysler explained to us that the objective of Project Genesis was to realign its dealership network so that its dealerships sold all three Chrysler brands, Chrysler, Jeep, and Dodge, and that the number of dealers was better aligned with the sales volume of Chrysler dealers. Under its then-current network structure, many dealers were selling only one or two brands, and many dealers sold a relatively small number of vehicles. We understood from Chrysler that, in its judgment, having too many dealers placed a burden on its

prospects for achieving long-term viability and success. This was because, according to Chrysler, too many dealers eroded the brand equity and Chrysler's ability to get a fair price for its products. Chrysler also advised us that having too many dealers forced the dealers to compete against each other, which led to price-cutting and lower dealer profits, reducing the ability of the dealers to re-invest in their facilities." Tr.2721:4-23. He went on to explain that "[C]hrysler also advised the Auto Team that a more aggressive dealer rationalization effort would further enhance the prospects for achieving long-term viability, a judgment we supported." Tr.2722:2-5. However, he made clear that "[a]s part of the Auto Team's due diligence responsibilities, we continued to have some general discussions with Chrysler during the month of May regarding the status of its dealership network plans. I did not request and Chrysler did not provide any update to either the number of dealers Chrysler was considering rejecting or the names of any potential dealers the company would put forward for rejection." Tr.2723:15-21. He explained that the Auto Team "did not get into the details of management decisions behind Chrysler's selection of individual dealers to reject." Tr.2724:15-18. He stated that the only requirement placed on Chrysler was that the dealer rationalization plan be "based on objective criteria and be fair and impartial." Tr.2724:23-2725:3. Mr. Bloom explained he recalled learning that Chrysler would reject 789 dealership agreements during a May 11, 2009 presentation made by Chrysler. Tr.2725:4-15; DX1309.

On cross examination, Mr. Bloom admitted that prior to working for the government, he had spent twelve years working for the steelworkers' union negotiating collective bargaining agreements. Tr.2737:7-10. Mr. Bloom also acknowledged that the February 2009 Viability Plan only included an accelerated Project Genesis that would

reduce the dealership count through voluntary consolidation. Tr.2741:1-15; DX1056, DX1058. He agreed that the Chrysler stand-alone plan was off the table because the Auto Team had determined that Chrysler could not survive long term as a stand-alone entity. He also agreed that in 2008, he had believed that bankruptcy was the likely outcome for Chrysler, before he joined the Auto Team. Tr.2770:6-10.

Mr. Bloom further admitted that the government's idea of shared sacrifice came to include dealer terminations. Tr.2775:4-14. He also admitted that when the Auto Team rejected the Viability Plan in March 2009, it required a more aggressive dealer rationalization approach from Chrysler along with other concessions. Tr.2755:2-14. As part of that more aggressive rationalization approach, Mr. Bloom understood that Chrysler had proposed Project Tiger and termination of franchise agreements in bankruptcy. Tr.2778:8-21. Mr. Bloom received the first draft of Project Tiger on April 7, 2009, one week after President Obama had announced that he was rejecting Chrysler's February 2009 Viability Plan. Tr.2820:18-23; DX1167.

Mr. Bloom admitted that Chrysler was not really involved in the negotiations concerning the Voluntary Employee Beneficiary Association Plan ("VEBA") and union benefits, and that during April 2009 the government facilitated negotiations between Fiat and UAW. Tr.2783:1-5. He also admitted that the VEBA claims would most likely not have recovered in a Chrysler bankruptcy without government assistance because they were unsecured debts, and there was a substantial amount of secured debt that had a higher priority in a bankruptcy. Tr.2792:14-24. Mr. Bloom testified that the bankruptcy was structured in a manner to give value to the unsecured creditors such as the VEBA

and key auto part suppliers, that would have presumably not recovered anything if Chrysler had filed for bankruptcy without government assistance. Tr.2792:14-24.

Mr. Bloom testified that he understood that, under the government's negotiated prepackaged bankruptcy plan, Fiat would take over the management of Chrysler. Tr.2799:14-17. Mr. Bloom also admitted that the Auto Team viewed providing assistance to Chrysler and GM as a "multiplier" because there were dozens of companies that might have gone bankrupt if Chrysler and GM liquidated. Tr.2812:2-9; *see also* PX635.

### ix.    Brian Osias

Mr. Osias also testified as a former member of the Auto Team. Prior to serving on the Auto Team, Mr. Osias worked on President Obama's transition team "focusing on tracking and evaluating the Bush Administration's efforts to support the auto industry." Tr.3138:7-10. He explained that he began working at Treasury in January 2009 and quickly gravitated to the Auto Team. Tr.3138:11-16. He testified that when he became a member of the Auto Team, he "was brought in as an analyst with skills in research, forecasting, and analyzing companies' financials and viability[.]" Tr.3138:21-25.

Mr. Osias explained that he was tasked with analyzing Chrysler's February 17, 2009 Viability Plan. Tr.3139:14-25. To perform this analysis, he familiarized himself with the auto industry including "Chrysler's operational framework, . . . its manufacturing footprint, dealer network, capital equipment efficiency, power train technology, and a long list of other important variables." Tr.3140:9-14. Mr. Osias explained that "[i]f an investment could not be justified on the basis of the submitted Viability Plan, we sought to understand what changes Chrysler might need to ensure that if further taxpayer support were provided to the company, the taxpayers had a strong

chance of repayment." Tr.3144:8-13. He explained that "to accomplish these tasks we attempted to make every transaction and interaction as commercial as possible." Tr.3144:18-20.

He testified "[t]he task force definition of viability had three parts. First, to be viable, a business must be able to generate positive cash flow and earn an adequate return on capital over the course of a normal business cycle. Second, the positive cash flow must account for spending on research and development and capital expenditures necessary to maintain and enhance the company's competitive position. Third, a viable company must have a balance sheet consistent with the cash flow dynamics of the business and must be capable of weathering typical industry downturns." Tr.3145:1-12. He explained that part of the problem with the Chrysler Viability Plan was that Chrysler had made too many positive assumptions about the auto market to justify its stand-alone plan. Tr.3150:12-23. He stated that the Auto Team concluded that "[e]ven under generous assumptions, Chrysler was not viable under its stand-alone viability plan. It was not close. In all but the most favorable macroeconomic and company-specific cases, some of which defied logic and history, Chrysler was destined to suffer or fail in the medium term, and any taxpayer support provided by Treasury would quickly be spent by the company with little hope of recovery." Tr.3153:12-19.

Mr. Osias went on to discuss the Auto Team's examination of a potential merger between Fiat and Chrysler. Tr.3154:11-17. He explained that Fiat made a powerful argument for the viability of a merger using more conservative assumptions. Tr.3154:18-3155:4. Mr. Osias explained that after President Obama stated that the government had rejected Chrysler's Viability Plan, he began "analyzing whether the alliance between Fiat

and Chrysler was feasible and would result in a viable company." Tr.3162:23-3163:1. He explained he "continued to perform due diligence on the potential Chrysler-Fiat alliance to determine if the proposed alliance would result in a viable company, one with positive cash flow the Treasury would feel comfortable underwriting with taxpayer money." Tr.3163:7-13. He went on to explain that during the viability review process "Chrysler recognized that one benefit to a bankruptcy process is that it would allow them to accelerate their dealer rationalization process, . . . at a substantially lower cost than could be achieved outside of bankruptcy." Tr.3167:16-20. He further explained "[a]s with other aspects of the Chrysler-Fiat alliance, Treasury did not have a specific strategy with regard to the dealers, other than that the company's dealer network plan must contribute to the company's overall viability." Tr.3168:5-9.

Mr. Osias noted that he understood that "Treasury obviously was not a purely commercial actor. No wholly commercial actor would have agreed to give Chrysler money at this point because its prospects were so bleak. We understood that the potential for return in a structure that actually made sense for Chrysler was very low. Treasury had other priorities beyond earning a fair return for taxpayers, including preserving jobs and limiting damages to auto-related communities." Tr.3170:5-13. Mr. Osias testified that the Auto Team was "performing this diligence to ensure that if the company was going to be restructured through a 363 sale, that such a sale was the most efficient option." Tr.3176:7-10. The Auto Team, he testified, "had neither the interest nor the ability nor the mandate to play any specific part in determining which dealers Chrysler and Fiat wanted to cut" but wanted to ensure that any franchise rejections were based on a reasonable and fair methodology. Tr.3182:3-19.

On cross examination, Mr. Osias admitted that he evaluated all three viability scenarios equally despite Chrysler advocating for a stand-alone plan. Tr.3195:16-3196:17. Mr. Osias also admitted that he did not continuously work for the Auto Team; he did not work for the Auto Team from late February 2009 until March 20, 2009. Tr.3261:19-3262:8. He reemphasized that his role was to look at the financial practicability of Chrysler's viability rather than the political consequences of Chrysler potentially failing. Tr.3271:5-21. He also explained that the Auto Team only evaluated whether the franchise rejection criteria were fair and reasonable and was never involved in identifying any of the franchise agreements to be rejected. Tr.3324:9-3325:11. According to Mr. Osias, Fiat was not concerned with Chrysler's dealer rationalization plans. Tr.3308:15-24.

> **x.   Brian Stern**

In addition to Mr. Rattner, Mr. Bloom, and Mr. Osias, the government also called Brian Stern from the Auto Team to testify. He was with the Auto Team from March 2009 until August 2009. Tr.4308:23-25. Mr. Stern explained that he was recruited by Mr. Rattner based on his experience as a member of the private equity group at Bank of America Merrill Lynch Global Private Equity. Tr.4309:4-8. Mr. Stern testified that he "worked on issues related to Chrysler Financial and General Motors Acceptance Corp., GMAC, the financial companies affiliated with Chrysler and General Motors." Tr.4309:15-19. He testified that he was on "what was known as the finance companies or FinCos team because our work focused on Chrysler Financial and GMAC, which were collectively known as the FinCos." Tr.4310:16-21.

Mr. Stern explained that the "Auto Team worked with Chrysler Financial and GMAC because Chrysler's viability depended on financing being available for Chrysler's dealers and customers." Tr.4311:1-2. He went on to explain that this was "[b]ecause Chrysler was wholly dependent on dealers to sell its automobiles, Chrysler would not be viable if the dealer network was incapable of financing the purchase of new cars that would then be offered to consumers to purchase off the dealer's lot." Tr.4311:17-21. Mr. Stern testified that leading up to the financial crisis, Chrysler Financial was the main financier for Chrysler dealers. Tr.4311:22-24.

Mr. Stern then testified that during the financial crisis, Chrysler Financial experienced "an extreme liquidity crisis" and that in an email on April 17, 2009, Chrysler Financials' CEO Tom Gilman stated that in the event of a Chrysler bankruptcy, Chrysler Financial would cease lending to Chrysler dealers and retail customers. Tr.4312:1-19; DX1202. He went on to explain that by late 2008, Chrysler Financial had to shrink the amount of outstanding retail loans in order to not be in default, which negatively impacted Chrysler. Tr.4313:2-17; DX1182. Mr. Stern testified that the Auto Team concluded that Chrysler Financial would require too much assistance to continue as the financier for Chrysler and that the recapitalized GMAC was the most prudent and effective deployment of taxpayer capital to ensure that there was sufficient lending capacity in floor plan and retail auto loan markets. Tr.4314:15-22. He explained that "[u]ltimately, on April 30, 2009, the day that Chrysler filed for bankruptcy, Chrysler and GMAC executed a master financial services agreement term sheet" under which GMAC would provide the financial services to Chrysler dealers and customers. Tr.4316:18-24; DX1375. This required that Treasury provide $7.5 billion to GMAC and that the FDIC

provide assistance to GMAC through its Temporary Liquidity Guarantee Program. Tr.4317:20-4318:9; DX1336a.

On cross examination, Mr. Stern admitted that he did not consider whether Chrysler dealers could have obtained floor plan financing from other sources. Tr.4321:3-11. He also admitted that on April 18, 2009, Chrysler Financial expressed its desire to continue to provide retail and floor plan financing in the event of a Chrysler Chapter 11 bankruptcy. Tr.4323:8-22. Mr. Stern further acknowledged that Treasury told Congress in 2011 that the reason it provided GMAC with financing was not because it was the most prudent investment but because of its importance in the auto industry. Tr.4330:11-15; PX485. He also stated that he had not had any conversations with Chrysler regarding the best path forward for Chrysler Financial. Tr.4336:9-14.

### xi.    James Lambright

The government also called James Lambright to testify. Mr. Lambright, from October 2008 until June 2009, served as the interim chief investment officer for TARP. Tr.3711:5-10. He explained that "[t]he overarching objective of TARP transactions was to protect the financial system; however, in structuring individual transactions with particular companies, our goal was to provide the necessary financial assistance, while at the same time protecting taxpayers whose funds were being put at risk." Tr.3713:6-11. He explained that President Bush took the action of providing loans to Chrysler and GM from TARP in January 2009 because "Chrysler and GM were on the brink of financial collapse but had not taken measures to prepare themselves for an orderly restructuring. Thus, our goal at the time was to provide sufficient financing to keep Chrysler, GM, and their associated financing companies alive, giving them some time and an incentive to

develop paths towards long-term viability, and also give the incoming Obama Administration flexibility in deciding how and whether to provide further assistance to these companies." Tr.3714:1-10.

He went on to explain that "[t]he bridge loans [to Chrysler and GM] were designed to provide the manufacturers sufficient capital to continue operations for a period of time, long enough to develop a plan for long-term viability that could be presented to the new administration." Tr.3714:16-20. Mr. Lambright further explained that "[t]he concept of a viability plan and the bridge loan was derived from the legislation that had passed the House on December 10th, 2008 [but was never enacted]." Tr.3717:19-21. He explained that his "understanding was that this provision called for Chrysler to include in its viability plan an explanation of the steps it would take to improve its operating efficiency in a manner that would allow it to continue manufacturing and selling cars for the long term." Tr.3725:20-25.

### B.   Government's Expert Witnesses

### i.   Dr. Andrew Carron

Dr. Andrew Carron, Ph.D., is an expert in financial economics, damages, and valuation. His testimony addressed plaintiff experts' opinions regarding the value of plaintiffs' franchise agreements in a "but for world" where Chrysler entered bankruptcy without government assistance. He holds a B.A. in economics from Harvard University and a Ph.D. in economics from Yale University with a concentration in industrial organization. Tr.2912:21-2913:5. Dr. Carron is currently an affiliated consultant at National Economic Research Associates ("NERA") Economic Consulting. Tr.2910:2-3. From 2013 to 2017, Dr. Carron was the chairman of NERA and from 2006 to 2012, he

was NERA's president. Tr.2910:3-5. He has authored texts, book chapters, and articles on fixed-income securities. Tr.2912:11-13.

Dr. Carron was retained by the government to opine on two issues. First, Dr. Carron was asked to opine on "whether Plaintiffs' Chrysler franchise agreements would have had value had Chrysler foregone government financial assistance and conducted an orderly wind-down and liquidation in bankruptcy." Tr.2913:14-20. As discussed in detail below, Dr. Carron opined that the franchise agreements at issue would have been valueless in the plaintiffs' proposed "but for world" – where Chrysler was acquired in a Section 363 sale – because a willing buyer in an arms' length transaction would not have paid more than zero for their franchise agreements. Tr.2913:23-2914:13.

Second, Dr. Carron was asked to opine on "whether Plaintiffs' dealerships in the actual world had substantial value absent those franchise agreements." Tr.2914:14-16. As discussed in detail below, Dr. Carron opined that eight out of the nine plaintiffs' dealerships without franchise agreements with Chrysler retained substantial value in the actual world, both during and after the Chrysler bankruptcy. Tr.2914:21-24.

Dr. Carron began his testimony by discussing the difference between the income-producing activities plaintiffs received by having a franchise agreement with Chrysler and the income-producing activities that were not directly dependent on the franchise agreements. He explained that the franchise agreements allowed a franchise holder to sell the manufacturer's new cars and trucks, purchase new cars and trucks from the manufacturer, and provide warranty repair and maintenance work on those cars and trucks that is paid for by the manufacturer at a negotiated rate. Tr.2915:10-16. He went on to explain that other income streams are not franchise dependent. He testified that a

133

"franchise agreement is not required for the sale of used cars[,] the sale of finance and insurance products[,] customer pay . . . repair service and parts[, and] physical assets, such as land, buildings, and general tools." Tr.2915:15-23.

Dr. Carron challenged the opinions of the plaintiffs' experts that evaluated the lost value of the plaintiffs' franchise agreements by not distinguishing between franchise dependent and non-franchise dependent income streams. Tr.2915:23-2916:2. As a result, he asserted, the plaintiffs' experts were "unable and . . . do not, in fact, isolate, identify, or estimate the value brought to a dealership by the Chrysler franchise agreement."[40] Tr.2916:3-2916:5.

Dr. Carron testified that for purposes of his valuation analysis he assumed a "but for world" where "Chrysler would have declared bankruptcy on December 31, 2008 or April 30, 2009 and subsequently liquidated its assets through an orderly wind-down without financial support from the Government." Tr.2916:12-16, Tr.2917:1-5. Dr. Carron explained that, for purposes of his analysis, Chrysler would have ceased manufacturing new vehicles during this wind-down period and would have stopped shipping parts to the

---

[40] As discussed above, Ms. Murphy testified on behalf of the *Alley's* plaintiffs that she did not separately value the "franchise agreement" because, in her opinion, there is no distinction between valuing a franchise and a dealership. Dr. Nevin, in his testimony on behalf of the *Colonial* plaintiffs, explained that in the auto dealership industry there is a unique method of measuring the value of the intangible benefit of having a franchise agreement with a specific manufacturer using what is called a "blue sky" multiple. This multiple is applied to the value of the assets of the franchise to determine how the "brand" franchise agreement increases the value of franchise to a potential buyer. As discussed above, the references Dr. Nevin relied upon in his testimony regarding blue sky indicated that in 2009, there was no "blue sky" value for Chrysler dealerships and thus a buyer wanting to purchase a Chrysler franchise would not have paid a multiple above "asset" value. Finally, Mr. Stockton, also on behalf of the *Colonial* plaintiffs, valued the Finnin and Guetterman franchises in his "but for world" to include income streams not directly related to what the manufacturer is obligated to provide under the franchise agreements.

dealers. Tr.2917:5-11. He further explained that he assumed plaintiffs would have been able to continue as Chrysler, Jeep and/or Dodge dealers during the wind-down. Tr.2916:16-24. He also assumed that the plaintiffs would generate income from their directly-related franchise activities, such as used car sales and customer pay service. *Id.*

Using the above-noted assumptions, Dr. Carron opined on the value of plaintiffs' franchise agreements. He focused on the income streams tied directly to the plaintiffs' franchise agreements: the right to sell new cars, the right to purchase new cars, and the right to be paid for warranty work. Dr. Carron concluded that with the assumptions he used, none of plaintiffs' franchise agreements would have had any value. Each of Dr. Carron's opinions will be discussed in turn.

Dr. Carron started by explaining why, in his opinion, plaintiffs would not see any value in being able to sell new Chrysler cars or trucks. Dr. Carron testified that "new car sales are typically the least profitable of a dealer's major activities and can often even lead to losses." Tr.2919:17-20. He explained that this least-profitable aspect of plaintiffs' dealerships would have become worse in a "but for world" where the new cars in the plaintiffs' inventory might be discontinued. Tr.2920:1-11. He stated that "[t]he cost of the vehicles purchased [by the franchisees] prior to the bankruptcy would have been significantly higher than the price customers would have been willing to pay for them after bankruptcy." Tr.2920:24-2921:2. Dr. Carron reasoned that "[b]uyers tend to be adverse to discontinued brands due to the lack of warranty coverage, ceased production of parts, among other reasons." Tr.2922:3-6. Dr. Carron thus concluded that no value to the franchise agreements could be attributed to the sale of existing vehicles on the plaintiffs' lots. *See* Tr.2922:17-19.

Dr. Carron also explained that the cars on plaintiffs' lots would have resulted in losses for plaintiffs because, contrary to plaintiffs' experts' opinions, without "government financial assistance, there would have been no manufacturer warranty coverage." Tr.2922:21-22. Dr. Carron testified that he rejected the notion, advocated by plaintiffs' experts, that the federal government would have paid for warranty work in a "but for world." He testified that "[p]laintiffs' experts did not provide support for their opinions that a program would have been established to provide warranty coverage during a hypothetical Chrysler liquidation." Tr.2923:13-16, Tr.2923:17-2924:16.[41] Dr. Carron opined that cars without a manufacturer's warranty would "signal a lower level of product quality to customers, lowering the price they would be willing to pay." Tr.2925:19-12. Dr. Carron further opined that even if dealers purchased third-party warranty coverage for their new vehicles, they would have discounted them by the amount of the cost of the warranty, around $2,000. Tr.2926:3-19.

In further support of his opinion that franchisees would not see any value associated with a franchisee's ability to sell new cars in the "but for world," Dr. Carron testified regarding the lack of retail financing. Dr. Carron testified that retail financing at the time of the "but for world" was hard to come by, and that all plaintiffs relied to some extent on Chrysler Financial to provide retail financing for their customers. Tr.2928:1-4. He explained that by 2008, Chrysler Financial was facing its own liquidity crisis and that,

---

[41] Dr. Carron dismissed the notion that the limited warranty program offered by the government for March 2009 was evidence of a government commitment to a continued warranty program. He explained that the March warranty program was designed to encourage the sale of Chrysler cars and trucks but that without a government commitment to keep the Chrysler brand, there would have been no reason to continue the warranty. Tr.2923:19-2924:22.

by the time that Chrysler would have filed for bankruptcy in a "but for world," Chrysler

Financial would not have been in the position, without government assistance, to provide

retail financing to customers. Tr.2932:8-18. Dr. Carron explained that even for those

dealers who did not overly rely on financing from Chrysler Financial, obtaining retail

financing would have been difficult during the year or two in question. He testified that

the "overall volume of outstanding auto loans and leases in the US decreased eighteen

percent between April 2008 and April 2009, as consumers paid down outstanding loans

and fewer new loans were being made." Tr.2933:21-25.

Dr. Carron testified based on the data from the plaintiffs' financial statements that

"[a]n average price decline of a little more than 3% would reduce the profits of new car

sales to zero." Tr.2938:5-7. The plaintiffs' financial statements showed an average mark

up in May 2009 of 3.18%. *See* Tr.2938:4-14. Dr. Carron further opined that plaintiffs

would have lost money on their inventory in a "but for world" without government

assistance. Relying on data from other manufacturers with discontinued lines, including

Mazda Tribute, Suzuki, and Saab, Dr. Carron opined that the new cars on plaintiffs' lots

would have declined in value by at least 15% and up to 25%. Tr.2948:19-23.

Specifically, Dr. Carron explained that when Mazda discontinued the production

of its Mazda Tribute SUV in 2011, the value declined by 4.5% during the six months

following the announcement, while a similar SUV like the 2011 Ford Escape rose by

1.5% leading to an overall 6% decline of relative price of the Mazda Tribute. *See*

Tr.2937:10-Tr.2946:1. Regarding the decline in the value of Suzuki cars during its

bankruptcy, Dr. Carron noted that news reports during the Suzuki bankruptcy indicated

that dealers were offering discounts ranging from twenty to twenty-five percent for their

new vehicle inventory. Tr.2943:15-16.

Dr. Carron explained that he thought that the Saab bankruptcy provided the most

reliable comparison to what would have happened in the "but for" without government

financing world because like Chrysler, Saab as the manufacturer went bankrupt.[42] Dr.

Carron explained that, where the manufacturer no longer manufactures cars and is not

able to offer a warranty, it is very difficult for a dealer to sell its remaining new car

inventory. In Saab's case, the new cars on dealer lots declined by an average of 42%.

Tr.2945:16-2947:8. Dr. Carron further supported his opinion with the analysis done by

Chrysler's first lien lenders who had estimated that new Chrysler cars and trucks would

be discounted between 50% to 75%. Tr.2948:5-12.

Dr. Carron next explained why he believed that the franchisees would not see any

value in the second right provided in franchise agreements, the right to purchase

additional new cars from Chrysler. He challenged Mr. Berliner's contention that, in a

"but for world," plaintiffs would have derived a benefit from having access to the 9,580

new cars Chrysler had not yet sold at the time of its bankruptcy. Dr. Carron opined that

Chrysler would have likely sold these vehicles at a bulk auction open to both Chrysler

dealers and non-Chrysler dealers to obtain maximum value for the cars. Tr.2953:16-21.

Dr. Carron further opined that even if Chrysler were acquired by another manufacturer in

a 363 sale, there "[was] no indication . . . at the time that an acquirer would have resumed

---

[42] Dr. Carron explained that plaintiffs' reliance on the Daewoo bankruptcy was misplaced because the Daewoo involved only the distributor and DIP financing was available, which Dr. Carron concluded would not have been available in a "but for" Chrysler bankruptcy. Tr.2943:20-2944:25.

production of any, much less of most or all, of Chrysler's existing brands." Tr.2956:3-6.

Relying on the work of Mr. Manzo, Dr. Carron questioned whether any lines but for the

Jeep Wrangler line would have been acquired and stated that he saw no evidence to

suggest that production of all Chrysler lines would have resumed in bankruptcy without

interruption. He also opined that the lack of floor plan financing for most dealers would

have made the ability to purchase new cars difficult even if Chrysler continued to

manufacture cars. It was for all of these reasons that Dr. Carron concluded that the right

provided in the franchise agreement to buy and then sell additional Chrysler vehicles in

the "but for world" would not have had any value. Tr.2957:20-22.

Regarding the value derived from the right to perform warranty work, the third

value Dr. Carron attributed to a franchise agreement, Dr. Carron opined that this right

was also valueless in a "but for world" without government financing. Dr. Carron

testified that if Chrysler filed for bankruptcy without government assistance, all the

outstanding warranty claims, which for these plaintiffs totaled $198,741 by the end of

April 2009, would have gone unpaid. Tr.2961:21-2962:6. Dr. Carron explained, as noted

above, that he believed it was unreasonable to assume that there would have been a

program to honor outstanding warranties in a "but for world." He thus concluded that

plaintiffs would have received no value for their franchise agreement based on their

ability to perform warranty work. Instead, he opined that the plaintiffs would have lost

the money due to them by Chrysler for warranty work they performed but for which they

had not have been paid. Tr.2962:7-12.

Dr. Carron concluded his testimony regarding his first opinion by stating that, had

the dealerships chosen to sell their Chrysler franchise agreements immediately before a

Chrysler bankruptcy or during the bankruptcy, a willing buyer would not have paid anything for the franchise agreements because none of the express rights provided for in the intangible franchise agreements – the right to sell Chrysler cars and trucks, the right to purchase Chrysler cars and trucks directly from Chrysler, and the right to perform warranty work – would have produced any profit in a "but for world" where Chrysler went into bankruptcy without government assistance. *See* Tr.2963:7-12.

Dr. Carron did not consider any loss attributable to the plaintiffs' other income streams, which Ms. Murphy and Mr. Stockton asserted were also attributable to the franchise agreement, including customer pay work, used car sales, and the sale of insurance and other commercial products. He did, however, provide an analysis in his second opinion to show that, for most of the plaintiffs, there was no evidence that profits from these income streams diminished in the period that would have coincided with a bankruptcy wind-down of Chrysler in a "but for world."

Dr. Carron focused his second opinion on the value of the plaintiffs' dealerships in the actual world, after their franchise agreements were rejected in bankruptcy. Dr. Carron explained that in valuing the plaintiffs' dealerships without a Chrysler franchise agreement, he took into account the goodwill, expertise, and revenues the plaintiffs derived from their other business lines, such as new car sales and warranty repairs under their non-Chrysler franchise agreements, used car sales, and customer-pay repairs. Tr.2989:14-18. Dr. Carron explained that, in the actual world, several of the plaintiffs were able to retain much of the value associated with Chrysler-related work because, by virtue of the government's contribution, Chrysler continued as a brand. Thus, they were

able to obtain Chrysler parts for repairs and sell their remaining Chrysler vehicles with warranties.[43] Tr.2990:20-2991:5.

For the six representative plaintiffs that continued in business as car dealerships under other franchise agreements (Theel, Marsh, Guetterman, Finnin, Taylor, and Whitey), Dr. Carron explained that, in the actual world, the termination of their Chrysler franchise agreements did not result in any discernible loss of income or net profits. Tr.2994:2-3002:3. Dr. Carron testified that he came to the same conclusion for Barry Dodge, the only dealership to continue as a used car dealership. Barry's net profits either remained stable or grew in the three years after the rejection of its Chrysler franchise agreements as compared to the three years before the rejection of the Chrysler franchise agreements. Tr.3002:4-3003:11.

For the two remaining plaintiffs, Livonia and RFJS, which did not continue their operations, he could not reach a conclusion about the value of the dealerships in the actual world. Tr.3003:12-3005:24. Dr. Carron explained that Livonia transferred its unsold used vehicles to another company owned by the same owner as Livonia, Century Sales, which also sold Mitsubishi vehicles and used vehicles. Tr.3003:12-22. He noted that although Livonia did not continue to operate after the rejection of its Chrysler franchise agreements, Livonia eventually was awarded Chrysler franchises in 2015 and is currently selling Chrysler and Jeep vehicles. Tr.3003:23-3004:12. Regarding RFJS, because it did not have a permanent franchise agreement it was not like the other

---

[43] Aspects of Dr. Carron's opinion were confirmed by the fact that certain plaintiffs, as discussed *infra*, were able to sell their new car Chrysler inventory to other Chrysler dealerships without sustaining a loss, and were also able to sell or use much of their remaining Chrysler parts and service equipment without taking a loss.

plaintiffs and, therefore, Dr. Carron explained that he could not come up with a valuation. Tr.3004:13-23. The RFJS franchise agreement was set to expire in October 2009 and RFJS never turned a profit in the actual world. Tr.3004:24-3005:6.

On cross examination, Dr. Carron admitted that he did not consider the impact that the financial recovery had on the revenues of the plaintiffs' dealerships after the 2008-09 recession. Thus, he could not say if the steady profits or increased profits he examined in the actual world were attributable to the recovery or the value of the dealerships themselves. Tr.3014:2-3016:15. Dr. Carron also admitted that he did not consider what dealership profits would have been after 2009 if the plaintiffs had retained their Chrysler franchise agreements. Tr.3023:1-15. Dr. Carron further admitted that if the plaintiffs were required to purchase a third-party warranty in order to sell the new vehicles on their lots it was possible that they would see a profit (not a loss). Tr.3084:7-3085:11.

### ii.    Donald MacKenzie

The government called Donald MacKenzie, the "founder and CEO of Conway MacKenzie, Inc. . . . a global financial consulting and advisory firm," as its second expert. Tr.4022:24-4023:2. Mr. MacKenzie is a "certified turnaround professional, certified public accountant, and [has] a Bachelor of Science in accounting from Michigan State University." Tr.4023:5-7. Mr. MacKenzie is "frequently engaged to provide advice and counsel by auto-related entities, including original equipment manufacturers [OEMs,] . . . suppliers who manufacture and sell vehicle parts and systems directly to OEMS, which are commonly referred to as tier one suppliers; other suppliers further down the supply chain; which include tier two, tier three, and raw materials suppliers; and also, financial institutions and investors." Tr.4023:5-14. Mr. MacKenzie has also

served as a Chief Restructuring Officer ("CRO") for numerous middle market companies, as well as for automotive companies including large tier one automotive parts suppliers. Tr.4024:23-4025:4.

Mr. MacKenzie offered two opinions on behalf of the government based on his experience with the auto industry. First, he opined that "without financing from the U.S. Treasury, Chrysler would have immediately liquidated in bankruptcy." Tr.4027:18-20. Second, he opined that "had Chrysler immediately liquidated in bankruptcy, all of Chrysler's dealer franchise agreements, including the Plaintiffs', would have been rejected and had no value." Tr.4027:21-24.

In support of his opinion that Chrysler would have been forced to liquidate in a "but for world" without government assistance, Mr. MacKenzie began by explaining the financial history leading up to the Chrysler bankruptcy, including Chrysler's 1979 financial difficulties, its sale to Daimler in 1998, and its sale to Cerberus in 2007. Tr.4029:8-4030:25. He testified about the $4 billion bridge loan Chrysler received from the government in December 2009, the credit crunches effecting the auto market, the actual world bankruptcy, and Fiat's purchase of Chrysler. He explained that in developing his "opinions . . . [he] assumed that Chrysler had received the $4 billion of bridge financing that was approved by the U.S. Treasury on December 31st, 2008 but did not receive any additional government financing and filed for bankruptcy protection on April 30th, 2009." Tr.4039:16-21.

Mr. MacKenzie explained that in the actual world on April 30th, 2009, Chrysler had $407 million in usable cash but was burning through tens of millions of dollars per day while it continued to manufacture cars. Tr.4046:12-18. He opined that Chrysler

would have been forced to liquidate without government financing because no financial institution would have been willing to provide DIP financing or any other financial assistance to Chrysler in April 2009. Tr.4047:7-17. He explained that because Chrysler had a high cash burn rate and a low amount of cash on hand it could be insolvent, which would result in the Chapter 11 bankruptcy being converted into a Chapter 7 bankruptcy. Tr.4045:8-10.

Mr. MacKenzie explained that there would have been a significant negative impact on Chrysler's lenders, dealers, suppliers, employees, and consumers if it had been forced to liquidate. Tr.4050:19-23. Mr. MacKenzie further explained that in December 2008, Chrysler's warranty obligations totaled $3.75 billion, and that given the low amount of cash Chrysler had on hand it would not have had funds available to finance a warranty program during a liquidation. Tr. 4060:22-4063:24. He also testified that at the time Chrysler would have filed for bankruptcy all of Chrysler's vehicle lines were unprofitable. For example, in 2008 the Jeep brand had a negative $88 million worth, Dodge Ram Truck was worth a negative $111 million, and Chrysler Town & Country was worth a negative $25 million. Tr.4064:19-4065:2.

Mr. MacKenzie testified that, because Chrysler's manufacturing operations were all interconnected, the sale of any individual Chrysler vehicle line would have been difficult and that this would have reduced the value of Chrysler's lines in liquidation. Tr.4065:24-4067:9. Ultimately, Mr. MacKenzie concluded that under a liquidation of Chrysler, there would have been no recovery for any creditors beyond the secured lenders. Tr.4071:21-4072:4.

In his second opinion, Mr. MacKenzie opined that in a Chrysler liquidation, all of the Chrysler franchise agreements, including those of the plaintiffs, would have been rejected. He explained that franchise agreements are executory contracts that can be rejected in a Chapter 11 bankruptcy and if they are not rejected must be assumed by another entity. Tr.4073:5-20. In a Chapter 7 liquidation, Mr. MacKenzie explained that "if a contract is not explicitly assumed by the trustee, the contract is automatically deemed to be rejected." Tr.4073:21-23. Mr. MacKenzie further explained that if Chrysler entered bankruptcy and was no longer manufacturing new cars, or shipping new cars, or reimbursing warranty work, all of which Chrysler was obligated to do under its franchise agreements, the CRO would have had a fiduciary duty to reject the franchise agreements because they imposed obligations on Chrysler that Chrysler would not be able to fulfill. He explained that where the franchise agreements would not generate any profits but potentially subject Chrysler to financial claims from the franchisees, the franchise agreements would be rejected in bankruptcy as soon as possible. Tr.4075:18-4077:2.

Finally, Mr. MacKenzie explained how and why his opinions about a Chrysler bankruptcy without government financing differed from plaintiffs' experts. Mr. MacKenzie testified that he could not find support for plaintiffs' assumption that Chrysler would have had $2 billion on hand rather than the $400 million he identified. According to Mr. MacKenzie, because some of that extra $1.6 billion was held by foreign entities and $846 million of that total was held as collateral by Chrysler's secured lenders, the extra dollars plaintiffs' experts identified would not have been available to help Chrysler get through a wind-down without the consent of Chrysler's creditors. Tr.4078:25-4079:18. Next, Mr. MacKenzie testified that Mr. Berliner's assumption that there would

have been DIP financing was not supported. Mr. MacKenzie explained that in the actual world, it was understood that neither Cerberus nor JP Morgan, first lien creditors, were willing to provide DIP financing to keep Chrysler continuing as an ongoing concern. Tr.4079:19-4081:10. Mr. MacKenzie testified that if there would have been other sources of DIP financing Chrysler would not have needed the $4 billion bridge loan it sought from the government. *See* Tr.4081:8-10.

Mr. MacKenzie explained why he believed that Mr. Berliner's assumption that the government would have funded a warranty program was not supported. Mr. MacKenzie testified that there is no evidence that the government would have funded a warranty program if it had decided not to otherwise provide Chrysler with financial support. Tr.4084:23-4085:1. Mr. MacKenzie testified that Mr. Berliner's opinion that in the first few months of an unassisted Chrysler bankruptcy it would have been business as usual for the dealers was not supported. According to Mr. MacKenzie, Mr. Berliner failed to acknowledge that business as usual would not have been possible if no new vehicles were being produced and Chrysler was not able to meet its warranty obligations or supply franchisees with Chrysler parts. Tr.4087:13-4092:15.

Finally, Mr. MacKenzie testified that Mr. Berliner's reliance on the Daewoo, Saab, and Suzuki bankruptcies was misplaced. He explained several of the major differences between those bankruptcies and a Chrysler bankruptcy without government assistance. Specifically, he testified that in those bankruptcies there was no economic crisis, there was a parent company not going through bankruptcy, and there was continued production of supplies and service during the bankruptcy. Tr.4094:2-4104:8.

### iii.    Judge Robert Gerber

The government called Robert E. Gerber, a retired United States Bankruptcy Judge, who served for more than fifteen years in the United States Bankruptcy Court for the Southern District of New York to address the opinions offered by Judge Fitzgerald. Tr.4162:23-4163:2. Judge Gerber is currently Of Counsel to the law firm of Joseph Hage Aaronson LLC where he provides fiduciary, alternative dispute resolution, and consulting and expert testimony services. He is also an Adjunct Professor of Law at Columbia University Law School, a contributing author to Collier on Bankruptcy, and a Fellow of the American College of Bankruptcy. Tr.4170:11-22. During his judicial tenure, Judge Gerber oversaw many bankruptcy cases, including the GM bankruptcy which followed the Chrysler bankruptcy. Tr.4171:21-4172:3.

Judge Gerber broke his testimony into three parts (1) bankruptcy law and practice, (2) the real-world facts, and (3) a discussion of the bankruptcy cases that Judge Fitzgerald relied on. Judge Gerber first testified about bankruptcy law and practice. Tr.4172:10-14. He explained that liquidity in a Chapter 11 bankruptcy is "paramount." Tr.4172:25. Judge Gerber stated that "Chapter 11 cases live, or die, based on their available liquidity, the cash they need to operate every day." Tr.4173:14-16. He also stated that when all the assets of a debtor are subject to liens, the lien holders have "substantial . . . influence over the Chapter 11 case." Tr.4174:16-25. Judge Gerber explained that when Section 363 sales are used in a Chapter 11 bankruptcy, "bankruptcy judges approve 363 sales, if, but only if, the debtors lack the liquidity to allow the Chapter 11 case to proceed by . . . confirmation of a reorganization plan." Tr.4175:15-21.

147

Judge Gerber testified about DIP financing and how approval of DIP financing is secured. Tr.4184:10-13. He explained that DIP financing differs from the use of cash collateral which is subject to a lien. He testified that "DIP financing is required . . . when use of cash collateral alone will not do." Tr.4186:7-9. Judge Gerber explained that "[s]ources of DIP financing will vary with the amount of cash that's required[.]" Tr.4186:18-20. He explained that "[p]re[-bankruptcy]petition secured lenders are, indeed, a fairly common source of DIP financing, but where the debtor's assets are already entirely subject to prepetition liens, and . . . the prepetition lenders are already underwater, generalizations as to prepetition lenders' willingness to lend more, based on observations of the broader universe of financing transactions, are of little or no value." Tr.4187:15-23. Judge Gerber thus took issue with Judge Fitzgerald's characterization of the government's control of the bankruptcy process as "unusual." He opined that because the government was providing billions of dollars in DIP financing that the government's involvement in shaping the bankruptcy terms was not unusual. Tr.4189:15-20. He explained that DIP lenders normally "exert significant influence over their borrowers as a condition to their providing DIP financing loans." Tr.4190:4-6.

Judge Gerber testified that he also disagreed with Judge Fitzgerald's contention that the speed with which the Chrysler 363 sale took place was unusual. Tr.4193:14-17. Judge Gerber testified that in large bankruptcies 363 sales have become the norm so that the bankruptcy estate can survive long enough to pay back its creditors. Tr.4193:18-4199:9.

Judge Gerber also testified about why the actual world facts needed to be considered in formulating a "but for world" bankruptcy without government assistance.

Judge Gerber testified that he reviewed the declarations that Robert Manzo, Thomas LaSorda, and Robert Nardelli filed with the bankruptcy court, and that these declarations confirmed that there would not have been any DIP financing available to Chrysler. Tr.4208:4-4211:11. Judge Gerber thus found Judge Fitzgerald's opinion that someone would have provided DIP financing to Chrysler in the "but for world" to be unsupported. He explained this was because her opinion rested solely on "what lenders sometimes do, and what the first lien lenders might theoretically have been motivated to do," and not on real-world facts. Tr.4211:12-16. Judge Gerber further explained that the declarations filed in the actual Chrysler bankruptcy also would have ruled out financing by Fiat or from the dealers, as Judge Fitzgerald opined. Tr.4211:24-4212:8.

Judge Gerber next challenged Judge Fitzgerald's assertion that there would have been multiple bidders for Chrysler's assets if there had been an open 363 sale in a "but for world." Judge Gerber testified that Thomas LaSorda filed a declaration with the bankruptcy court in which LaSorda, consistent with his testimony in this court, stated that the government was the last hope because no other auto company was willing to form an alliance with Chrysler despite his extensive efforts. Tr.4217:4-23.

Finally, Judge Gerber took issue with Judge Fitzgerald's opinion that the Suzuki and Hostess bankruptcies were appropriate comparisons for what a Chrysler bankruptcy would have looked like without government financing. Tr.4233:8-20. Judge Gerber testified that American Suzuki "was a distributor but not a manufacturer," which distributed vehicles manufactured by its Japanese parent company Suzuki. Tr.4233:21-4234:4. Therefore, Judge Gerber explained, American Suzuki did not face the same financing and liquidity problems that Chrysler would have faced in its "but for world."

Tr.4234:4-11. Judge Gerber further noted that American Suzuki had sufficient liquidity from its parent and thus would have enough cash to complete the Chapter 11 bankruptcy. Judge Gerber testified that Judge Fitzgerald "fail[ed] to note the essential role played by the Japanese parent in the American Suzuki bankruptcy and the absence of any such benefactor in Chrysler." Tr.4236:18-21.

Judge Gerber next explained that the Hostess bankruptcy was much smaller than that of Chrysler, Hostess was in a more stable financial position, and Hostess had the funding it needed to remain in business during its bankruptcy. Tr.4237:22-25. He also noted that the Hostess stores were owned and operated by Hostess, which meant that Hostess had the responsibility of exacting extra value from them. The Chrysler franchise agreements, in contrast, were not assets of Chrysler but liabilities. Tr.4239:13-24.

On cross examination, Judge Gerber acknowledged that the government's decision to become the DIP financing lender was not consistent with traditional lending practices because the government agreed to take a priority lower than preexisting creditors who already were not likely to be paid in full. Tr.4244:17-21, Tr.4246:4-9. Judge Gerber also acknowledged that the 363 sale in the actual Chrysler bankruptcy was different from a typical 363 sale in that any party wanting to bid for Chrysler's assets had to agree to honor the collective bargaining agreements and the UAW Retiree Settlement Agreement the government had negotiated. Tr.4282:3-25. He also agreed that Chrysler, as an entity, would not have had any interest in what would happen to its contracts with third parties once its assets were acquired by another entity. Tr.4281:21-24.

### iv.      Joseph T. Gardemal

The government presented the testimony of Joseph T. Gardemal III, a managing director with the firm Alvarez & Maral, an international consulting firm, to respond to the valuations performed by Ms. Murphy and Mr. Stockton. Tr.4417:9-22. Mr. Gardemal is a certified public accountant, a certified valuation analyst and a certified fraud examiner. He holds a certification in distress business valuation and is accredited in business valuation by the American Institute of Certified Public Accountants. Tr.4418:2-7. He has been an auditor, forensic accountant, and valuation professional for over thirty years. Tr.4418:11-12. He testified that for the past twenty years he has served as an auditor, valuation professional, and financial consultant to the automotive retail industry and has valued over 100 dealerships. Tr.4418:13-19.

Mr. Gardemal offered the following five opinions regarding Ms. Murphy's expert report: (1) Ms. Murphy appropriately assumed that without government financing Chrysler would have had to enter bankruptcy, (2) Ms. Murphy erred in valuing the entire dealership and not just the franchise agreement, (3) Ms. Murphy's assumptions about the "but for world" were unreasonable and contradicted by the facts, (4) Ms. Murphy's assumption that a Section 363 purchaser would have assumed the franchise agreements of the entire Chrysler dealership network was unreasonable, and (5) Ms. Murphy's valuation opinions were faulty because her growth rate, discount rate, and the terminal value she selected were incorrect and unsupported. Tr.4422:3-4423:10.

Mr. Gardemal offered the following three opinions regarding Mr. Stockton's valuation analysis: (1) that Mr. Stockton appropriately assumed Chrysler would enter bankruptcy in his fair value and lost profit analysis, (2) that some of Mr. Stockton's

assumptions were contradicted by the facts, and (3) Mr. Stockton's valuation and lost-profit scenarios were fundamentally flawed because he failed to provide guidance on which of his multiple (seventeen months, three years or ten years) liquidation scenarios was the appropriate measure, and because he ignored or under-allocated fixed expenses in reaching his profit contribution calculations. Tr.4423:13-4425:4.

Mr. Gardemal testified that, had Ms. Murphy and Mr. Stockton made the correct assumptions, they would have reached the same conclusion he reached:  That at the time of the valuation dates of December 2008 or April 2009, the plaintiffs' franchise agreements would have had zero value. Tr.4426:4-9.

Turning first to Mr. Gardemal's disagreements with Ms. Murphy's valuation opinions, Mr. Gardemal testified that Ms. Murphy made a fundamental error by conflating the value of the plaintiffs' franchise agreements with the value of their dealerships. According to Mr. Gardemal, Ms. Murphy "inappropriately includes assets and profits unrelated to the Chrysler franchise agreement, and she therefore doesn't value the franchise agreement." Tr.4428:17-20. Specifically, Mr. Gardemal stated that Ms. Murphy failed to acknowledge that some of the plaintiffs' income streams were not dependent upon the plaintiff having a Chrysler franchise agreement. Tr.4428:24-4429:3. Mr. Gardemal testified, consistent with Dr. Carron's testimony, that Ms. Murphy should have limited her calculations to the income streams derived solely from new Chrysler vehicle sales, Chrysler warranty work, and discounted sales of Chrysler parts, the three sources of income provided by Chrysler to franchisees. Tr.4429:15-20.

Mr. Gardemal also testified that Ms. Murphy's various assumptions regarding the "but for world" were unreasonable and unsupported. Mr. Gardemal stated that Ms.

Murphy's "assumption that the Chrysler franchise agreements continue on indefinitely is unreasonable and renders her analysis unreliable." Tr.4436:18-20. Mr. Gardemal explained that Chrysler in the "but for world" would have immediately liquidated and terminated production of all of its vehicle lines upon entering bankruptcy. Tr.4437:8-4438:2. Mr. Gardemal thus determined that Ms. Murphy's conclusion that plaintiffs' franchise agreements should have been valued as ongoing Chrysler franchises was not supported. He noted that not only was her conclusion inconsistent with the reality of Chrysler's circumstances, but that plaintiffs' expert, Mr. Berliner, conceded that in the event of a bankruptcy Chrysler would have had to shut down all of its manufacturing facilities and part depots for a period. Tr.4439:24-4440:7.

Mr. Gardemal testified that Ms. Murphy's assumption that a Section 363 purchaser would have maintained or assumed the entire Chrysler dealership network was also unreasonable. Tr.4443:25-4444:4. He noted that Ms. Murphy's assumption was contradicted by the plaintiffs' expert, Mr. Berliner, who testified that some plaintiffs would likely have been eliminated during or right after the bankruptcy. Tr.4445:3-12. Mr. Gardemal noted that Ms. Murphy failed to consider the "risk that a new entity would choose to retain none or only some of Chrysler's prebankruptcy franchises." Tr.4446:15-17. He explained that she did not consider the fact that several of the plaintiffs had failed to meet the MSR over the course of four to five years and thus ran the risk of being rejected in a Chrysler bankruptcy as low-performing franchisees. Tr.4446:23-4447:12. He testified that "[i]n this case, with Chrysler in bankruptcy, and evaluating which dealership contracts to reject, dealers not meeting their MSR would necessarily be at a higher risk of rejection than dealerships meeting their contractual obligations." Tr.4448:18-22.

Mr. Gardemal concluded his critique of Ms. Murphy's valuation by discussing three methodological flaws. First, Mr. Gardemal challenged Ms. Murphy's "expected growth rate projections." He stated that the growth rate projections, "do not appear to be supported by the historical performance of the Model Plaintiffs and are not supported by automotive industry data known at the valuation dates." Tr.4449:21-25. Mr. Gardemal noted that Ms. Murphy assumed that during a Chrysler bankruptcy not only would Chrysler not lose any market share, but that Chrysler's annual sales would grow by 11 percent. Mr. Gardemal testified that this assumption ran counter to the data of what happened during the 2008-09 financial crisis. Tr.4450:13-22. Mr. Gardemal testified that even Chrysler, in its Viability Plan, estimated retail sales to increase only by 5.2 percent from 2009 to 2010, 4.4 percent from 2010 to 2011, and 4.5 percent from 2011 to 2012, with government assistance. Tr.4450:23-4451:2.

Mr. Gardemal also challenged Ms. Murphy's discount and capitalization rates. He testified that they were "understated and inconsistent with the economic facts," resulting in overstated values for the representative plaintiffs. Tr.4453:3-8. Specifically, Mr. Gardemal testified that her discount rate on future profits failed to capture the high risk associated with a potential purchase of the plaintiffs' Chrysler franchise agreements. Mr. Gardemal explained that Ms. Murphy used a small company risk premium ranging between 7.2 and 8.7 percent but should have used a 9.7 risk percentage premium. Tr.4457:1-8. Mr. Gardemal also testified that Ms. Murphy's discount rate was too low for individual franchises because she did not consider specific factors related to their businesses, such as which Chrysler brands they offered or their past performance. Tr.4457:12-4449:20.

154

Finally, Mr. Gardemal challenged Ms. Murphy's terminal value calculation because it failed to account for the distress faced by Chrysler and "the significant volatility to which the Model Plaintiffs were subject." Tr.4459:21-4460:1. Mr. Gardemal testified that Ms. Murphy's annual growth rate of 5%, was improper because the plaintiffs never saw such a high annual growth. Mr. Gardemal noted that Barry's Auto was the best performing dealer with an annual growth rate of 4% while Jim Marsh saw an annual decline of 22% between 2006 and April 2009. Tr.4461:10-15. Mr. Gardemal testified that the "perpetual growth rate of 5 percent is also in contrast to Chrysler's projections at February 2009 that the [Seasonally Adjusted Annual Rate ("SAAR")] would increase at an annualized rate of 4.5 percent -- that's the SAAR for the industry, not specific -- assuming receipt of government funding." Tr.4461:16-20. Thus, Mr. Gardemal concluded that Ms. Murphy's terminal rate was unfounded and thus unreliable.

Next, Mr. Gardemal disputed Mr. Stockton's valuation on two grounds. First, he opined that Mr. Stockton's "assumptions are unreasonable, inappropriate, and contradicted by the economic evidence" and thus his valuations are unreliable. Tr.4464:1-5. Specifically, Mr. Gardemal explained that Mr. Stockton assumed for his fair value and profit contribution value that the government would be providing some financial assistance. Tr.4465:16-18.

Second, Mr. Gardemal testified that "Mr. Stockton's profit contribution calculations for Finnin and Guetterman are flawed and, as I understand it, irrelevant to a taking case. But even if they were relevant, by either ignoring or underallocating fixed expenses, Mr. Stockton has overstated any hypothetical lost profits for these two Model Plaintiffs." Tr.4470:18-24. Mr. Gardemal explained that Mr. Stockton's profit

155

contribution is flawed because he makes aggressive future sale volume projections for the income streams he valued and because he includes profits from income streams that were not associated with the franchise agreement. Tr.4472:1-5. Mr. Gardemal opined that these errors in Mr. Stockton's assumptions made Mr. Stockton's valuations based on lost net profits in a "but for world" unreliable.

### v.   Professor Daniel R. Fischel

The government's last expert was Daniel R. Fischel, the "president of Compass Lexecon, a consulting firm that specializes in the application of economics to a variety of legal and regulatory issues." Tr.4645:23-4646:1. Professor Fischel is also the Lee and Brena Freeman Professor of Law and Business Emeritus at the University of Chicago Law School. He previously served as the Dean of the University of Chicago Law School, the Director of the Law and Economics Program at the University of Chicago, and as Professor of Law and Business at the University of Chicago Graduate School of Business, the Kellogg School of Management at Northwestern University, and the Northwestern University Law School. Tr.4646:2-10. He has "served as a consultant or advisor on economic issues to, among others, the United States Department of Justice, the United States Securities and Exchange Commission, the National Association of Securities Dealers, the New York Stock Exchange, the Chicago Board of Trade, the Chicago Mercantile Exchange, the New York Mercantile Exchange, the United States Department of Labor, the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, the Federal Housing Finance Agency, and the Federal Trade Commission." Tr.4646:20-4647:5. He is also "a member of the American Economic Association and the American Finance Association." Tr.4647:6-7. Professor Fischel has testified in over 50

proceedings in federal and state courts as an expert in valuation, financial institutions, regulation of financial markets, the economic analysis of damage claims, and the economics of government contracts and public and private markets. Tr.4647:15-25.

Professor Fischel offered five opinions, as follows: (1) Chrysler would have needed to liquidate in December 2008 or April 2009, (2) Fiat would not have entered into a business combination with Chrysler absent government funding, (3) the $24 billion that Chrysler needed in DIP financing was unavailable in the private lending market, (4) the terms of the government's assistance were consistent with a commercial desire to protect capital, and (5) plaintiffs' claims are speculative and contradicted by the relevant economic evidence. Tr.4649:11-4650:4.

Professor Fischel testified that Chrysler was insolvent by December 2008 and that without government financial assistance Chrysler would have immediately liquidated. Tr.4655:16-4656:1. He stated that "Chrysler's liabilities exceeded its assets" and that "Chrysler's financial statements show that the fair value of its financial liabilities was only 59 percent of the book value of those same liabilities as of December 31st, 2008." Tr.4656:4-11. Professor Fischel further testified that the value of Chrysler's debt declined from sixty-three cents on the dollar in April 2008 to only twelve cents on the dollar in April 2009. Tr.4656:18-24. Professor Fischel noted that even with the $4 billion bridge loan, Chrysler would have been insolvent in April 2009. Tr.4659:22-4660:15. He explained that the value of Chrysler's assets declined substantially during this time, that Chrysler incurred more debt during this period, and that the value of that debt continued to decline. Tr.4660:8-4662:4.

157

Next, Professor Fischel opined that the economic evidence demonstrated that Fiat would not have entered into a business combination with Chrysler absent government funding. Tr.4665:2-8. Professor Fischel noted that in the actual world, Fiat and Chrysler signed a non-binding term sheet in January 2009 that was conditioned on Fiat not providing any cash and Chrysler receiving $7 billion more from the government. Tr.4665:17-4666:1. Professor Fischel noted that even the March 30, 2009 amended term sheet was conditioned on Chrysler receiving $6 billion in government funds. Tr.4666:10-13. Professor Fischel testified that Fiat's financial condition during 2008 and early 2009 was deteriorating and that Fiat expected to have a negative cash flow for portions of 2009. Tr.4666:13-4667:5. Additionally, Professor Fischel noted that Daimler was not interested in saving Chrysler, having just sold 80% of its stake in Chrysler in 2007 and wanting to offload its remaining 20% interest in late 2008. Tr.4667:17-4669:7.

Professor Fischel testified that the DIP financing Chrysler needed for an orderly bankruptcy would not have been available in the private lending market. Tr.4669:8-12. Professor Fischel explained that in December 2008, Chrysler estimated that it would need $12 to $15 billion for a short one-year bankruptcy and would need up to $17 to $20 billion if there was a lack of financing for its dealers. Tr.4669:13-20; DX956; Tr.4670:4-9; DX1056. Professor Fischel explained the absence of private lending was evident from the fact that no private DIP funding of the size required by Chrysler was provided to any company in 2008 or 2009. Tr.4670:10-16; DX1609. Professor Fischel also noted that plaintiffs did not identify any "plausible source of private DIP financing for Chrysler" and that their suggestion that the first lien lenders would have provided DIP financing is

inconsistent with the economic evidence that shows that Chrysler's debt was continuously being devalued. Tr.4671:2-3, Tr.4671:12-4672:2.

Professor Fischel opined that the conditions placed on Chrysler by the government were consistent with a lender that "seek[s] to reduce the ability of the borrowers to take on excessive risk" in order to ensure that the loan will be repaid. Tr.4676:7-11. However, on cross examination Professor Fischel conceded that the government had public policy goals in mind as well in providing financing to Chrysler. Tr.4766:11-16.

Professor Fischel testified at length about his disagreement with Ms. Keller's opinion that any of the companies identified by Ms. Keller would have been potential buyers of all Chrysler assets at a Section 363 sale. He testified that Blackstone would not have been a potential purchaser because it had experienced financial losses in late 2008 and lacked liquidity, and that Blackstone had stated in the first quarter of 2009 that "lenders continued to severely restrict commitments to new debt [which] limit[ed] industry-wide leveraged acquisition activity levels in both corporate and real estate markets." Tr.4696:2-24.

Next, Professor Fischel explained why Geely or any other Chinese automobile manufacturer would not have been potential purchasers of Chrysler. He explained that in Geely's 2008 annual report, Geely stated that it was not interested in investing in deteriorating automobile markets, and that the president of Shanghai Automotive Industry Corporation said in early 2009 said that there were no acquisition targets in 2009 and that Geely had no plans for acquisitions in the immediate future. Tr.4697:2-17.

Professor Fischel continued to explain that Magna, an Indian automobile manufacturer, would also not have been a potential 363 purchaser. Its credit rating was

downgraded in late 2008 and early 2009 and it was reducing discretionary spending and

deferring capital spending given the decline in auto sales. Tr.4697:18-4698:5. Professor

Fischel testified that Mahindra & Mahindra, another Indian automotive company, would

not have been a potential 363 purchaser because it had stated in January 2009 that it was

not "interested in buying nonenvironmentally friendly vehicles, which likely would have

limited its interest in Chrysler, and Mahindra planned to enter the U.S. market with its

own fuel-efficient SUV." Tr.4698:6-11.

Professor Fischel then discussed Peugeot ("PSA") and Renault and explained why

they also would not have been potential 363 purchasers of Chrysler's assets. He

explained that PSA had been downgraded by Standard & Poor's and Moody's in late

2008 and early 2009 because of negative cash flow and a material deterioration in PSA's

financial flexibility as a result of the reduction in global demand for cars. Tr.4698:12-20.

Additionally, Professor Fischel explained that Renault's credit had also been downgraded

by Standard & Poor's in late 2008 and early 2009 because of the global economic

recession, which would have meant that Renault also would have been in no position to

purchase Chrysler's assets. Tr.4698:21-25.

Professor Fischel explained that Tata Motors would not have been in a financial

position to purchase Chrysler's assets because its credit had been downgraded by both

Standard & Poor's and Moody's twice between November 2008 and March 2009, and

Tata was facing a decreased amount of sales through 2008 and early 2009. Tr.4699:10-

24. Professor Fischel also noted that by March 2009 "Tata faced imminent refinancing

needs, tight liquidity position, weak capital structure, and challenging market conditions."

Tr.4699:21-24.

160

Professor Fischel next explained that Tracinda also would not have been a potential 363 purchaser given that it had sold 7.3 million shares of its common stock in Ford and intended to reduce its holdings in Ford by selling all of its remaining shares. He further explained that Tracinda had announced in October 2008 that it was shifting its investment strategy to gaming, hospitality, and energy. Tr.4699:25-4700:15.

Finally, Professor Fischel explained that neither GM or Ford would have been in a position to purchase Chrysler's assets because they were facing a liquidity and financial crisis of their own and both had their credit scores downgraded several times by the credit rating agencies between 2008 and 2009. Tr.4700:16-4701:15.

Professor Fischel also disputed Ms. Keller's claims that the economy was improving in early 2009. Professor Fischel testified that it was irrelevant that the economy in early 2009 was slightly better than in later 2008 because "[t]he economy was terrible in both periods, and the market for M&A was consequently very poor in both periods." Tr.4701:25-4702:3. Professor Fischel explained that Ms. Keller ignored broad evidence about the economy and instead cherry-picked four data series to suggest that there was a favorable climate for investors to purchase Chrysler's assets. Tr.4702:11-18. He testified that "[e]ven if these were the relevant economic indicators, it is well known that economic recovery does not mean an immediately favorable M&A environment." Tr.4702:19-21. Professor Fischel noted that Ms. Keller ignored other important measurements of economic activity such as unemployment claims, new manufacturing orders, and the sale of light duty vehicles. Tr.4704:15-4705:3.

Finally, Professor Fischel explained why Ms. Keller had not established that a 363 purchaser would have retained the entire dealership network, which Chrysler had on

multiple occasions stated was over-dealered. Tr.4706:14-19. Professor Fischel explained

that even if the examples that Ms. Keller relied on were relevant, "Ms. Keller appears to

recognize that franchise agreements are often terminated in such situations . . . [i]n

particular, she notes that in the cases of Saturn, Hummer, and Saab, the buyers sought to

or did terminate many or all of the dealership franchises." Tr.4707:21-4708:1.

Professor Fischel testified that Judge Fitzgerald's assertions regarding a potential

363 purchaser were also speculative and unsupported. Professor Fischel testified that

Judge Fitzgerald overlooked the economic facts known at the time, including the fact that

several of the potential purchasers she identified were known to have no interest or were

not in a financial position to make an offer. Tr.4708:10-4710:1. Professor Fischel noted

that Judge Fitzgerald's assertion that DIP financing would have been available to

Chrysler absent government assistance was also unsupported and inconsistent with

known economic evidence. Specifically, Professor Fischel noted that despite stating that

first lien lenders would have provided some DIP financing in the "but for world," it was

known that no such financing was offered by the first lien lenders or anyone, which is

why Chrysler had to approach the government as a lender of last resort. Tr.4710:2-

4712:17. Professor Fischel noted the fact that there was some DIP financing available for

other bankruptcies "provides no reliable evidence about what they would have done for

Chrysler." Tr.4714:6-11.

Professor Fischel testified that Judge Fitzgerald also failed to establish how the

plaintiffs' franchise agreements would have had value in a liquidation. He explained that

Judge Fitzgerald did not have any support for her opinion that a hypothetical 363

purchaser would not have rejected the plaintiffs' franchise agreements just as Chrysler

did. Tr.4714:15-25. Professor Fischel testified that he also found Mr. Berliner's opinions about a hypothetical Chrysler liquidation under Chapter 11 speculative and unsupported by the economic evidence. Tr.4718:5-10.

On cross examination, as noted above, Professor Fischel agreed that Treasury's investment in Chrysler was not made purely for the purposes of seeing a return on any prior investment. Tr.4765:1-25. Professor Fischel agreed that part of the government's motivation in aiding Chrysler was to save the American auto industry and economy. Tr.4736:5-8, Tr.4738:10-13, Tr.4766:11-16. Professor Fischel also acknowledged that he agreed with Judge Gerber's assessment that no rational lender would have provided DIP financing at a lower priority of repayment than preexisting creditors who were already unlikely to be paid in full. Tr.4738:24-4739:23.

## IV.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    Legal Framework

In *A&D Auto Sales*, the Federal Circuit held that there may be circumstances where the government is liable for a Fifth Amendment taking based on actions taken by a third party at the direction of the government or on the government's behalf. 748 F.3d at 1154. The Circuit in *A&D Auto Sales* distinguished between government actions that have unintended or collateral effects on third parties and do not give rise to a taking, citing *Omnia Comm. Co. v. United States*, 261 U.S. 502, 510-11 (1923), and government actions involving third parties that may give rise to a taking. *A&D Auto Sales*, 748 F.3d at 1153-54. The Circuit explained that there are two paths through which government action involving a third party may result in takings liability. First, the Circuit stated, "the government may be liable [for a taking] if a third party is acting as the government's

agent." *Id.*at 1154. Here, the plaintiffs concede that Chrysler was not acting as the government's agent when it filed for bankruptcy in April 2009 and thus this avenue for liability outlined by the Circuit has been foreclosed. *See supra* n.4. Second, the Circuit explained that plaintiffs may be able to establish a taking if "the government's influence over the third party [(here, Chrysler)] was coercive rather than merely persuasive." *A&D Auto Sales*, 748 F.3d at 1154 (citations omitted). The plaintiffs maintained throughout the course of this trial that the government's actions rose to the level of coercion.

The Circuit acknowledged in *A&D Auto Sales* that the "question of coercion is . . . complex." *Id.* The Circuit went on to discuss a case where the government's actions were deemed coercive enough to give rise to a taking, as well as cases where the government action at issue was not sufficiently coercive. *Id.* at 1154-56 (citing *Turney v. United States*, 125 Ct. Cl. 202, 207-08, 214 (1953); *Langenegger v. United States*, 756 F.2d 1565, 1572 (Fed. Cir. 1985); *B&G Enters. v. United States*, 220 F.3d. 1318, 1318-25 (Fed. Cir. 2000)). All the above-cited cases dealt with the federal government endeavoring to assert control over a foreign state or state government, situations that are very different from this case. *See Turney*, 125 Ct. Cl. at 208-08, 214 (finding that the government exercised unusual influence over the Philippines when it induced the Philippines to forbid the exportation of certain military equipment that the United States had sold in a surplus action to private parties after World War II); *Langenegger*, 756 F.2d at 1572 (finding that the United States' influence over an expropriation by the El Salvadoran government was not coercion but "friendly persuasion" because, in part, diplomatic persuasion among allies is a common occurrence and cannot be deemed sufficiently irresistible to be coercive for takings purposes); *B&G Enters.*, 220 F.3d at

1318-25 (finding that California was not coerced into passing a law banning cigarette

vending machines in order to receive a federal grant and that the federal government was

not liable for a taking to those who owned cigarette vending machines). These cases do,

however, demonstrate that to prove coercion by government action there must be

evidence that the coerced did not act voluntarily.

To assist the court in deciding whether Chrysler did not act voluntarily and was

coerced into filing for bankruptcy and rejecting plaintiffs' franchise agreements, the

Circuit identified several issues it deemed relevant. As noted at the outset of this decision,

the Circuit stated that the trial court should examine "whether the government insisted on

the [franchise] terminations, whether the terminations would have occurred in any event

absent government action, whether the government financing was essential to the

companies, whether the government had any role in creating the economic circumstances

alleged to give rise to coercion, and whether the government targeted the dealers for

termination." *A&D Auto Sales*, 748 F.3d at 1155. The Circuit's list is consistent with the

plain meaning of coercion. *See Coercion*, Black's Law Dictionary (11th ed. 2019)

("Compulsion of a free agent by physical, moral, or economic force or threat of physical

force [or] . . . [c]onduct that constitutes the improper use of economic power to compel

another to submit to the wishes of one who wields it."); *Coerce*, Merriam Webster Online

Dictionary ("[T]o compel to an act or choice[,] to achieve by force or threat[.]").

Importantly, the plaintiffs did not focus their coercion evidence on Chrysler's need

for government financing. Instead, the plaintiffs focused their evidence on the

government's insistence on certain terms. Plaintiffs presented expert opinion testimony to

the effect that the government's involvement limited the options that would have been

available to Chrysler in a bankruptcy without government assistance. Specifically, plaintiffs presented expert opinion testimony which claimed that Chrysler would have remained operational during a bankruptcy without government assistance and that none of plaintiffs' franchise agreements would have been rejected.

To meet their burden of proving that the government by its actions forced the involuntary reduction of Chrysler franchises by rejection of the franchise agreements in the Chrysler bankruptcy, the court finds that the plaintiffs needed to establish that the government either expressly directed Chrysler to accept the government's negotiated prepackaged bankruptcy plan or took away other options available to Chrysler at the time in question. In this connection, it is important to note that Chrysler came to the federal government voluntarily for financial assistance – outside of any formal federal government grant or lending program with specific requirements – and voluntarily agreed to submit a Viability Plan, in which Chrysler proposed a significant reduction in the number of its franchises. It is plaintiffs, not Chrysler, that claim they would have been better off had the government not gotten involved by providing assistance to Chrysler.

The court finds that the government's evidence overwhelmingly established that Chrysler's decision to accept the government's prepackaged bankruptcy plan was not forced on Chrysler by the government. The evidence established that Chrysler's decision to accept the government's terms for financial assistance through bankruptcy was voluntary and not coerced. The evidence established that Chrysler's decision to accept the government's prepackaged bankruptcy plan was based on Chrysler's best business judgment. Indeed, the evidence established that, without the government's financial

assistance, Chrysler would have been liquidated under Chapter 7, which would have resulted in a worse outcome for not only the Chrysler brand but for all plaintiffs.

**B.    The Government's Prepackaged Bankruptcy Plan Was Negotiated for a Public Purpose, but the Government Did Not Force Chrysler to Accept Its Prepackaged Bankruptcy Plan, Was Not Responsible for Causing Chrysler's Financial Difficulties, and Did Not Interfere with Chrysler Pursuing Any Other Options**

To begin, the court finds that the government's prepackaged bankruptcy plan included terms and conditions that would not have been required by traditional lenders and were included for various public purposes, including saving manufacturing jobs in Michigan and supporting the UAW's pension plan. The court finds that in negotiating certain terms in its prepackaged bankruptcy plan, the government was acting, at least in part, in its governmental capacity. To establish coercion, however, plaintiffs had to prove that the government by its actions forced Chrysler into bankruptcy to achieve the government's goals. This the plaintiffs failed to do.

**i.    Fact witnesses established that Chrysler was not forced to accept the government's terms but did so based on its "best business judgment," and that Chrysler's financial problems pre-dated the Great Recession and were not caused by the government.**

The testimony of Chrysler's executives Mr. Nardelli, Mr. Landry, Mr. LaSorda, Mr. Grady, and the Auto Team leaders, Mr. Rattner and Mr. Bloom, established that the government never threatened Chrysler's management in order to secure acceptance of the government's prepackaged bankruptcy plan. While it was not disputed that Chrysler would have preferred for the government to have given Chrysler billions of dollars outside of bankruptcy, there was no evidence to show that Chrysler was directly forced into accepting the government's assistance when bankruptcy became Chrysler's only

option. Each witness with personal knowledge testified that the government never forced

Chrysler to take any action. *See, e.g.*, Tr.3383:14-17, Tr.3384:3-17. In this regard, it is

important to note that the evidence established that Chrysler's bankruptcy was triggered

when certain first lien holders refused to sign onto the government's negotiated deal

outside of bankruptcy. Tr.1653:14-1654:11. Mr. Rattner testified that the government

would have accepted Chrysler's negotiated plan outside of bankruptcy had an agreement

been reached. Tr.1653:24-25 ("Nobody wanted to be in bankruptcy if we could avoid

it."), Tr.1654:9-11 ("[T]here was some chance right up until the end of April that

bankruptcy could have been avoided."); *see also* Tr.1642:4-11 (Mr. Rattner's testimony

that the Auto Team considered a "variety of options . . . some of which didn't include

bankruptcy"), Tr.2715:11-15 (Mr. Bloom's testimony that "we worked hard to find a path

to viability without bankruptcy").

 The evidence of the government's fact and expert witnesses also established that

the government did not act to keep Chrysler from making any other deal outside of the

government's prepackaged plan in order to achieve viability. The evidence established

that Chrysler was always free to reject the government's prepackaged bankruptcy plan

and go it alone in bankruptcy. Indeed, the government offered Chrysler $750 million to

add to Chrysler's remaining cash in order to wind-down Chrysler in a bankruptcy outside

of the government's prepackaged bankruptcy plan. DX1263 ("[E]ven if the Company

were to liquidate . . . [Treasury] would provide additional funds to the Company so that it

had $750 million to facilitate an orderly liquidation."); Tr.3373:6-11, Tr.3377:6-23.

 The evidence further established that Chrysler accepted the government's

prepackaged bankruptcy plan because Chrysler decided the plan was Chrysler's best

business option. Mr. Manzo's testimony established, based on Chrysler's financial

statements and contemporaneous economic data, that Chrysler would have been forced to

liquidate without government assistance because it could not get any more money from

any other source in late 2008. Specifically, Mr. Manzo explained that when Chrysler

approached the government in 2008, it was experiencing a rapid cash burn rate of $2

billion a month, which meant that the company had only three to four months left before

Chrysler would have to close down. Tr.3931:18-3932:9. Mr. Manzo's testimony also

established that the first lien lenders (the lien holders represented by JP Morgan) were not

willing to provide any more money to Chrysler either in or outside of bankruptcy.

Tr.3946:2-3947:18. ("[The first lien lenders] rejected the invitation to lend more

money."). Mr. Manzo further explained that due to the Great Recession and the financial

problems potential purchasers were facing, the proceeds from Chrysler's sale of its assets

in a liquidation would be depressed. Tr.3943:16-3944:23. Mr. Manzo estimated that in a

liquidation the $7 billion lien holders would likely recover only between $654 million to

$2.6 billion. DX1029.

     The government's fact witnesses also established and the court finds that Chrysler

had a history of financial problems that pre-dated the 2008-09 financial crisis and that

these financial problems were not created by the government. The government's evidence

established that Chrysler began exploring the possibility of an alliance with another

automaker in 2007, well before the recession, after the merger with Daimler had proven

unsuccessful. Mr. LaSorda, Chrysler's CEO from 2005 until 2007, testified at length

about Chrysler needing to find an alliance with another car company to remain

competitive. Tr.4342:20-23, Tr.4357:10-4358:22, Tr.4361:11-12 ("We needed the cash to

169

survive and stay out of the ultimate case of bankruptcy."). Mr. LaSorda's undisputed

testimony confirmed that Chrysler would not be viable without an alliance or partnership

with a small car manufacturer. *Id.* Mr. LaSorda explained that during 2007 he attempted

to form an alliance with Nissan Renault, Honda, Kia, Hyundai, Toyota, Volkswagen,

Tata Motors, and various Chinese manufacturers, but none of these companies expressed

any interest in forming an alliance with Chrysler, sharing vehicle platforms and

technology, or in injecting any capital into Chrysler. Tr.4359:6-9, Tr.4360:2-4361:25,

Tr.4365:11-22, Tr.4366:1-4368:3. Mr. LaSorda specifically noted that the only company

that expressed any interest in forming an alliance with Chrysler was Fiat, but that Fiat

was not interested in injecting any cash into the alliance to help sustain Chrysler.

Tr.4375:2-4377:17, Tr.4379:10-20 ("It was absolutely clear that [Fiat] would put no

capital up, zero."). Mr. LaSorda's testimony, together with the testimony of Professor

Fischel, discussed *infra*, convincingly refuted Ms. Keller's opinion, offered on behalf of

the plaintiffs, that many companies were and would have been interested in purchasing or

forming a partnership with Chrysler in 2009, but were likely dissuaded from approaching

Chrysler because of the government's involvement. The court finds that Ms. Keller's

opinion was unsupported and wholly speculative on this point.

Finally, Mr. Nardelli, Chrysler's CEO from 2007 until April 30, 2009, established

through his testimony that the government did not force its prepackaged plan on Chrysler

but that Chrysler's decision to accept the prepackaged bankruptcy terms negotiated by the

government was voluntary on the part of Chrysler's board and dictated by Chrysler's

"best business judgment." He explained that he believed that the government's

prepackaged bankruptcy plan was the only way to ensure the continuation of the Chrysler

brand. Tr.3382:21-3383:17, Tr.3384:9-3385:16.

> **ii.** **The government's expert witnesses confirmed that acceptance of the government's plan was consistent with Chrysler's "best business judgment" and thus was a voluntary decision and not coerced.**

The government's expert witnesses confirmed for the court that accepting the

government's prepackaged bankruptcy plan was in Chrysler's best business interest and

thus was a voluntary decision and not coerced. The government's experts also confirmed

that the government never interfered with Chrysler pursuing, on its own, any other option

in 2009. The court finds that the testimony of Mr. MacKenzie, former Bankruptcy Judge

Gerber, and Professor Fischel established that Chrysler would have been forced into

immediate liquidation without government assistance and that, under that scenario, the

plaintiffs would have suffered a worse fate than they experienced under the government's

negotiated bankruptcy plan. As explained below, the evidence established that if Chrysler

had immediately closed all its factories and parts depots, plaintiffs would not have had

any ability to, among other things, do warranty and other service work requiring Chrysler

parts while they closed their franchises.

Mr. MacKenzie, a certified turnaround professional with extensive auto industry

experience, persuasively testified that Chrysler faced immediate liquidation in a

bankruptcy without government assistance and that all of Chrysler's franchisees, in that

circumstance, would have faced immediate rejection of their franchise agreements.

Tr.4027:18-24. Mr. MacKenzie explained that in April 2009, at the time of the alleged

taking, Chrysler had only $407 million left in useable cash and was burning through tens

of millions a day. Tr.4046:12-18. He persuasively explained why he rejected Mr. Berliner's contention that Chrysler had adequate resources for an orderly wind-down based on Chrysler's access to an additional $1 billion. Specifically, Mr. MacKenzie persuasively explained that Chrysler would not have been able to easily access the amounts of money it had outside the United States and that the $400 million was simply not enough to allow for an orderly wind-down in Chapter 11. Tr.4078:25-4079:18, Tr.4075:7-17.

Mr. MacKenzie also convincingly opined that there was no entity willing to offer debtor-in-possession or DIP financing to Chrysler in 2009. Tr.4079:19-4081:10. For this reason, Chrysler would have faced immediate liquidation under Chapter 7. He explained that in that circumstance all of Chrysler's factories would have had to have been closed and that Chrysler parts also would not have been available. Tr.4075:7-4076:3. He also claimed that suggestions that Chrysler would have been an attractive purchase to other auto manufacturers or private equity firms was without support because each of Chrysler's major brands was worth a negative amount. Tr.4064:11-4065:2.

He further testified that, contrary to the testimony of plaintiffs' witnesses, Chrysler franchisees would have put a significant potential drain on Chrysler's resources and thus would have had their franchise agreements rejected in bankruptcy. He testified that Chrysler owed $3.75 billion in warranty obligations to its franchisees. Tr.4060:22-23. This was money Chrysler did not have. Mr. MacKenzie explained that in a Chapter 7 liquidation, because Chrysler would have stopped making cars and trucks, the franchisees would no longer be needed to buy cars and trucks from Chrysler. Tr.4075:7-4076:16. Rather, the franchisees would have become Chrysler creditors. Chrysler would have

172

continued to incur warranty debts from its franchisees as well as other expenses. Tr.4076:17-23 ("[I]f any warranty work was completed by the dealers, this would have generated new post-petition liabilities for Chrysler."). For these reasons, Mr. MacKenzie persuasively established that a bankruptcy trustee would have rejected the franchise agreements as soon as possible after the bankruptcy filing to avoid any additional franchisee drain on the bankruptcy estate. Tr.4076:24-4077:2 ("Considering all of this, the CRO would have had a fiduciary duty to reject each of the over 3100 dealer franchise agreements, including the Plaintiffs', as soon after the bankruptcy filing as possible."). In this connection, Mr. MacKenzie also persuasively explained that he saw no basis for plaintiffs' assumption that the government would have elected to continue to cover Chrysler warranties, once Chrysler began to liquidate. Tr.4084:23-4085:1. The court agrees with Mr. MacKenzie and finds that Mr. Berliner and Judge Fitzgerald's assumption regarding the government paying for warranties was not supported.

Mr. MacKenzie's opinions were confirmed by former Bankruptcy Judge Gerber. The court is mindful that Judge Gerber was the bankruptcy judge in the GM bankruptcy and thus came to this case with some inside knowledge of certain issues and a stake in supporting the approach taken by the bankruptcy judge in the Chrysler bankruptcy case. Nonetheless, the court found Judge Gerber to be a highly credible witness and was persuaded by his opinions, which were confirmed by facts.

First, Judge Gerber opined that Chrysler had no source of DIP financing if the government were not available and thus Chrysler would not have been able to continue as an ongoing business during a Chrysler bankruptcy without government funding, as plaintiffs' experts assumed. Tr.4211:12-4212:20. He persuasively opined that the many

billions of dollars needed to keep Chrysler operational during a wind-down pending a potential Section 363 sale was not available from private parties during the Great Recession. Tr.4212:21-4213:4 ("Thus, we see the refusal to provide the necessary funding by the secured lenders and Chrysler's inability to get the funding from anyone else."). In this regard, he persuasively testified that the other bankruptcies Judge Fitzgerald relied on to support her opinion that DIP financing would have been available from the private sector were not comparable and thus not relevant to understanding the challenges Chrysler would have faced in bankruptcy without government assistance. Tr.4233:8-20 ("I can't see how Suzuki and Hostess . . . are in any meaningful way analogous to Chrysler."). Judge Gerber opined that for these reasons Chrysler would have been quickly forced into a Chapter 7 bankruptcy which would have been a disaster for Chrysler and for all the plaintiffs.[44] Tr.4213:24-25 (noting the only other alternative is immediate liquidation).

Professor Fischel, with his extensive expertise, provided persuasive testimony which confirmed to the court that Ms. Keller's opinions were based on pure speculation. Professor Fischel, who is an expert on a broad range of economic issues, explained that Chrysler's debt was selling for twelve cents on the dollar in April 2009, a clear indication of the market's lack of confidence. Tr.4656:18-4657:24. He explained that Chrysler would have needed $12 to $15 billion for a short one-year unplanned bankruptcy and the

---

[44] The court understands that Mr. Rattner testified that the government decided it could not let Chrysler fail because it would adversely affect the auto suppliers. How this would have played out had Chrysler not accepted the government's prepackaged bankruptcy was not, however, discussed at trial by either party. There was no evidence introduced to suggest that in finding some way to save suppliers, the plaintiffs would have fared any better than they did in the actual world.

lack of private DIP financing was evident from the fact that the total amount of private

DIP financing provided to all companies together was $12.5 billion in 2008 and $21.6

billion in 2009. Tr.4669:13-20; DX956; Tr.4670:4-9; DX1056.

In his testimony regarding each of the 12 potential buyers identified by Ms. Keller,

Professor Fischel systematically and convincingly explained why none of the potential

buyers identified by Ms. Keller either had the interest or the wherewithal to buy all of

Chrysler's assets in a 363 sale. Tr.4696:2-4701:15. His testimony regarding potential

Chrysler purchasers was well-supported and, based on his testimony and Mr. LaSorda's,

the court finds that there was no purchaser for Chrysler among the 12 entities Ms. Keller

identified. This evidence again confirmed for the court why Chrysler's decision to accept

the government's prepackaged bankruptcy plan, which allowed the Chrysler brand to

survive, was voluntary.

### iii. Plaintiffs' experts' opinions regarding Chrysler and franchisees in a bankruptcy without government action were unsupported.

As noted at the outset of this opinion, plaintiffs concede that Chrysler would have

had to enter bankruptcy if the government had not provided financial assistance in 2009.

They contend, however, that Chrysler did not need government assistance and that

Chrysler's fate in a bankruptcy without the government's aid would have allowed

plaintiffs to have experienced a better outcome. Plaintiffs supported their position with

expert testimony, which, as discussed above, was not supported by facts. None of the

plaintiffs' experts presented facts to show that Chrysler had a viable option of going it

alone in bankruptcy and surviving in a reorganization or with a purchaser as an ongoing

business with all brands continuing to be manufactured. There was no evidence to

support Mr. Berliner's or Judge Fitzgerald's opinions that Chrysler would have been able

to obtain the more than the $10 billion in DIP financing Chrysler would have needed for

a twelve- to twenty-four month period while waiting for a new purchaser to take over the

manufacture of Chrysler's lines. *See* Tr.138:10-14, Tr.694:3-7. Mr. Berliner and Judge

Fitzgerald failed to provide any economic data or facts from late 2008 and early 2009 to

support their opinions that, despite economic conditions at that time, Chrysler would have

been able to obtain billions in private DIP financing to continue manufacturing cars and

trucks without disruption and thus Chrysler would have had a reason to keep all of its

franchise agreements.[45]

   As discussed above, Professor Fischel's testimony established that plaintiffs'

claims of a successful Chapter 11 bankruptcy in which Chrysler would have been able to

continue operations while interested purchasers bid for Chrysler was not supported.

Indeed, Ms. Keller could not identify which of any of the 12 potential buyers she

discussed had an actual interest in buying Chrysler in a 2009 bankruptcy. Nor could she

estimate how much any Section 363 buyer would have been willing to pay for Chrysler in

a Chrysler bankruptcy without government assistance. Tr.1123:11-23, Tr.1124:2-14.

   Ms. Keller also opined, without reference to any corroborating evidence, that the

Auto Team's involvement in preparing Chrysler's Viability Plan discouraged interested

buyers from coming forward to buy Chrysler in 2009. Tr.1086:22-1087:9, Tr.1155:21-24,

Tr.1159:22-25, Tr.1160:15-16. She testified that in bankruptcy she believed Chrysler

---

[45] Importantly, Mr. Berliner testified that it was possible that some franchise agreements would
have eventually been rejected in a Chrysler bankruptcy without government assistance.
Tr.203:19-204:25. Ms. Keller also was confronted on cross examination with an article in which
she stated that Chrysler had too many dealers. Tr.1148:1-1149:11.

would have been attractive to many buyers. Tr.1121:11-17. This is not true. As discussed

above, Mr. LaSorda testified that he had spoken to many of the potential buyers she

identified, and none were interested, save for Fiat. Professor Fischel went through each of

her proposed prospects and credibly explained based on facts why none would have been

interested or able to acquire Chrysler in April 2009. Ms. Keller's entire testimony was

credibly refuted by Mr. LaSorda and Professor Fischel.

Without any source of DIP financing, and with only $400 million of cash in hand,

the court finds that Chrysler would have been forced to liquidate under Chapter 7 without

government assistance, which would have resulted in Chrysler stopping all car and truck

production and would have resulted in all franchisees losing their franchise agreements in

a Chapter 7 bankruptcy.

### C.   Plaintiffs Failed to Establish that the Government Coerced Chrysler to Reject Any of the Plaintiffs' Franchise Agreements in Bankruptcy

The court finds that plaintiffs also failed to establish that the government coerced

Chrysler into using the bankruptcy as a means of ending plaintiffs' franchise agreements

through the involuntary method of bankruptcy rejections. The evidence established that

Chrysler had been working on reducing its franchise network for years. The fact that

rejecting franchise agreements in bankruptcy would make the reduction of its franchise

network easier was obvious to Chrysler while it was considering options during the

viability planning process in 2009. Tr.3611:23-3612:4 (Mr. Landry's testimony that a

reduction in the dealership network was necessary "for Chrysler's survival"); *see also*

Tr.3463:25-3480:4 (Mr. Landry's testimony describing history of Chrysler's dealership

network).

The evidence also established – and plaintiffs do not dispute – that the government did not have any hand in deciding the number of franchise agreements to reject or in identifying any individual franchise agreements to reject. *See, e.g.*, Tr.2724:15-18 (Mr. Bloom testified that the government "did not get into the details of management decisions behind Chrysler's selection of individual dealers to reject."). Rather, the decisions regarding which franchise agreements to reject were made by Chrysler based on a series of objective criteria developed by Chrysler. *See* Tr.3463:25-3480:4 (Mr. Landry's testimony describing history of Chrysler's dealership network), Tr.3598:8-3602:11 (Mr. Grady's testimony describing the criteria). At no time did any Chrysler witness testify that franchise reduction did not make good business sense and was only advanced to meet a government goal of "shared sacrifice," as plaintiffs contended. The Chrysler bankruptcy afforded Chrysler an opportunity to reduce its franchise network more expeditiously and Chrysler took advantage of that opportunity. *See* Tr.3564:11-13 (Mr. Landry's testimony that "after we were in bankruptcy . . . we were able to be more aggressive with Project Genesis, which created Project Tiger.").

The government accepted Chrysler's judgment that its franchise network needed to be reduced and Chrysler decided how many franchise agreements to keep and which ones to reject. *See* Tr.2686:22-25 (Mr. Bloom testified that "[a]lthough [the government] engaged in dialogue and discussion with company management about the companies' approaches, we were not to substitute our judgment about specific decisions for theirs."), Tr.1664:20-1665:12 (Mr. Rattner testified that the government "never got into the question of which dealers, how, or anything of that sort" but rather was looking at it from a macro level of how many.). The plaintiffs thus failed to prove that the decision to

reduce the Chrysler franchise network by rejecting franchise agreements in bankruptcy, rather than terminating franchisees under various state laws, was imposed on Chrysler by the government through coercion.

> **D.     Plaintiffs Failed to Establish by a Preponderance of the Evidence that Their Franchise Agreements Would Have Had Value in a "But For World" Without Government Assistance**

The court also finds for the reasons set forth below that plaintiffs failed to establish by a preponderance of the evidence that their franchise agreements would have had value in a "but for world" without government assistance.

As discussed above, the *Alley's* and *Colonial* plaintiffs used different experts to establish that their franchise agreements would have had value in a "but for world" without government assistance. The *Alley's* plaintiffs offered in addition to Mr. Berliner, Judge Fitzgerald, and Ms. Keller the opinion testimony of Ms. Murphy, and the *Colonial* plaintiffs relied on the testimony of Mr. Stockton. Ms. Murphy and Mr. Stockton's opinions were based on different assumptions but neither of these expert opinions credibly established that plaintiffs' franchises had value in a "but for world" without government assistance.

> **i.      The *Alley's* plaintiffs failed to establish that their franchise agreements had value in a "but for world."**

Although Ms. Murphy has extensive experience valuing auto dealerships, because the assumptions she was given by counsel were not supported, the valuations she prepared for each of the *Alley's* plaintiffs were likewise unsupported. Specifically, Ms. Murphy's valuation opinions rested on her contention that in a "but for world" in which Chrysler went into bankruptcy without government assistance, Chrysler would have

continued production of either all of its car and truck lines or all of its truck lines with little or no interruption and that plaintiffs would have continued to sell and service Chrysler cars without interruption indefinitely. Tr.1404:16-1410:3, Tr.1747:9-14, Tr.1748:24-1749:3. She also opined based on the assumptions she was given that Chrysler would have been sold in Chapter 11 and that any Section 363 purchaser would have assumed all of Chrysler's franchise agreements, including plaintiffs' agreements. *See* Tr.1408:15-1409:19. Relying on these assumptions, Ms. Murphy projected the sales volume growth of plaintiffs' franchises for a period of five years and with that number she applied a discount rate to find a fair market value for each franchise. Tr.1425:22-1426:5, Tr.1427:23-1428:8, Tr.1428:11-18, Tr.1431:18-21. Ms. Murphy admitted that her valuation included not only an estimated discounted cash flow but also included the value of all tangible assets of the dealership including the equipment, parts, land and other cash assets that would be part of any normal sale of a dealership with a franchise agreement. Tr.1542:2-22. She did not separately analyze how these tangible assets contributed to the plaintiffs' income stream profits, separate from the franchise agreement allegedly taken.

Because the court has found that Ms. Murphy's assumptions regarding Chrysler's fate in bankruptcy without government assistance were not supported and indeed were contrary to the facts known at the time in 2009, the court finds that Ms. Murphy's opinion of economic value in a "but for world" without government assistance for each of the 7 representative plaintiffs she analyzed must be rejected. As discussed above, the plaintiffs failed to prove that without government assistance Chrysler could have continued to manufacture cars or trucks. Rather, the outcome for Chrysler in a world without

government assistance was liquidation under Chapter 7. Ms. Murphy did not consider the value of plaintiffs' franchise agreements in a Chrysler Chapter 7 bankruptcy.

The court therefore finds that, in a Chapter 7 bankruptcy, the plaintiffs' franchise agreements would have had zero fair market value.[46]

> ### ii.   The *Colonial* plaintiffs failed to establish that their franchise agreements had value in a "but for world."

The court finds that the *Colonial* plaintiffs failed to prove that the Guetterman and Finnin franchises would have had value in a "but for world" without government assistance. Mr. Stockton's valuation opinions were not based – as Ms. Murphy's was – on Chrysler's survival as an ongoing business during a bankruptcy without government assistance. Rather, he valued the Finnin and Guetterman franchises using the assumption that Chrysler would have stopped manufacturing cars and trucks during a bankruptcy wind-down. *See* Tr.2366:5-20. Mr. Stockton nonetheless opined that Chrysler would not have had any reason to reject Finnin and Guetterman's franchise agreements during a Chapter 11 bankruptcy wind-down because Chrysler would have wanted the franchisees to sell Chrysler's existing inventory and because he believed the government would have funded Chrysler's warranty work, which would have provided plaintiffs with another

---

[46] There were numerous other problems with Ms. Murphy's opinion. She assumed a growth rate of 5% that was wholly unsupported and a discount rate that was not supported by the economic circumstances of the time at issue. Tr.1469:19-24. It is not necessary to review all the other unsupported assumptions and problems raised by her opinions, because her fundamental assumption regarding Chrysler's fate in a bankruptcy without government assistance was not supported.

income stream, along with used cars and other service, depending upon how many years it took to wind-down Chrysler.[47] Tr. 2446:5-10.

As discussed above, the court finds, based on Mr. MacKenzie's testimony, that there is no support for the assumption that the government would have funded warranty work in a "but for world" without government assistance. There was no evidence presented to show that the government paid for warranties during any other auto bankruptcy. While it is true that the government offered to pay for warranties on new Chrysler cars in March through April 2009, there was never a discussion of the government offering to continue that program. Mr. Stockton's assumption regarding government payment of warranty work was based on pure speculation.

In addition, the court finds based on Mr. MacKenzie and Judge Gerber's testimony that in a "but for world" without government assistance, Chrysler would have been forced into Chapter 7 and that a trustee in bankruptcy would have rejected all franchise agreements to protect the assets of the bankruptcy estate. In a Chapter 7 liquidation scenario, not only would Chrysler face continued liability for the warranty work it had not paid to franchisees, but Chrysler would have also faced liability under its franchise agreements for the cost of repurchasing inventory and parts. Thus, as Mr. MacKenzie and Judge Gerber explained, there would have been every reason for the bankruptcy trustee to immediately reject all franchise agreements.

---

[47] Mr. Stockton also posited a valuation scenario where Chrysler went out of business but others licensed the Chrysler name, and that under that scenario franchisees could have continued on forever as "licensed Chrysler" dealers. That scenario, of course, does not involve a franchise agreement with Chrysler and is thus irrelevant.

Finally, Mr. Stockton's valuation opinions must be rejected on the grounds that the opinions are based on a lost profits model and not on fair market value. The government is not liable in a taking of lost profits unique to the owner but only for what the property is worth in a fair market. *See A&D Auto Sales*, 748 F.3d at 1157; *see also Yancy v. United States*, 915F.2d 1534, 1542 (Fed. Cir. 1990) (citing *United States v. General Motors*, 323 U.S. 373, 380 (1945)). Here, Mr. Stockton conceded there was no fair market for the franchise agreements. Tr. 2359:4-9, Tr.2454:20-23, Tr.2590:12-16.

Based on the foregoing, the court finds all the representative plaintiffs failed to meet their burden of proving that their franchise agreements would have had economic value in a "but for world" without government assistance by a preponderance of the evidence. For this reason, as well, the plaintiffs' taking claims fail.

## CONCLUSION

The taking claims of representative plaintiffs Taylor & Sons, Inc., Cedric Theel, Inc., Whitey's Inc., RFJS Company, Jim Marsh American Corp., Livonia Chrysler Jeep, Inc., Barry Dodge, Inc., Guetterman Motors, Inc., and Mike Finnin Motors, Inc. are hereby **DENIED**. There being no just reason for delay, the court directs the Clerk of the Court to enter judgment for the Defendant regarding these claims pursuant to Rule 54(b). The parties shall have until **November 1, 2019** to file a status report proposing a schedule for next steps to resolve the litigation of the remaining rejected Chrysler and GM franchisees.

 **IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge